# Exhibit "B" -2

## Secured Convertible Note Purchase Agreement

**COINTERRA, INC.**

**SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT**

**AUGUST 1, 2014**

AUS:678594.12

# TABLE OF CONTENTS

**Page**

1.  The Notes. ................................................................................................................. 1

   1.1  Authorization of the Notes ................................................................................. 1
   1.2  Purchase and Sale of the Notes ......................................................................... 1
   1.3  Charter Amendment ........................................................................................... 1
   1.4  Closings ............................................................................................................. 2

2.  Security Interest ........................................................................................................ 2

3.  Representations and Warranties of the Company ..................................................... 2

4.  Representations and Warranties of the Investors ...................................................... 3

   4.1  Authorization ..................................................................................................... 3
   4.2  Purchase Entirely for Own Account .................................................................. 3
   4.3  Disclosure Information ...................................................................................... 3
   4.4  Experience; Accredited Investor ....................................................................... 3
   4.5  Restricted Securities .......................................................................................... 4
   4.6  Foreign Investors ............................................................................................... 4
   4.7  Brokers or Finders ............................................................................................. 4
   4.8  Tax and Legal Advice ....................................................................................... 4
   4.9  No Disqualification Events ................................................................................ 5
   4.10  Canadian PCMLTFA ....................................................................................... 5
   4.11  Investor Information ......................................................................................... 6
   4.12  Canadian Legal Notices ................................................................................... 6
   4.13  Legends ............................................................................................................ 6
   4.14  Exclusion of Liability to the Agent .................................................................. 7
   4.15  Reliance, Indemnification and Notice of Changes ........................................... 7
   4.16  Registration ...................................................................................................... 8

5.  Covenants .................................................................................................................. 8

   5.1  Corporate Existence; Good Standing ................................................................ 8
   5.2  Compliance with Laws ...................................................................................... 8
   5.3  Indebtedness ...................................................................................................... 8
   5.4  Use of Proceeds ................................................................................................. 9
   5.5  Books and Records ............................................................................................ 9
   5.6  Security Interests ............................................................................................... 9
   5.7  Deposit Account Control Agreements and Securities Account Control Agreements .... 9
   5.8  Liens .................................................................................................................. 9
   5.9  Future Electronics Corp. UCC-1 ....................................................................... 12
   5.10  Subsidiary Guarantees ..................................................................................... 12

6.  Conditions to Closing ............................................................................................... 12

   6.1  Conditions to Closing of the Investors .............................................................. 13
   6.2  Conditions to Closing of the Company .............................................................. 14

6.3    Conditions to Closing of the Collateral Agent.................................................. 15

7.    Miscellaneous .................................................................................................... 16

7.1    Survival of Warranties ...................................................................... 16
7.2    Expenses ........................................................................................... 16
7.3    Waivers and Amendments ................................................................ 16
7.4    Governing Law ................................................................................. 16
7.5    Notices .............................................................................................. 16
7.6    Aggregation of Notes ....................................................................... 18
7.7    Entire Agreement ............................................................................. 18
7.8    Usury................................................................................................. 18
7.9    Severability ...................................................................................... 19
7.10   Successors and Assigns..................................................................... 19
7.11   Delays or Omissions ......................................................................... 19
7.12   Titles and Subtitles ........................................................................... 20
7.13   Telecopy Execution and Delivery .................................................... 20
7.14   Counterparts...................................................................................... 20
7.15   Construction...................................................................................... 20
7.16   Other Interpretive Provisions........................................................... 20
7.17   Exculpation Among Investors........................................................... 20
7.18   Venue ................................................................................................ 21
7.19   Indemnification ................................................................................ 21
7.20   Confidentiality .................................................................................. 21
7.21   Authority to Agent ........................................................................... 21
7.22   Third Party Beneficiary.................................................................... 22


Schedule A    -    Schedule of Investors
Schedule B    -    Canadian Legal Notices

Exhibit A    -    Form of Note
Exhibit B    -    Form of Certificate of Amendment
Exhibit C    -    Form of Canadian Investor Questionnaire
Exhibit D    -    Form of U.S. Accredited Investor Certification
Exhibit E    -    Form of Offshore Certification

## COINTERRA, INC.
## SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT

This SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT (this "***Agreement***") is made and entered into as of August 1, 2014, by and among CoinTerra, Inc., a Delaware corporation (the "***Company***"), and each of the investors (each, an "***Investor***" and collectively, the "***Investors***") listed on the Schedule of Investors attached as **Schedule A**.

### RECITALS:

**WHEREAS**, the Company requires additional financing, and the Investors have proposed to provide interim bridge financing to the Company on the terms and conditions set forth herein; and

**WHEREAS**, the Company and the Investors desire to set forth certain agreements and certain terms and conditions regarding the sale and purchase of the Notes (as defined below) and the relationship between the Company and the Investors.

### AGREEMENT:

**NOW, THEREFORE**, in consideration of the foregoing premises, the respective representations, warranties and covenants contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **The Notes.**

    1.1    Authorization of the Notes.  The Company has authorized the sale and issuance of Secured Convertible Notes (the "***Notes***") with an aggregate principal amount of up to $15,000,000.00.  The Notes shall be in the form attached hereto as **Exhibit A**.  This Agreement, the Agency Agreement (as defined below), the Notes, the Security Agreement in a form to be agreed upon by the parties and third party beneficiaries hereto (the "***Security Agreement***"), the Intellectual Property Security Agreement in a form to be agreed upon by the parties and third party beneficiaries hereto (the "***IP Security Agreement***"), the Collateral Agent Agreement in a form to be agreed upon by the parties and third party beneficiaries hereto (the "***Collateral Agent Agreement***"), Guarantee and Security Agreements, each in a form to be agreed upon by the parties and third party beneficiaries hereto (collectively, the "***Guarantees***") and the other documents delivered in connection with this Agreement are herein referred to as the "***Transaction Documents***."

    1.2    Purchase and Sale of the Notes.  Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase, and the Company agrees to sell and issue to each Investor, a Note or Notes in the principal amount set forth opposite such Investor's name on the Schedule of Investors.

    1.3    Charter Amendment.  The Company shall adopt and file with the Secretary of State of Delaware, on or before the Closing (as defined below), the Certificate of

Amendment to the Amended and Restated Certificate of Incorporation (the "***Certificate of Amendment***") in the form attached hereto as **Exhibit B**.

      1.4    <u>Closings</u>.

      (a)    <u>Initial Closing</u>.  At the initial Closing, which shall take place on the date of this Agreement (the "***Initial Closing***"), each Investor shall purchase the principal amount of Note set forth opposite such Investor's name on **Schedule A**.  The Initial Closing shall take place at the offices of Norton Rose Fulbright Canada LLP, located at Suite 3800, 200 Bay Street, Royal Bank Plaza, South Tower, Toronto, Ontario, M5J 2Z4 at 10:00 a.m. local time, on the dates specified above, or at such other time and place as the Company and the Investors purchasing at least a majority of the aggregate principal amount of the Notes at the Closing mutually agree upon orally or in writing.  The Company shall deliver to each Investor at the Closing, a Note in the principal amount set forth opposite such Investor's name on **Schedule A** against payment of the principal amount of such Note (as detailed on **Schedule A**) by such Investor.

      (b)    <u>Subsequent Closing</u>.  If the aggregate principal amount of the Notes sold at the Initial Closing is less than $15,000,000.00, then, subject to terms and conditions of this Agreement, the Company may sell and issue at one or more additional closings (each a "***Subsequent Closing***") on or before August 31, 2014 or such other date as agreed upon between the Company and the Agent, Notes with an aggregate principal amount of up the amount equal to $15,000,000.00 less the aggregate principal amount of the Notes sold at the Initial Closing.  Any such sale and issuance in a Subsequent Closing shall be on the same terms and conditions as those contained herein.  The Initial Closing and the Subsequent Closing are referred to herein as a "***Closing***".

      (c)    Immediately after each Closing, **Schedule A** will be amended to list the Investors purchasing Notes hereunder and the principal amount of the Notes issued to each Investor hereunder at each such Closing.

      2.    **Security Interest**.  The Obligations shall be secured by, and guaranteed pursuant to, the Transaction Documents, including without limitation, the Security Agreement, the IP Security Agreement, the Guarantees and the Deposit Control Agreement (as defined in <u>Section 5.7</u> below).  "***Obligations***" means all indebtedness, liabilities and other obligations (monetary (including post-petition interest, allowed or not) or otherwise) of the Company under this Agreement, any Note or any other agreement, document or instrument executed in connection herewith or therewith, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.  Fortis Advisors LLC (the "***Collateral Agent***") has been appointed by the Investors pursuant to the Collateral Agent Agreement to act as the Investors' agent with respect to the payment and performance of the Obligations.

      3.    <u>**Representations and Warranties of the Company**</u>.  The Company hereby makes to and in favor of each of the Investors the representations and warranties of the Company contained in the agency agreement between the Company and Industrial Alliance Securities Inc. (the "***Agent***") dated the date hereof (the "***Agency Agreement***"), which representations and

warranties will survive the Closing in accordance with the Agency Agreement.  On or prior to the Closing, and dated as of such date, the Company will provide to the Investors, promptly on request and without charge, an extract from the Agency Agreement certified by an officer of the Company as a true extract of the representations and warranties contained in the Agency Agreement.

     4.   **<u>Representations and Warranties of the Investors</u>**.  Each Investor hereby severally and not jointly represents and warrants to the Company and to the Agent that:

     4.1   <u>Authorization</u>.  All action on the part of the Investor and, as applicable, its officers, directors, partners, members, managers and stockholders necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents to which it is a party, the performance of all of its obligations hereunder and thereunder, have been taken or will be taken prior to the Closing. Such Investor has full power and authority to enter into this Agreement and the other Transaction Documents to which it is a party, and each such agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

     4.2   <u>Purchase Entirely for Own Account</u>.  The Notes will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to any of the Notes.  The Investor has not been formed for the specific purpose of acquiring the Notes.

     4.3   <u>Disclosure Information</u>.  Such Investor has not received or reviewed any information about the Company other than the convertible notes offering investor presentation of the Company dated July 2014 (the "***Presentation***").  Such Investor understands and acknowledges that the Presentation (i) was intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily an exhaustive description, and (ii) may have contained forward-looking statements involving known and unknown risks and uncertainties which may cause the Company's actual results in future periods or plans for future periods to differ materially from what was anticipated and that no representations or warranties were or are being made with respect to any such forward-looking statements or the probability of achieving any of the results projected in any of such forward-looking statements.  Nothing contained in this <u>Section 4.3</u> shall limit in any respect the Company's representations and warranties contained in this Agreement or in the Agency Agreement.

     4.4   <u>Experience; Accredited Investor</u>.  Such Investor has experience as an investor in securities of companies in the developmental stage and acknowledges that it can bear the economic risk of its investment in the Notes.  Such Investor has either (a) a pre-existing

personal or business relationship with the Company or any of its officers, directors or controlling persons that is of a nature and duration which enables the Investor to be aware of the character, business acumen and general business and financial circumstances of the Company or (b) by reason of its business or financial experience or the business or financial experience of its professional advisors who are unaffiliated with and who are not compensated by the Company or any affiliate or selling agent of the Company, directly or indirectly, has the capacity to protect its own interests in connection with its purchase of the Notes.  Such Investor has the financial capacity to bear the risk of this investment.  Such Investor is an accredited investor as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "***Securities Act***") or otherwise purchasing the Notes on a basis that exempt from the prospectus requirements of the jurisdiction in which the Investor resides. The purchase of Notes by the Investor does not give rise to any obligation of the Company or the Agent to prepare and file a prospectus or similar document or to register the Notes or the common stock issuable upon conversion or exercise thereof to be registered with any governmental or regulatory authority.

4.5     Restricted Securities.    Such Investor understands that immediately following its purchase of the Notes hereunder, such Notes will be characterized as "restricted securities" under the U.S. federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Notes may be resold without registration under the Securities Act, only in certain limited circumstances. In this connection, such Investor represents that it is familiar with Rule 144 as promulgated by the SEC under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.  Similar restrictions apply under applicable Canadian securities laws to trades of the securities in Canada.

4.6     Foreign Investors.  If an Investor is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986), such Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Notes or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Notes, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Notes.  Such Investor's subscription and payment for, and continued beneficial ownership of, the Notes will not violate any applicable securities or other laws of its jurisdiction.

4.7     Brokers or Finders.  Other than a commission payable to the Agent, none of the Investors has any contract, arrangement or understanding with any broker, finder or similar agent with respect to the transactions contemplated by this Agreement. The Investor acknowledges that the Agent will receive a commission from the Company in connection with the private placement of Notes.

4.8     Tax and Legal Advice.  No Investor is relying on or has relied on the Company or any of the Company's officers, directors, shareholders, representatives, agents or advisers (including, without limitation, Andrews Kurth LLP and Bennett Jones LLP), for any advice, including, without limitation, any financial, tax or legal advice in connection with the transactions contemplated by this Agreement and the other Transaction Documents.  Each

4

Investor has had an opportunity to consult with its legal counsel and tax and other advisors regarding the purchase of the Notes.  Each Investor shall be responsible for any and all taxes, duties and other similar charges payable in connection with the issuance of the Notes, including if applicable any "original issue discount" that may result from the issuance of such securities, or the conversion or exercise thereof, and hereby agrees to indemnify the Company and its successors and assigns with respect to same.  The Investors understand and acknowledge that Andrews Kurth LLP and Bennett Jones LLP have acted solely as legal counsel for the Company with respect to the preparation of this Agreement and the Transaction Documents, and the transactions contemplated hereby and thereby, and have not acted as legal counsel for any Investor in connection therewith. Each investor acknowledges that Norton Rose Fulbright Canada LLP is acting as counsel to the Agent  and not as counsel to any Investor and is not protecting the rights or interests of any Investor.

4.9     No Disqualification Events.    Neither (i) the Investor, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by the Investor is subject to any of the "bad actor" disqualifications described in Securities Act Rule 506(d)(1)(i) to (viii) (a "**_Disqualification Event_**"), except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed reasonably in advance of the Closing in writing in reasonable detail to the Company.  In furtherance of the foregoing, the Investor represents and warrants that:  (1) the Investor has not been subject to a criminal conviction within ten years of the date hereof or to a court injunction or restraining order within five years of the date hereof in connection with the purchase or sale of a security, in connection with making a false filing with the U.S. Securities and Exchange Commission (the "**_SEC_**"), or arising out of the conduct of any financial intermediaries; (2) the Investor has not been subject to a final order from state securities, insurance, banking, savings association or credit union regulators or federal banking agencies, the CFTC or the National Credit Union Administration (A) that would bar the Investor from associating with a regulated entity; engaging in the business of securities, insurance or banking; or engaging in savings association or credit union activities, or (B) that were based on fraudulent, manipulative or deceptive conduct and were issued within ten years of the date hereof; (3) the Investor is not subject to any SEC disciplinary orders relating to brokers, dealers, municipal securities dealers, investment companies, investment advisers or their associated persons; (4) the Investor is not subject to any SEC cease-and-desist order arising out of any scienter-based anti-fraud violation or violation of Section 5 of the Securities Act; (5) the Investor has not been suspended or expelled from membership in a self-regulatory organization; and (6) the Investor has not been subject to any SEC stop orders or orders suspending a Regulation A exemption issued within five years of the date hereof.

4.10     Canadian PCMLTFA.    The funds representing the aggregate purchase price which will be advanced by the Investor to the Company hereunder will not represent proceeds of crime for the purposes of the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (the "**_PCMLTFA_**") and the Investor acknowledges that the Company may in the future be required by law to disclose the Investor's name and other information relating to this Agreement and the Investor's purchase of Notes hereunder, on a confidential basis, pursuant to the PCMLTFA and (i) to the best of the Investor's knowledge none of the

5

purchase price funds to be provided by the Investor (A) have been or will be derived from or related to any activity that is deemed criminal under the law of Canada, the United States of America, or any other jurisdiction, or (B) are being tendered on behalf of a person or entity who has not been identified to the Investor, and (ii) it shall promptly notify the Company and the Agent if the Investor discovers that any of such representations ceases to be true, and to provide the Company with appropriate information in connection therewith.

4.11     Investor Information.  The Investor acknowledges that this Agreement, the questionnaire attached as **Exhibit C** hereto, the certification attached as **Exhibit D**  and the certification attached as **Exhibit E** hereto  require the Investor to provide certain personal information to the Company; such information is being collected by the Company for the purposes of this Agreement, which includes, without limitation, determining the Investor's eligibility to purchase the Notes under applicable securities legislation, preparing the Notes, preparing and registering certificates representing shares to be issued to the Investors upon conversion of the Notes and completing filings required by any securities regulatory authority, as applicable.   The Investor's personal information may be disclosed by the Company to: (i) securities regulatory authorities, (ii) the Company's registrar and transfer agent, (iii) Canada Revenue Agency; and (iv) any of the other parties and third party beneficiaries to this Agreement, including, (without limitation) each of their respective legal counsel, and may be included in record books in connection with this Agreement.  Without limiting the foregoing, the Investor has been advised that such personal information, as indirectly collected by the Ontario Securities Commission ("*OSC*"), is being collected under the authority granted to the OSC in securities legislation for the purposes of the administration and enforcement of the securities legislation of Ontario and any questions about the indirect collection of such information by the OSC can be directed to the Administrative Assistant to the Director of Corporate Finance at Suite 1903, Box 5520 Queen Street West, Toronto, Ontario M5H 3S8, Telephone (413) 593-8086.  By executing this Agreement, the Investor is deemed to be consenting to, and authorizing, the foregoing collection, use and disclosure of the Investor's personal information.  The Investor also consents to the filing of copies or originals of any of the Investor's documents, as may be required to be filed with any securities regulatory authority, as applicable, in connection with the transactions contemplated hereby.

4.12     Canadian Legal Notices.  The Investor acknowledges that it has read and reviewed the materials provided on **Schedule B** hereto.

4.13     Legends.  The Notes and all stock certificates representing any shares of the capital stock of the Company issued by the Company upon conversion of the Notes will bear legends in substantially the following forms (in addition to any legends required under Delaware corporate law or under other applicable securities laws):

"THIS NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE.  THEY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED ONLY ,IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT AND/OR APPLICABLE STATE

SECURITIES LAWS (A) TO THE COMPANY; (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN ACCORDANCE WITH ALL LOCAL LAWS AND REGULATIONS; (C) IN ACCORDANCE WITH THE EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR OTHER LOCAL LAWS AND REGULATIONS; (D) IN ACCORDANCE WITH THE EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR OTHER LOCAL LAWS AND REGULATIONS, OR (E) IN A TRANSACTION THAT DOES NOT OTHERWISE REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PROVIDED THAT IN THE CASE OF CLAUSES (D) OR (E), THE SELLER FURNISHES TO THE COMPANY AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY TO SUCH EFFECT."

"UNLESS PERMITTED BY SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THIS SECURITY IN CANADA BEFORE THE DATE THAT IS FOUR (4) MONTHS AND A DAY AFTER THE LATER OF (I) AUGUST 1, 2014, AND (II) THE DATE THE COMPANY BECOMES AS REPORTING ISSUER IN ANY PROVINCE OR TERRITORY OF CANADA."

4.14  Exclusion of Liability to the Agent.  Each Investor acknowledges that the Agent is acting as an agent in this transaction and that all warranties, conditions, representations or stipulations, whether express or implied and whether arising from this Agreement or under prior agreement or statement or by statute or at common law are expressly those of the Company. Each Investor acknowledges that no information or representation concerning the Company has been provided to the Investors by the Company or the Agent other than those contained in this Agreement and the Agency Agreement and that the Investor is relying entirely upon this Agreement and the Agency Agreement. Any information given or statement made is given or made without liability or responsibility howsoever arising on the part of the Agent. No person in the employment of, or acting as agent of, the Agent has any authority to make or give any representation or warranty whatsoever in relation to the Company or the Notes. Any information given or statement made is given or made without liability or responsibility howsoever arising on the part of the Agent, and the Investor hereby releases the Agent from any claims that may arise in respect of any such information given or statement made.

4.15  Reliance, Indemnification and Notice of Changes.  The representations and warranties in this Agreement (including the exhibits and schedules incorporated by reference herein) are made by each Investor with the intent that they be relied upon by the Company and the Agent in determining its suitability as a purchaser of Notes, and each Investor agrees to indemnify each of the Company and the Agent against all losses, claims, costs, expenses and damages or liabilities which any of them may suffer or incur as a result of reliance thereon. The Investor undertakes to notify each of the Company and the Agent immediately of any change in

7

any representation, warranty or other information relating to the Investor set forth in this Agreement (including the exhibits and schedules incorporated by reference herein) which takes place prior to the Closing.

4.16    Registration. The Investor acknowledges and agrees that the registration instructions set forth opposite such Investor's name on the Schedule of Investors are true and correct.

5.    **Covenants**.

5.1    Corporate Existence; Good Standing.  For so long as any Notes remain outstanding, the Company and each entity (other than the Company) in an unbroken chain of entities beginning with the Company, provided each entity (other than the last entity) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power in one of the other entities in such chain (the "***Subsidiaries***" and each a "***Subsidiary***") shall preserve and maintain its corporate existence and all of its licenses, privileges and franchises and other rights necessary or desirable in the normal course of its businesses, except to the extent that the failure to preserve and maintain its corporate existence and such rights would not reasonably be expected to have a material adverse effect on the Company's assets, financial condition or business  as now conducted or proposed to be conducted (a "***Material Adverse Effect***").  The Company and each of its Subsidiaries shall qualify to do business and shall be and remain in good standing in its jurisdiction of organization and in each jurisdiction in which the nature of its business requires it to be so qualified, or in which failure to be so qualified and in good standing would reasonably be expected to have a Material Adverse Effect.

5.2    Compliance with Laws.  For so long as any Notes remain outstanding, the Company and each of its Subsidiaries shall comply with all governmental requirements, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. The Company and each of its Subsidiaries shall pay and discharge when due any and all indebtedness, obligations, assessments and real and personal property taxes, including, but not limited to, federal and state income taxes, except as may be subject to good faith contest or as to which a bona fide dispute may arise.

5.3    Indebtedness.  For so long as any Notes remain outstanding, neither the Company nor its Subsidiaries shall create, incur, assume or be liable for any indebtedness (excluding trade accounts payable and accrued expenses in the ordinary course of business) without the prior written consent of Investors holding a majority of the aggregate principal amount of the Notes, other than the Permitted Indebtedness (as defined below).

For the purposes of this Agreement, "***Permitted Indebtedness***" means and includes: (a) indebtedness of the Company to the Investors under the Notes; (b) indebtedness arising from the endorsement of instruments in the ordinary course of business; (c) indebtedness secured by a lien, provided such indebtedness does not exceed the lesser of the cost or fair market value of the equipment financed with such indebtedness (in each case measured at the time of incurrence of such indebtedness); (d) inter-company indebtedness incurred in the ordinary course of business; (e) indebtedness owing to any person providing workers' compensation, health disability or other

8

employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such person incurred in the ordinary course of business; (f) indebtedness owing to insurance carriers or finance companies and incurred to finance insurance premiums; (g) indebtedness incurred in the ordinary course of business in the form of bids, tenders, statutory obligations, customary reimbursement obligations for surety bonds, performance bonds and appeal and other similar bonds; (h) indebtedness of the Subsidiaries incurred in connection with the Guarantee, and (i) extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness (a) through (h) above.

5.4     Use of Proceeds.  Proceeds from the sale of Notes will be used only for the purposes set out in the Agency Agreement.

5.5     Books and Records.  The Company and its Subsidiaries shall keep its books and records in accordance with sound business practices sufficient to allow the preparation of financial statements in accordance with GAAP, and permit the Investors, at the Company's expense, to inspect the properties and operations of the Company and its Subsidiaries at a time and in a manner that, in the Company's reasonable discretion, does not materially disrupt the Company's or such Subsidiary's operations.

5.6     Security Interests.  The Company will at all times take, or cause to be taken, all actions requested by the Collateral Agent to maintain the security interests granted under the Transaction Documents as valid and perfected Liens (as defined below), subject only to the Permitted Liens (as defined below), and supply all information to Collateral Agent necessary for such maintenance.  "*Liens*" means, with respect to any person, any mortgage, lien, encumbrance, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise granted by such person in any real or personal property, asset or other right owned or being purchased or acquired by such person which secures payment or performance of any obligation.

5.7     Deposit Account Control Agreements and Securities Account Control Agreements.  On or before the date that is forty-five (45) days after the Closing or such later date agreed to by the Collateral Agent, the Company will deliver to the Collateral Agent a duly executed Deposit Account Control Agreements (as defined below) and Securities Account Control Agreements (as defined below) with respect to the operating accounts and securities accounts of the Company (other than any payroll accounts, employee benefit accounts, other bank accounts having an average daily balance of not more than $250,000 in the aggregate, and investment accounts with average daily balance not in excess of $250,000 in the aggregate and zero balance accounts), each in form and substance satisfactory to the Agent and the Collateral Agent.  "*Deposit Control Agreement*" means a control agreement among the Company, a depository bank and Collateral Agent, for the benefit of the Investors in form and substance reasonably acceptable to Agent and the Collateral Agent.  "*Securities Account Control Agreement*" means a control agreement among the Company, a securities intermediary, as the case may be, and Collateral Agent, for the benefit of the Investors, in form and substance reasonably acceptable to the Agent and the Collateral Agent.

5.8     Liens.

(a)    For the purposes of this Section 5.8, the following terms have the following meanings:

(i)    "*Acquisition*" means any transaction or series of related transactions resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a person, or of all or substantially all of any business or division of a person, (b) the acquisition of in excess of 50% of the capital stock, partnership interests, membership interests or equity of any person, or otherwise causing any person to become a subsidiary of the acquiring party or (c) a merger or consolidation or any other combination with another person (other than a person that is already a subsidiary), in each case whether for cash, property, services, assumption of Debt, securities or otherwise.

(ii)    "*Capital Lease*" means, with respect to any person, any lease of (or other agreement conveying the right to use) any real or personal property by such person that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such person.

(iii)    "*Debt*" of any person means, without duplication, (a) all obligations of such person to pay the deferred purchase price of property or services, including any earnout payments and any obligations in respect to purchase price adjustments in connection with any Acquisition permitted herein, (b) all indebtedness secured by a Lien on the property of such person, whether or not such indebtedness shall have been assumed by such person (provided that if such indebtedness has limited recourse only to such property, the amount of such indebtedness shall be measured as the lesser of (i) fair market value of such property and (ii) the principal amount of indebtedness secured by such Lien), (c) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of such person, (d) all obligations in connection with performance, surety, bid, appeal, or similar bonds, (e) all indebtedness of the kind referred to in clauses (a) through (d) of this definition incurred by any partnership of which such person is a general partner, and the liquidation value of all redeemable preferred equity interests of such person issued to parties other than the Company and its subsidiaries, if any, if any possible redemption date is prior to the Maturity Date (as defined in the Notes) (except as a result of an initial public offering, change of control or asset sale so long as any rights of the holders thereof upon the occurrence of an initial public offering, change of control or asset sale event shall be subject to the prior repayment in full of the Obligations).

(b)    Until the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) are paid in full, unless the Collateral Agent shall otherwise expressly consent, the Company shall not create or permit to exist any Debt (except for Permitted Indebtedness) or any Lien on any of its real or personal properties, assets, revenues or rights of whatsoever nature (whether now owned or hereafter acquired), except the following (collectively, "*Permitted Liens*"):

(i)    Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being contested in good faith by appropriate proceedings and, in each case, for which it maintains adequate reserves in accordance with GAAP;

(ii)     (A) Liens of carriers, warehousemen, mechanics and materialmen and other similar Liens imposed by law and (B) Liens incurred in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA); provided that in the case of clauses (A) and (B), such Liens are for sums not overdue or being contested in good faith by appropriate proceedings and not involving any deposits or advances or borrowed money or the deferred purchase price of property or services and, in each case, for which it maintains adequate reserves in accordance with GAAP;

(iii)     Liens described on Schedule 5.8(b)(iii) and any renewals or extensions thereof; provided that (A) the property covered thereby is not changed, (B) the amount secured or benefited thereby is not increased, and (C) the direct or any contingent obligor with respect thereto is not changed;

(iv)     (A) Liens securing purchase money Debt (including obligations in respect of Capital Leases) to finance the purchase of fixed assets or assumed Debt in connection with any Acquisition (including obligations in respect of Capital Leases) hereafter incurred or assumed by the Company, (B) Debt existing at the time the applicable fixed assets are acquired (excluding Debt assumed, pursuant to an Acquisition) and (C) renewals, refinancings and extensions of Debt permitted under the foregoing clauses (A) and (B); provided that (1) such Liens do not at any time encumber any property other than the property financing by such Debt, (2) the Debt secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition and (3) such Liens attach to such property within sixty (60) days after the acquisition thereof;

(v)     easements, rights of way, restrictions, minor defects or irregularities in title and other similar Liens not interfering in any material respect with the ordinary conduct of the business of the Company;

(vi)     customary rights of setoff, revocation, refund or chargeback upon deposits of cash in favor of banks or other depository institutions;

(vii)     Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection (the "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests);

(viii)    Liens of sellers of goods to the Company arising under Article 2 of the Uniform Commercial Code or similar provisions of applicable law in the ordinary course of business, covering only the goods sold and securing only the unpaid purchase price for such goods and related expenses;

(ix)    Liens granted as security for appeal bonds in connection with obtaining such bonds incurred in the ordinary course of business not to exceed $150,000 at any time outstanding;

(x)    Liens granted as security for surety bonds, performance bonds and other similar bonds (other than appeal bonds), whether such Lien is granted upon entry into such bond or at such time the reimbursement obligations of such bond become due and payable, so long as such Liens are limited to the assets related to the underlying service contract and the grantor's rights thereunder;

(xi)    any licenses of intellectual property in the ordinary course of business that do not interfere with the Company's use thereof;

(xii)    Liens or deposits to secure performance of bids, tenders, or leases (other than debt) incurred in the ordinary course of business and not in connection with the borrowing of money; or

(xiii)    Liens arising under the Transaction Documents.

5.9    <u>Future Electronics Corp. UCC-1</u>.  The Company shall use best efforts to cause Future Electronics Corp. to amend prior to the Initial Closing, and in any event shall cause Future Electronics Corp. to amend prior to October 31, 2014, the (i) UCC Financing Statement, filed on March 7, 2014 with the Delaware Department of State, initial filing # 2014 0899773, and (ii) the security agreement, dated March 3, 2014, between the Company and Future Electronics Corp., in each case to limit the collateral definition set forth therein to "purchase-money collateral" (as defined in the UCC); provided that if the Company fails to cause Future Electronics Corp. to make such amendments prior to October 31, 2014, the Company shall forfeit the Amendment Holdback Amount (as defined in the Collateral Agent Agreement) and such Amendment Holdback Amount shall be paid by the Collateral Agent to the Investors in accordance with the Collateral Agent Agreement (for the avoidance of doubt, such payment will not reduce the outstanding principal amount of any Note). "***UCC***" means the Uniform Commercial Code as in effect in the State of Delaware from time to time

5.10    <u>Subsidiary Guarantees</u>.  The Company shall cause each entity that becomes a Subsidiary following the Initial Closing to enter into a Guarantee with the Company and the Collateral Agent (as defined therein) forthwith upon such entity becoming a Subsidiary.

6.    **Conditions to Closing**.

6.1     Conditions to Closing of the Investors.  Each Investor's obligations at the Closing are subject to the fulfillment, on or prior to the Closing, of all of the following conditions, any of which may be waived in whole or in part by such Investor:

(a)     Representations and Warranties.     The representations and warranties made by the Company in Section 2 and in the Agency Agreement shall be true and correct in all respects when made, and shall be true and correct in all respects on and as of the Closing with the same force and effect as if they had been made on and as of the Closing.

(b)     Performance.  The Company shall have performed and complied in all respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

(c)     Compliance Certificate.  An authorized officer of the Company shall have delivered to each Investor at the Closing a certificate stating that the conditions with respect to the Company specified in Sections 6.1(a) and (b) have been fulfilled.

(d)     Secretary's Certificate.  The Secretary of the Company shall have delivered to each Investor at the Closing a certificate stating that all Board and stockholder approvals necessary to consummate the transactions contemplated by this Agreement have been obtained and attaching thereto: (i) a copy of the Amended and Restated Certificate of Incorporation (as amended and in effect through the date of the Closing) and the Bylaws of the Company (as amended and in effect through the date of the Closing), certified by the Secretary of the Company as the true and correct copies thereof as of the Closing; and (ii) a copy of the resolutions of the Board of Directors and stockholders of the Company, evidencing the adoption and approval of the Certificate of Amendment, and, as applicable, the approval of this Agreement and other matters contemplated hereby.

(e)     Certificate of Amendment.  The Certificate of Amendment shall have been duly adopted by the Company by all necessary corporate action of its Board of Directors and stockholders, shall have been duly filed with and accepted by the Secretary of State of the State of Delaware and shall continue to be in full force and effect as of the Closing.

(f)     Delivery of Notes.  Against payment of the applicable purchase price, the Company shall have delivered to each Investor a Note with respect to the amounts set forth on the Schedule of Investors.

(g)     Consents.  Except for the notices required or permitted to be filed after the Closing with certain federal and state securities commissions, the Company shall have obtained all consents, approvals, permits and waivers required in connection with the sale and issuance of the Notes.

(h)     Agency Agreement.  The Company and the Agent shall have entered into the Agency Agreement.

(i)     Security Agreement.  The Company and the Collateral Agent (as defined therein) shall have entered into the Security Agreement.

13

(j)    <u>Guarantee and Security Agreement</u>.  The Company and the Collateral Agent (as defined therein) shall have entered into a Guarantee with each of Terramine Hosting Inc., Cohinoor, Inc., Zuriya LLC and each other entity that becomes a Subsidiary prior to the Initial Closing.

(k)    <u>Intellectual Property Security Agreement</u>.  The Company and the Collateral Agent shall have entered into the IP Security Agreement.

(l)    <u>Collateral Agent Agreement</u>.  The Company and the Collateral Agent shall have entered into the Collateral Agent Agreement.

(m)    <u>Other Proceedings</u>.  All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to such Investor, and such Investor shall have received all such counterpart original and certified or other copies of such documents as it may reasonably request.

6.2    <u>Conditions to Closing of the Company</u>.  The Company's obligations at the Closing as to each Investor are subject to the fulfillment, on or prior to the Closing, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of each Investor contained in <u>Section 3</u> shall be true in all respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

(b)    <u>Performance</u>.  The Investors shall have performed and complied in all respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by each Investor on or before the Closing.

(c)    <u>Payment</u>.  Each Investor shall have delivered to the Company payment of the principal amount of the Note in the respective amounts set forth opposite such Investor's name on the Schedule of Investors, in each case less the Amendment Holdback Amount (as defined in the Collateral Agent Agreement) applicable to such Note. Each Investor shall have delivered to the Collateral Agent the Amendment Holdback Amount (as defined in the Collateral Agent Agreement) applicable to the principal amount of the Note in the respective amounts set forth opposite such Investor's name on the Schedule of Investors.

(d)    <u>Agency Agreement</u>.  The Company and the Agent shall have entered into the Agency Agreement.

(e)    <u>Security Agreement</u>.  The Company and the Collateral Agent (as defined therein) shall have entered into the Security Agreement.

(f)    <u>Guarantee and Security Agreement</u>.  The Company and the Collateral Agent (as defined therein) shall have entered into a Guarantee with each of Terramine Hosting Inc., Cohinoor, Inc., Zuriya LLC and each other entity that becomes a Subsidiary prior to the Initial Closing.

14

      (g)     <u>Intellectual Property Security Agreement</u>.  The Company and the Collateral Agent shall have entered into the Intellectual Property Security Agreement.

      (h)     <u>Collateral Agent Agreement</u>.  The Company and the Collateral Agent shall have entered into the Collateral Agent Agreement.

      (i)     <u>Questionnaire or Certification</u>.  Each Investor residing in Canada shall have delivered to the Company and to the Agent a completed and executed questionnaire in the form of **<u>Exhibit C</u>** attached hereto.  Each Investor residing in the United States of America shall have delivered to the Company and to the Agent a completed and executed certification in the form of **<u>Exhibit D</u>** attached hereto. Each Investor residing outside of Canada and the United States of America shall have delivered to the Company and to the Agent a completed and executed certification in the form of **<u>Exhibit E</u>** attached hereto.

      (j)     <u>Consents</u>.  Except for the notices required or permitted to be filed after the Closing with certain federal and state securities commissions, the Company shall have obtained all consents, approvals, permits and waivers required in connection with the sale and issuance of the Notes.

      6.3     <u>Conditions to Closing of the Collateral Agent</u>.  The Collateral Agent's obligations at the Closing as to each Investor are subject to the fulfillment, on or prior to the Closing, of the following conditions, any of which may be waived in whole or in part by the Collateral Agent:

      (a)     <u>Transaction Documents</u>. The Collateral Agent shall have received each document (including, without limitation, each Uniform Commercial Code financing statement) required by the Transaction Documents or under law or reasonably requested by Collateral Agent to be filed, registered or recorded in order to create in favor of Collateral Agent for its own benefit and for the benefit of the Investors a first priority perfected Lien in the Collateral (as defined in the Security Agreement), subject to the Permitted Liens, each of which shall be in proper form for filing, registering or recording in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, or arrangements reasonably satisfactory to Collateral Agent for the filing, registering or recording thereof shall have been made.

      (b)     <u>Lien Searches</u>. The Collateral Agent shall have received copies of Uniform Commercial Code search reports from the jurisdictions in which Uniform Commercial Code financing statements are to be filed pursuant to subsection (a) above reflecting no other financing statements or filings which evidence Liens of other Persons in the Collateral which are before the Liens granted to Collateral Agent in this Agreement and the other Transaction Documents, except for any such prior Liens (a) which are expressly permitted by this Agreement to be prior or (b) for which Collateral Agent has received a termination statement or a payoff letter reasonably acceptable to Collateral Agent.

      (c)     <u>Security Agreement</u>.  The Company and the Collateral Agent (as defined therein) and shall have entered into the Security Agreement.

(d)     Intellectual Property Security Agreement.  The Company and the Collateral Agent (as defined therein) shall have entered into the Intellectual Property Security Agreement.

(e)     Guarantee and Security Agreement.  The Company and the Collateral Agent (as defined therein) shall have entered into a Guarantee with each of Terramine Hosting Inc., Cohinoor, Inc., Zuriya LLC and each other entity that becomes a Subsidiary prior to the Initial Closing.

(f)     Payment of Amendment Holdback Amount. Each Investor shall have delivered to the Collateral Agent the Amendment Holdback Amount (as defined in the Agency Agreement) applicable to the principal amount of the Note in the respective amounts set forth opposite such Investor's name on the Schedule of Investors.

7.     **Miscellaneous**.

7.1     Survival of Warranties.  The warranties, representations and covenants of the Company and the Investors contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Agent, the Investors or the Company.

7.2     Expenses.   All parties hereto will bear all of their own expenses in connection herewith.

7.3     Waivers and Amendments.   This Agreement and the obligations of the Company and the rights of the Investors under this Agreement and the Notes may be amended, waived, discharged or terminated (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely) with the written consent of the Company, the Agent and the Investors holding a majority of the aggregate principal amount of Notes then outstanding; *provided, however*, that no such amendment or waiver shall reduce the principal amount of any Note held by an Investor, or alter any other economic provisions of such Note in a manner adverse to such Investor or amend any of the provisions of such Note related to conversion of such Note in a manner adverse to such Investor without the written consent of such Investor.  Any amendment, waiver discharge or termination effected in accordance with this Section 7.3 shall be binding upon each Investor and the Company.

7.4     Governing Law.   This Agreement shall be governed by and construed under the laws of the State of Texas, without regard to conflicts of law principles.

7.5     Notices.   All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via facsimile (with confirmation of receipt) to the parties or third party beneficiaries, as applicable, at the address for such party set forth below (or at such other address for a party or third party beneficiary, as applicable, as shall be specified by like notice):

If to the Company:

CoinTerra, Inc.
11130 Jollyville Rd
Suite 100
Austin, TX 78759
Attn:  Chief Executive Officer
Email: ravi@cointerra.com

with a copy (which shall not constitute notice) to:

Andrews Kurth LLP
111 Congress Avenue, Suite 1700
Austin, Texas 78701
Fax: (512) 542-5227
Attn: Carmelo Gordian

If to the Collateral Agent:

Fortis Advisors
Attn: Rick Fink
4225 Executive Square, Suite 1040
La Jolla, CA 92037
Email: rfink@fortisrep.com

If to the Agent:

Industrial Alliance Securities Inc.
26 Wellington St. East, Suite 900
Toronto, Ontario          M5E 1S2

Attn:  John McMahon
Email:  jmcmahon@iagto.ca
Fax: (416) 864-6485

with a copy (which shall not constitute notice) to:

Norton Rose Fulbright Canada LLP
Royal Bank Plaza, South Tower, Suite 3800,
200 Bay Street, PO Box 84
Toronto, Ontario          M5J 2Z4
Fax: 416-216-3930
Attn: Sanjay Joshi

If to an Investor: At the address set forth below such Investor's name on
**Schedule A** hereto.

17

Notice given by facsimile shall be confirmed by appropriate answer back and shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party or third party beneficiary may change any address to which notice is to be given to it by giving notice as provided above of such change of address.

An electronic communication ("***Electronic Notice***") shall be deemed written notice for purposes of this Section 7.5 if sent with return receipt requested to the electronic mail address specified by the receiving party or third party beneficiary, as applicable, in a signed writing in a nonelectronic form. Electronic Notice shall be deemed received at the time the party or third party beneficiary sending Electronic Notice receives verification of receipt by the receiving party or third party beneficiary. Any party or third party beneficiary receiving Electronic Notice may request and shall be entitled to receive the notice on paper, in a nonelectronic form ("***Nonelectronic Notice***") which shall be sent to the requesting party or third party beneficiary within ten (10) days of receipt of the written request for Nonelectronic Notice.

7.6     Aggregation of Notes.  All Notes held or acquired by an Investor and its affiliated entities shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.  For purposes of the foregoing, (a) any Notes held by an Investor that is a partnership, limited liability company or corporation shall be deemed to include Notes held by (i) entities affiliated with such partnership, limited liability company or corporation, (ii) any partner (or retired partner), member (or retired member) or stockholder of such partnership, limited liability company or corporation, (iii) the spouse, siblings, lineal descendants or ancestors of any such partner (or retired partner), member (or retired member) or stockholder, (iv) the estate of any such partner (or retired partner), member (or retired member) or stockholder and (v) any custodian or trustee for the benefit of any such partner (or retired partner), member (or retired member) or stockholder or the spouse, siblings, lineal descendants or ancestors of any such partner (or retired partner), member (or retired member) or stockholder and (b) any Notes held by an Investor that is an individual shall be deemed to include Notes held by (i) the estate of such individual or (ii) the spouse, siblings, lineal descendants or ancestors of such individual and any custodian or trustee for the benefit of any of the foregoing persons.

7.7     Entire Agreement.  This Agreement (including the schedules and exhibits hereto), the other Transaction Documents, and the documents and certificates delivered in connection with the Closings constitute the entire agreement among the parties relating to the subject matter hereof and thereof.  No party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as specifically set forth herein or therein.

7.8     Usury.  Each provision in this Agreement and each of the Notes is expressly limited so that in no event whatsoever shall the amount paid, or otherwise agreed to be paid, by the Company for the use, forbearance or detention of the money to be loaned under this Agreement and each of the Notes, exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate, and all amounts owed under this Agreement and each of the Notes shall be held to be subject to reduction to the effect that such amounts so

18

paid or agreed to be paid which are for the use, forbearance or detention of money under this Agreement and each of the Notes shall in no event exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate. To the extent that the Highest Lawful Rate applicable to the Investor is at any time determined by Texas law, the applicable rate ceiling shall be the "weekly ceiling" described in, and computed in accordance with, the provisions of Section 303.003 of the Texas Finance Code, as amended.  The provisions of Chapter 346 of the Texas Finance Code are specifically declared by the parties hereto not to be applicable to this Agreement and each of the Notes.  Notwithstanding any provision in this Agreement and each of the Notes to the contrary, if the maturity of the amounts due hereunder are accelerated for any reason, or in the event of prepayment of all or any portion of the amounts due hereunder, earned interest on the principal may never exceed the Highest Lawful Rate, and any unearned interest otherwise payable hereunder that is in excess of the Highest Lawful Rate shall be canceled automatically as of the date of such acceleration or prepayment or other such event and, if theretofore paid, shall be credited on the principal outstanding hereunder or, if the principal has been paid in full, held as collateral for any contingent or unmatured obligation of the Company, or, if there are no contingent or unmatured obligations of the Company then outstanding, refunded to the Company.  In determining whether or not the interest paid or payable, under any specific contingency, exceeds the Highest Lawful Rate, the Company and the Investor shall, to the maximum extent permitted by applicable law, amortize, prorate, allocate and spread, in equal parts during the period of the actual term of this Agreement and each of the Notes, all interest at any time contracted for, charged, received or reserved in connection with this Agreement and each of the Notes. "*Highest Lawful Rate*" means, at the particular time in question, the maximum nonusurious rate of interest which, under applicable law, the Investor is then permitted to charge the Company amounts outstanding hereunder or under the Note.  If the maximum non-usurious rate of interest which, under applicable law, the Investor is permitted to charge the Company shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, as of the effective time of such change without notice.

       7.9    <u>Severability</u>.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

       7.10    <u>Successors and Assigns</u>.  Except as otherwise expressly provided in this Agreement or the Notes, the provisions of this Agreement and the Notes shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

       7.11    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power, or remedy accruing to the Investor, upon any breach or default of the Company under this Agreement shall impair any such right, power, or remedy of the Investor nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of the Investors of any breach or default under this Agreement or any waiver on the part of the Investors of any provisions or

conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to the Investors, shall be cumulative and not alternative.

7.12  <u>Titles and Subtitles</u>.  The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

7.13  <u>Telecopy Execution and Delivery</u>.  A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof. If less than a complete copy of this  Agreement is delivered to the Company or the Agent at Closing, the Company or the Agent and their respective advisors are entitled to assume that the Investor accepts and agrees to all of the terms and conditions of the pages not delivered at Closing unaltered.

7.14  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.15  <u>Construction</u>.  The language used in this Agreement and the Notes will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

7.16  <u>Other Interpretive Provisions</u>.  References in this Agreement and each of the other Transaction Documents to any document, instrument or agreement (a) includes all exhibits, schedules and other attachments thereto, (b) includes all documents, instruments or agreements issued or executed in replacement thereof, and (c) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement or any other Transaction Document refer to this Agreement or such other Transaction Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Transaction Document, as the case may be.  The words "include" and "including" and words of similar import when used in this Agreement or any other Transaction Document shall not be construed to be limiting or exclusive.

7.17  <u>Exculpation Among Investors</u>.  Each Investor acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its decision to invest in the Company.  Each Investor agrees that neither any Investor nor any of the respective controlling persons, officers, directors, partners, agents or employees of any Investor shall be liable to any other Investor for any action heretofore or

hereafter taken or omitted to be taken by any of them in connection with the purchase of the Notes.

7.18   Venue.  The Company and Investors consent and submit to the jurisdiction of any court located in Austin, Texas and waives any right to trial by jury in any action or proceeding based upon, arising out of or related to this Agreement or any other Transaction Document.

7.19   Indemnification. The Company hereby agrees to indemnify each Investor and its officers, directors, stockholders, partners, employees, agents and affiliates (each, an "**_Indemnitee_**") and hold them harmless from and against any and all claims, debts, liabilities, obligations, actions, costs and expenses (including reasonable attorneys' fees and expenses) (collectively, the "**_Losses_**") based upon or arising out of or relating to (i) any breach or inaccuracy of any representation or warranty of the Company contained in this Agreement or in the Agency Agreement; (ii) any non-fulfillment or breach of any covenant or agreement of the Company contained in the Transaction Documents; (iii) any suit, action, claim, investigation, liability or obligation against the Company or any Indemnitee arising out of or in connection with this Agreement or any other Transaction Document, other than any Losses which are finally determined in such proceeding to be primarily and directly a result of (i) the gross negligence or willful misconduct by such Indemnitee, (ii) a breach of a fiduciary duty, if any, owed by such Indemnitee to the Company, (iii) an act or omission that involves intentional misconduct or a knowing violation of law by such Indemnitee, (iv) a breach by such Indemnitee of any material provision of this Agreement, or (v) a transaction from which the Indemnitee received an improper personal benefit.  The Company's obligations pursuant to this Section 7.19 shall be limited to the principal and any accrued interest pursuant to the terms of the Notes.

7.20   Confidentiality.    The provisions of this Agreement and the other Transaction Documents shall be held in strictest confidence by the Company and the Investors and shall not be publicized or disclosed in any manner whatsoever; _provided, however,_ that Company and the Investors may disclose this Agreement and the Transaction Documents in confidence to its attorneys, accountants, auditors, insurers, tax preparers, and financial advisors, and insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law.

7.21   Authority to Agent.  The Investor irrevocably authorizes the Agent, in its sole discretion:

(a)   to negotiate and settle the form of any certificates to be delivered and any agreement to be entered into in connection with the private placement of the Notes and the Closing  and to vary, amend, alter or waive, on its own behalf and on behalf of the Investor, in whole or in part, or extend the time for compliance with, any of the conditions, representations, warranties or covenants in such manner and on such terms and conditions as the Agent may determine, acting reasonably, without in any way affecting the Investor's obligations or the obligations of such others hereunder; provided, however, that the Agent hall not vary, amend, alter or waive any such condition, representation, warranty or covenant where to do so would result in a material adverse change to any of the material attributes of the Notes;

21

(b)  to allocate the Notes being offered pursuant to the private placement of Notes in accordance with the terms of the Agency Agreement;

(c)  to act as its representative at the Closing with full power of substitution, as its true and lawful attorney and agent with the full power and authority in its place and stead to swear, execute, file and record any document necessary, to approve any opinions, certificates or other documents addressed to the Investor, to accept delivery of certificates representing the Notes at the Closing, to terminate this purchase on its behalf in the event that any condition precedent to the Closing has not been satisfied, to execute a receipt for such certificates and all other documentation, and to deliver such certificates to the Investor as set out in this Agreement promptly after the Closing; and

(d)  to correct any minor errors in, or complete any minor information missing from any part of this Agreement and any other acknowledgements, provisions, forms, certificates or documents executed by the Investor and delivered to the Company in connection with the private placement of Notes.

7.22  <u>Third Party Beneficiary</u>.  The Company and the Investors acknowledge and agree that the Agent and the Collateral Agent are third party beneficiaries to this Agreement.

*[Remainder of page intentionally left blank.]*

22

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**COMPANY**

**COINTERRA, INC.**

By: _____

Name: _RAVI IYENGAR_____

Title: _CHIEF EXECUTIVE OFFICER____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

<u>**INVESTORS**</u>

1,010 49658 JSK Ltd.

By: [_____]
    its General Partner

By: _____
Name: Donna Jubin
Title: President

AUS 678594 10

7/16/2014 9:25 PM FROM: Fax   To: 13063856251   PAGE: 003 OF 010

3063856251
01:34:20 p.m.   07-16-2014   2/9

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

### INVESTORS

[Dr. James ] Mchattie Medical Prof. Corp.

By: [ _____ ]
  its General Partner

By: _____ _McHattie_
Name: Dr. James McHattie
Title: President

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

AUS:678594.10

3063056251
    •

                                            12:46:58 p.m.    07-16-2014         2/9

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

I Rodney Koch

By: [_____]
    its General Partner

By: _____
Name: _Rodney Koch_____
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

### INVESTORS

T. Thiessen M.D. Surgical Prof. Corp.

By: [_____]
      its General Partner

By: _____
Name: _Trent Thiessen_
Title: _President_

AUS 678594 10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

<u>**INVESTORS**</u>

Brian Gibbs

By: [                    ]
    its General Partner

By: _____
Name: _____
Title: _____

AUS 678594 10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

## INVESTORS

[_____]

By: [_____]
  its General Partner

By: _____
Name: _PHiLip Armstrong_
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: _____
Name: _____ Mark Wayne _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By:   X
Name:   _FELCON CAPITAL CORPORATION_
Title:   _OTTO FELBER, PRESIDENT_

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

<u>INVESTORS</u>

[_____]

By: [_____]
     its General Partner

By: ___X_____
Name: ___ANNA BERKIS_____
Title: _____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: ____X_____
Name: __DONALD S. MCFARLANE__
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By:  X _____
Name: _____
Title: _____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
CoinTerra, Inc.
24

03/13/2009  03:07    7057349217                                    PAGE  04/04

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: _____X_____

Name: ____BRUCE  MACNICOL____ /MAXILLO-CARE
                                                     INC.
Title: _____PRESIDENT_____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[                    ]

By: [                ]
    its General Partner

By: _X_____
Name: DAVID  GARGARO
Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

### INVESTORS

[_____]

By: [_____]
     its General Partner

By: Marquest Asset Management ITF Marquest Funds
Name: Gerry Brockelsby
Title: Portfolio Manager

*FBC Investor Services*
*A/c 011800030*
*A/c 102147001*

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
     its General Partner

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: _____
Name: _____ Jason Mann _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[HEDGEHOG]ADVISORS LLC

By: [_____]
    its General Partner

By: _Michael Rauchman_
Name: __MICHAEL RAUCHMAN__
Title: ___Manager, HEDGEHOG ADVISORY
                               LLC_

AUS 678594 (4)

*acct# 60-PC90B*
*8T21*

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

## INVESTORS

DOUBLO ONTARIO INC

By: [            ]
    its General Partner

By:
Name: Adam Felber
Title: Secretary, Director

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[BRAD WHITE] GMP SECURITIES LP ITF 400-NHRO-E

By: [_____]
    its General Partner

By: _____
Name: _____ BRAD WHITE _____
Title: _____ DIRECTOR _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: _____
Name: _____
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
        its General Partner

By:  X _____

Name:  J. DAVID BUNSTON

Title: _____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.

24

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

Dorothy Platzer

By: [_____]
    its General Partner

By: _____Dorothy Platzer_____
Name: ___Dorothy Platzer_____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

|_____|

By: [_____]
    Its General Partner

By: _____
Name: _____
Title: _____

Peter Avent, President

AUS:678594.16

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[Kevin Thompson

By: [_____]
its General Partner

By: _____
Name: Kevin Thompson
Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
its General Partner

By:
Name:
Title:

ATB 678504 10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

INVESTORS

[_____]

By: [_____]
Its General Partner

By: _____
Name: _____
Title: Peter Avelt

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

AUSF-628398.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
   its General Partner

By: _B Hurell_
Name: _Mutual Holding_
Title: _Judy Thurrell_

_VP | Secretary_

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

AUS 678394 14)

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[ Serenity Investments ] LLC

By: [ Final Finish Inc. ]
   its   Manager

By: _Stephen Schuler_____
Name: Stephen Schuler
Title: President of Finial Finish, Inc., Manager of
      Serenity Investments LLC

AUS:678594.10

(2 unread) - gksteed@rogers.com - Rogers Yahoo Mail          https://ca-mg6.mail.yahoo.com/neo/launch?.partner=rogers-...

ComTerra-Steedco.pdf          2  of 4

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

By:

its General Partner

By:

Name: Steedco LTD

Title: Gary Freedman, President

1 of 1                                                              7/25/2014 2:44 PM

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

~~Thomas J Rice~~

By: [_____]
    its General Partner

By: X ~~_____~~
Name: ~~Thomas J. Rice~~
Title: _____

AUS 678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: _X_ *[signature]*_____
Name: _____
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

### INVESTORS

[ Clarence LP        ]

By: [ Wicklow Capital ]nc
    its General Partner

By: _____
Name: John R. Flynn _____
Title: COO of Wicklow Capital Inc., GP of Clarence LP

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

## INVESTORS

By: [==========]
   its General Partner

By: _____
Name:  DEREK  ANDERSON
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
its General Partner

By: *(signature)*
Name: MEL GLICKMAN ARCHITECT
Title: PRESIDENT

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.

24

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    *its General Partner*

By: _E. Jane Doe_____
Name: ___E Jane Day_____
Title: _____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

By: [_____]
   its General Partner


By: _____
Name: _____
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
its General Partner

By: _____
Name: _____
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

## INVESTORS

[_____]

By: [_____]
    its General Partner

By: X _____
Name: J. Conway _____
Title: _____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.

24

DocuSign Envelope ID: A331D00B-2197-46F8-9533-2D698C41398F

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[Certifiable Sol]utions, LLC

By: [_____]
    its General Partner

By: _Bart R McDonough_____
Name: _Bart McDonough_____
Title: _CEO_____

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.
24

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

PALODURO INVESTMENTS INC.

[_____]

By: [_____]
its General Partner

By: _____
Name: ROBERT CROSS
Title: PRESIDENT

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

☆ Sign ⟶ By: _Gisela Weibel_ Gisela Weibel.
Name: _____
Title: _____

AUS:678594.10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
    its General Partner

By: X _____
Name: _Robert Hannah_____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

[_____]

By: [_____]
its General Partner

By: _____
Name: _____ 685 2501 ALBERTA CIR.
Title: _____ PRESIDENT, JEFF GREEN

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

**INVESTORS**

|_____|

By: [_____]
    its General Partner

By: _____
Name: _____
Title: _____

*Peter Tven, President*

SIGNATURE PAGE TO SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT
COINTERRA, INC.

24

AUS-078394;10

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

<u>INVESTORS</u>

[_____]

By: [_____]
    its General Partner

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have executed this Secured Convertible Note Purchase Agreement on the day, month and year first set forth above.

<u>**INVESTORS**</u>

[_____]

By: [_____]
     its General Partner

By: _____
Name: _____
       DANA      GILMAN
Title: _____
       Investment advisor

<u>**SCHEDULE A**</u>

**SCHEDULE OF INVESTORS**

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| 101049658 SK Ltd.<br>518 Queen St<br>Saskatoon SK S7K 0M5 | 25,000.00 | NBCN Inc.  ITF **101049658 SK Ltd., Acct 4EH378A**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Dr. James McHattie Medical Prof. Corp<br>1821 Rose St<br>Regina SK S4P 1Z7 | 25,000.00 | NBCN Inc.  ITF **Dr. James McHattie Medical Prof Corp,  Acct 4EH122A**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Rodney Koch<br>PO BOX 151<br>Edenwold SK S0G 1K0 | 40,000.00 | NBCN Inc.  ITF **Rodney Koch,  Acct 4EH110E**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #905 |
| T.Thiessen M.D.Surgical Prof Corp<br>247 Lakeshore Pl<br>Saskatoon SK S7J 3T7 | 54,000.00 | NBCN Inc.  ITF **T. Thiessen M.D. Surgical Prof Corp,  Acct 4EH623E**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #906 |

A-1

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Dorothy Platzer<br>401 Dalhousie Cres<br>Saskatoon SK S7H 3S3 | 40,000.00 | NBCN Inc.  ITF **Dorothy Platzer, Acct 4EH104B**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #906 |
| Brian Gibbs<br>PO Box 29004<br>111-1715 Preston Ave N<br>Saskatoon SK S7N 4V2 | 50,000.00 | NBCN Inc.  ITF **Brian Gibbs,  Acct 4EH035E**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Kevin Thompson<br>414 Victor Place<br>Saskatoon SK S7T 0E2 | 10,000.00 | NBCN Inc.  ITF **Kevin Thompson, Acct 4EE498A**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Philip Armstrong PH 77 Avenue Rd Toronto On M5R 3R8 | 100,000.00 | NBCN Inc.  ITF Philip Armstrong **Acct 4EDO89F**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Mel Glickman Architect,<br>378A Beresford ave , Toronto On M6S 3B5 | 100,000.00 | NBCN Inc.  ITF Mel Glickman Architect  **Acct 4ELJ28F**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |

A-2

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Mark Wayne, 155 Waterloo Dr SW, Calgary AB T3C 3G4 | 250,000.00 | NBCN Inc.  ITF Mark Wayne **Acct 4EE211F** 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Felcom Capital Corp 26 Wellington Street East Suite 910 Toronto ON M5E 1S2 | 25,000.00 | NBCN Inc.  ITF Felcom Capital Corp, Acct 4ea937f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Anita Berkis 26 Wellington Street East Suite 910 Toronto ON M5E 1S2 | 25,000.00 | NBCN Inc.  ITF Anita Berkis, Acct 4ea938f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Donald S McFarlane 26 Wellington Street East Suite 900 Toronto ON M5E 1S2 | 100,000.00 | NBCN Inc.  ITF Donald S McFarlane, Acct 4ee586f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| James Ward Timothy Witzel 932 Victoria Street North Kitchener ON N2B 1W4 | 50,000.00 | NBCN Inc.  ITF James Ward Timothy Witzel, Acct 4ea875f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Maxillo-Care Inc 2891 Ridge Road West RR # 2 RPO Shanty Bay ON L0L 2L0 | 25,000.00 | NBCN Inc.  ITF Maxillo-Care Inc, Acct 4ea656f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |

A-3

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| David Gargaro 9 Hyland Ave Etobicoke ON M8X 1P8 | 25,000.00 | NBCN Inc.  ITF David Gargaro, Acct 4ea764e 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Ward Seymour, 81 Stainway Blvd, Etobicoke On M9W 6H6 | 50,000.00 | NBCN Inc.  ITF Ward Seymour, Acct 4ea054f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Thomas J Rice, 342 Country Club Blvd. Winnipeg MB R3K 1X6 | 50,000.00 | NBCN Inc.  ITF Thomas J Rice, Acct 4eb620f1010 Rue De la Gauchetiere OuestMezzanine 100Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere OuestMezzanine 100Montreal, QC H3B 5J2Attn: Securities Department #904 |
| J David Bunston,46 Bernard Ave, Toronto On M5R 1R2 | 25,000.00 | NBCN Inc.  ITF J David Bunston, Acct 4ea200e 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Joseph Conway, 49 Nanton Ave, Toronto On M4W 2Y8 | 100,000.00 | NBCN Inc.  ITF Joseph Conway, Acct 4ea247f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Purling Holdings, 9 Wakefield Cres Scarborough ON M1W 2C1 | 60,000 | NBCN Inc.  ITF Purling HoldingsAcct.#4EB713F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |

A-4

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| JA Developments. 14689 Bathurst St. Aurora On L4G 7A4 | 35,000 | NBCN Inc. ITF JA Developments Acct.#4eb720F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Lorne Waldman, 281 Eglinton Ave E. Toronto ON M4P 1L3 | 35,000 | NBCN Inc. ITF Lorne Waldman Acct.#4eb766F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Jane Day, 36 Rosedale Rd, Toronto On M4W 2P6 | 60,000 | NBCN Inc. ITF Jane Day Acct.#4eda04e 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Steedco, 796217 Grey Rd Blue Mountains On L9Y 0R1 | 25,000 | NBCN Inc. ITF Steedco Acct.#4EB743B 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Peter Avery, 146 bathurst St. Aurora On L4G 7A4 | 35,000 | NBCN Inc. ITF Peter Avery Acct.#4edn50F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Robert Hannah, 26 Wellington St E Suite 900 Toronto On M5E 1S2 | 26,000 | NBCN Inc. ITF Robert Hannah Acct: 4EE078F 1010 de la Gauchetiere West Mezzanine 100 Montreal QC, H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |

A-5

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Marquest -501 | 210,000.00 | RBC Investors Services Trust in Trust for a/c#011800030 | RBC Investor Sevices Trust,155 Wellington St. 2nd Floor, Toronto ON M5J 2S1 Att: Cage Rebecca 416-955-3191 |
| Marquest -571 | 115,000.00 | RBC Investors Services Trust in Trust for a/c#162142001 | RBC Investor Sevices Trust,155 Wellington St. 2nd Floor, Toronto ON M5J 2S1  Att: Cage Rebecca 416-955-3191 |
| Michael Shannon,2860 Hill Park Rd Montreal QC H3H 1T1 | 200,000.00 | Laurentian Bank Securities Inc. 1981, ave McGill College, Suite 1900 Montreal (Quebec) H3A 3K3 | Laurentain Bank Securities Inc. Attn: Louise Belanger 514-350-2826 belangerL@vmbl.ca, 1981 Ave McGill College Bureau 1900 Montreal Qc H3A 3K3 |
| Jason Mann | 145,000.00 | Mackie Research Capital Corp. ITF Jason Mann, 199 Bay Street, Suite 4500 Commerce Court West Box 368 Toronto On M5L 1G2 | Mackie Research Capital Corp. ITF Jason Mann, 199 Bay Street, Suite 4500 Commerce Court West Box 368 Toronto On M5L 1G2 |
| Brad White, 3 May St, Toronto On M4W 2X9 | 250,000.00 | GMP Securities LP ITF 400-NHR0-F, 145 King St. W Suite 300 Toronto On M5H 1J8 | GMP Securities LP, ITF A/C #400-NHR0-F    2nd Fl-Cage, 145 King Street West, Suite 300 Toronto On M5H 1J8 |
| 2026860 Ontario Inc. 606-77 Avenue Rd, Toronto On M5R 3R8 | 100,000.00 | GMP Securities LP ITF 610-PC90-B, 145 King St. W Suite 300, Toronto On M5H 1J8 | GMP Securities LP,ITF A/C #610-PC90-B 2nd Fl-Cage, 145 King Street West, Suite 300 Toronto On M5H 1J8 |
| Helen Dittmer, 78 Sunset Way SE Calgary AB T2X 3C1 | 50,000.00 | GMP Securities L.P. ITF A/C 610-AWS0-F , 145 King St. W Suite 300, Toronto On M5H 1J8 | |

A-6

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Darren Dittmer or Ellen Shong Leong 308 Hidden Ranch Circle NW Calgary AB T3A 5R2 | 25,000.00 | GMP Securities L.P. ITF A/C 610-ZTN0-B , 145 King St. W Suite 300, Toronto On M5H 1J8 | |
| Gisela Wsaibel, 1385 Crestwell Rd West Vancouver BC V7V 3N6 | 100,000.00 | GMP Securities L.P. ITF A/C 610-B0R0-F  145 King St. W Suite 300, Toronto On M5H 1J8 | |
| Paloduro Investments | 500,000.00 | Paloduro Investments Inc. 1560 - 505 Burrard St. Vancouver BC V7X 1M5 | |
| Clarence LP | 500,000.00 | Clarence LP c/o Wicklow Capital, Inc.53 W. Jackson Blvd. Suite 1204, Chicago IL 60604 | |
| Serenity Investments LLC | 250,000.00 | Serenity Investments LLC 830 North Boulevard Oak Park, IL 60301 | |
| David G P Allan | 50,000.00 | David G P Allan 90 Winchester St T oronto, ON Canada M4X 1B2 | |
| Michael Rauchman | 75,000.00 | Hedgehog Advisors, LLC 1584 Dawn Ct,  Long Grover, IL 60047 | |
| Derek Anderson | 35,000.00 | Derek Anderson 6179 Iris Way Arvada, CO 80004 | |

A-7

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Bart R McDonough | 100,000.00 | Certifiable Solutions, LLC 201 David L Boren Blvd, Suite 250 Norman, OK 73072 | |
| | | | |
| | 4,150,000.00 | | |

**SCHEDULE OF INVESTORS**
SECOND CLOSING - SEPTEMBER 3, 2014

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Jane Day, 36 Rosedale Rd Toronto On M4W 2P6 | 40,000.00 | NBCN Inc.  ITF Jane Day    a/c #4eda04f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 250 Yonge Street Suite 1900 Toronto ON M5B 2L7 Attention: Eria Lau (416) 869-6527 |
| JA Developments, 17 Autumn Way, Aurora On L4G 4P2 | 40,000.00 | NBCN Inc.  ITF 4eb720F   a/c # 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 250 Yonge Street Suite 1900 Toronto ON M5B 2L7 Attention: Eria Lau (416) 869-6527 |

A-8

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Tom Kritsch, 504-10 Bay St E Thornbury On N0H 2P0 | 50,000.00 | NBCN Inc.  ITF 4eb962F a/c # 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 250 Yonge Street Suite 1900 Toronto ON M5B 2L7 Attention: Eria Lau (416) 869-6527 |
| 682501Alberta Ltd. 26 Wellington st E Suite 920 Toronto ON M5E 1S2 | 50,000.00 | NBCN Inc.  ITF   a/c # 4ec880F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 250 Yonge Street Suite 1900 Toronto ON M5B 2L7 Attention: Eria Lau (416) 869-6527 |
| Dana Gilman | 100,000.00 | Fidelity Clearing Canada ULC ITF A/C D12-DGC0-E, 200-483 Bay St, South Tower, Toronto, ON, M5G 2N7 | Fidelity Clearing Canada ULC 200-483 Bay St, South Tower Toronto ON  M5G 2N7          Attn: Dwayne McKenzie |
|  | 280,000.00 |  |  |

| TOTAL | 4,430,000.00 |  |  |
|---|---|---|---|

A-9

AUS:678594.12

## SCHEDULE B

### CANADIAN LEGAL NOTICES

#### *Rights of Action for Rescission or Damages — General*

A purchaser of Notes has a statutory right of action, which is described below, in the following jurisdictions: in Ontario, Manitoba, Saskatchewan, Nova Scotia, New Brunswick, Prince Edward Island and Newfoundland and Labrador. These rights are in addition to, and without derogation from, any other right or remedy that purchasers may have at law. For the purposes of the following, "Misrepresentation" means an untrue statement of a material fact, or an omission to state a material fact that is required to be stated, or that is necessary to make a statement not misleading in the light of the circumstances in which it was made.

The following summaries are subject to the express provisions of the relevant securities legislation and the rules, regulations and other instruments thereunder in the provinces of Ontario, Manitoba, Saskatchewan, Nova Scotia, New Brunswick, Prince Edward Island, and Newfoundland and Labrador, as the case may be. Those provisions may contain other limitations and statutory defences on which purchasers of the Notes may rely. These remedies, or notice with respect to these remedies, must be exercised or delivered, as the case may be, by a purchaser of Notes within the time limits prescribed by applicable securities legislation. Canadian purchasers should refer to the applicable provisions of the securities legislation of their province of residence for the particulars of these rights and consult with their own legal advisers prior to investing in the Notes.

#### *Rights of Action (Ontario Investors)*[1]

Ontario Securities Commission ("**OSC**") Rule 45 501 Ontario Prospectus and Registration Exemptions, provides that when an offering memorandum, such as this offering memorandum, is delivered to an investor to whom securities are distributed in reliance upon the "accredited investor" prospectus exemption in Section 2.3 of NI 45-106, the right of action referred to in Section 130.1 of the *Securities Act* (Ontario) ("**Section 130.1**") is applicable unless the prospective purchaser is:

(a)      a Canadian financial institution, meaning either:

      (i)      an association governed by the *Cooperative Credit Associations Act* (Canada) or a central cooperative credit society for which an order has been made under Section 473(1) of that Act; or

      (ii)      a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services cooperative, or league that, in each case, is authorized by an enactment of Canada or a jurisdiction of Canada to carry on business in Canada or a jurisdiction in Canada;

---

Language regarding individual provinces to be deleted if no sales will occur in such province.

(b)     a Schedule III bank, meaning an authorized foreign bank named in Schedule III of the *Bank Act* (Canada);

(c)     the Business Development Bank of Canada incorporated under the *Business Development Bank of Canada Act* (Canada); or

(d)     a subsidiary of any person referred to in paragraphs (a), (b) or (c), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by the directors of that subsidiary.

Section 130.1 provides purchasers who purchase securities offered by an offering memorandum with a statutory right of action against the issuer of securities for rescission or damages in the event that the offering memorandum or any amendment to it contains a misrepresentation, without regard to whether the purchaser relied on the misrepresentation.  "Misrepresentation" means an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made.

In the event that this offering memorandum, together with any amendment, is delivered to a prospective purchaser of Notes in connection with a trade made in reliance on Section 2.3 of NI 45-106, and this offering memorandum contains a Misrepresentation which was a Misrepresentation at the time of purchase of the Notes, the purchaser will have a statutory right of action against the Corporation for damages or, while still the owner of the Notes, for rescission, in which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages, provided that:

(e)     no action shall be commenced more than, in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or in the case of any other action, the earlier of (a) 180 days after the plaintiff first had knowledge of the facts giving rise to the cause of action, or (b) three years after the date of the transaction that gave rise to the cause of action;

(f)     in an action for damages, the defendant will not be liable if it proves that the purchaser purchased the Notes with knowledge of the Misrepresentation;

(g)     in an action for damages, the defendant will not be liable for all or any portion of the damages that it proves do not represent the depreciation in value of the Notes as a result of the Misrepresentation relied upon;

(h)     in no case will the amount recoverable exceed the price at which the Notes were offered to the purchaser; and

(i)     the statutory right of action for rescission or damages is in addition to and without derogating from any other rights the purchaser may have at law.

This summary is subject to the express provisions of the Securities Act (Ontario) and the regulations, rules and policy statements made under it, and you should refer to the complete text of those provisions.

AUS:678594.12

### Rights of Action (Manitoba Investors)

The right of action for rescission or damages described herein is conferred by Section 141.1 of the *Securities Act* (Manitoba). Manitoba's securities legislation provides that in the event that an offering memorandum contains a Misrepresentation, a purchaser to whom the offering memorandum has been delivered and who purchases the securities offered by such offering memorandum shall be deemed to have relied upon such Misrepresentation if it was a Misrepresentation at the time of purchase and the purchaser has a right of action for damages against the issuer and, subject to certain additional defences, against directors of the issuer and persons who have signed the offering memorandum, but may elect to exercise a right of rescission against the issuer, in which case such purchaser shall have no right of action for damages against the issuer, directors of the issuer or persons who have signed the offering memorandum, provided that, among other limitations:

(j)     in an action for rescission or damages, the defendant will not be liable if it proves that the purchaser purchased the securities with knowledge of the Misrepresentation;

(k)     in an action for damages, the defendant is not liable for all or any portion of the damages that it proves do not represent the depreciation in value of the securities as a result of the Misrepresentation relied upon; and

(c)     in no case shall the amount recoverable under the right of action described herein exceed the price at which the securities was offered.

In addition no person or company other than the issuer is liable if the person or company proves that:

(l)     the offering memorandum was sent or delivered to the purchaser without the person's or company's knowledge or consent and that, on becoming aware of its delivery, the person or company gave reasonable notice that it was delivered without the person's or company's knowledge or consent;

(m)     after delivery of the offering memorandum and before the purchase of the securities by the purchaser, on becoming aware of any Misrepresentation in the offering memorandum, the person or company withdrew the person's or company's consent to the offering memorandum, and gave reasonable notice of the withdrawal and the reason for it; or

(n)     with respect to any part of the offering memorandum purporting (a) to be made on the authority of an expert, or (b) to be a copy of, or an extract from, a report, an opinion or a statement of an expert, the person or company had no reasonable grounds to believe and did not believe that (A) there had been a Misrepresentation, or (B) the relevant part of the offering memorandum did not fairly represent the report, opinion or statement of the expert or was not a fair copy of, or an extract from, the report, opinion or statement of the expert.

Furthermore no person or company other than the issuer is liable with respect to any part of the offering memorandum not purporting (a) to be made on the authority of an expert; or (b) to be a copy of, or an extract from, a report, opinion or statement of an expert, unless the person or

company (i) failed to conduct a reasonable investigation to provide reasonable grounds for a belief that there had been no Misrepresentation; or (ii) believed that there had been a Misrepresentation. If a Misrepresentation is contained in a record incorporated by reference in, or deemed incorporated by reference into, the offering memorandum, the misrepresentation is deemed to be contained in the offering memorandum.

In addition, no action shall be commenced to enforce these rights more than:

(o) in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or

(p) in the case of any action, other than an action for rescission, the earlier of: (a) 180 days after the date on which the purchaser first had knowledge of the facts giving rise to the cause of action, or (b) 2 years after the date of the transaction that gave rise to the cause of action.

The rights of action for rescission or damages described herein are in addition to and without derogation from any right the purchaser may have at law.

### Rights of Action (Saskatchewan Investors)

The right of action for rescission or damages described herein is conferred by Section 138 of the *Securities Act*, 1988 (Saskatchewan), as amended, (the "**Saskatchewan Act**").  If this offering memorandum or any amendment to it is sent or delivered to a purchaser resident in Saskatchewan and it contained a Misrepresentation, a purchaser who purchases a security covered by the offering memorandum or any amendment to it has, without regard to whether the purchaser relied on the Misrepresentation, a right of action for rescission against the issuer or has a right of action for damages against:

the issuer;

(q) every promoter and director of the issuer at the time the offering memorandum or any amendment to it was sent or delivered;

(r) every person or company whose consent has been filed respecting the offering, but only with respect to reports, opinions or statements that have been made by them; and

(s) every person who or company that sells securities on behalf of the issuer under the offering memorandum or amendment to the offering memorandum.

Such rights of rescission and damages are subject to certain limitations including the following:

(t) if the purchaser elects to exercise its rights of rescission against the issuer, it shall have no right of action for damages against that party;

(u) in an action for damages, a defendant will not be liable for all or any portion of the damages that he, she or it proves do not represent the depreciation in value of the securities resulting from the Misrepresentation relied on;

AUS:678594.12

(v)     in no case shall the amount recoverable exceed the price at which the securities were offered; and

(w)     no person or company is liable in an action for rescission or damages if that person or company proves that the purchaser purchased the securities with knowledge of the Misrepresentation.

The liability of all persons or companies referred to above is joint and several with respect to the same cause of action. A defendant who is found liable to pay a sum in damages may recover a contribution, in whole or in part, from a person or company who is jointly and severally liable to make the same payment in the same cause of action unless, in all the circumstances of the case, the court is satisfied that it would not be just and equitable.

In addition, no person or company, other than the issuer, will be liable if the person or company proves that:

(x)     the offering memorandum or any amendment to it was sent or delivered without the person's or company's knowledge or consent and that, on becoming aware of it being sent or delivered, that person or company immediately gave reasonable general notice that it was so sent or delivered; or

(y)     with respect to any part of the offering memorandum or any amendment to it purporting to be made on the authority of an expert, or purporting to be a copy of, or an extract from, a report, an opinion or a statement of an expert, that person or company had no reasonable grounds to believe and did not believe that there had been a Misrepresentation, the part of the offering memorandum or any amendment to it did not fairly represent the report, opinion or statement of the expert, or was not a fair copy of, or an extract from, the report, opinion or statement of the expert.

Similar rights of action for damages and rescission are provided in respect of a Misrepresentation in advertising and sales literature disseminated in connection with an offering of securities.

Section 138.2 of the *Saskatchewan Act* also provides that where an individual makes a verbal statement to a prospective purchaser that contains a Misrepresentation relating to the security purchased and the verbal statement is made either before or contemporaneously with the purchase of the security, the purchaser has, without regard to whether the purchaser relied on the Misrepresentation, a right of action for damages against the individual who made the verbal statement.

Section 141(1) of the *Saskatchewan Act* provides a purchaser with the right to void the purchase agreement and to recover all money and other consideration paid by the purchaser for the securities if the securities are sold in contravention of the *Saskatchewan Act*, the regulations to the *Saskatchewan Act* or a decision of the Financial and Consumer Affairs Authority of Saskatchewan, Securities Division.

Section 141(2) of the *Saskatchewan Act* also provides a right of action for rescission or damages to a purchaser of securities to whom this offering memorandum or any amendment to it was not sent or delivered prior to or at the same time as the purchaser enters into an agreement to

purchase the securities, as required by the Saskatchewan Act, as required by Section 80.1 of the *Saskatchewan Act*.

Section 80.1(3) of the *Saskatchewan Act* provides that no action shall be commenced to enforce any of the foregoing rights more than:

(z)     in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or

(aa)    in the case of any other action, other than an action for rescission, the earlier of:

    (i)     one year after the plaintiff first had knowledge of the facts giving rise to the cause of action; or

    (ii)    six years after the date of the transaction that gave rise to the cause of action.

The *Saskatchewan Act* also provides a purchaser who has received an amended offering memorandum delivered in accordance with the *Saskatchewan Act* with a right to withdraw from the agreement to purchase the securities by delivering a notice to the person who or company that is selling the securities, indicating the purchaser's intention not to be bound by the purchase agreement, provided such notice is delivered by the purchaser within two business days of receiving the amended offering memorandum.

The rights of action described above are in addition to, and without derogation from, any right or remedy available at law to the purchaser and are intended to correspond to the provisions of the relevant securities laws and are subject to the limitations and defenses contained in those laws.

### *Rights of Action (Nova Scotia Investors)*

The right of action for rescission or damages described herein is conferred by Section 138 of the *Securities Act* (Nova Scotia) (the "**Nova Scotia Act**").  Where an offering memorandum or any amendment thereto or any advertising or sales literature (as defined in the *Nova Scotia Act*) contains a Misrepresentation, a purchaser to whom the offering memorandum has been delivered and who purchases a security referred to therein shall be deemed to have relied upon such Misrepresentation if it was a Misrepresentation at the time of purchase and the purchaser has a right of action for damages against the issuer or other seller and, subject to certain additional defenses, against directors of the seller and persons who have signed the offering memorandum, but may elect to exercise a right of rescission against the seller, in which case he shall have no right of action for damages against the seller, directors of the seller or persons who have signed the offering memorandum, provided that, among other limitations:

(bb)    in an action for rescission or damages, the defendant will not be liable if it proves that the purchaser purchased the security with knowledge of the Misrepresentation;

(cc)    in an action for damages, the defendant is not liable for all or any portion of the damages that it proves do not represent the depreciation in value of the security as a result of the Misrepresentation relied upon; and

(dd)    in no case shall the amount recoverable under the right of action described herein exceed the price at which the security was offered.

In addition, no person or company other than the issuer is liable if the person or company proves that:

(ee)    the offering memorandum or the amendment to the offering memorandum was sent or delivered to the purchaser without the person's or company's knowledge or consent and that, on becoming aware of its delivery, the person or company gave reasonable general notice that it was delivered without the person's or company's knowledge or consent;

(ff)    after delivery of the offering memorandum or the amendment to the offering memorandum and before the purchase of the securities by the purchaser, on becoming aware of any misrepresentation in the offering memorandum, or amendment to the offering memorandum, the person or company withdrew the person's or company's consent to the offering memorandum, or amendment to the offering memorandum, and gave reasonable general notice of the withdrawal and the reason for it; or

(gg)    with respect to any part of the offering memorandum or amendment to the offering memorandum purporting: (a) to be made on the authority of an expert; (b) to be a copy of, or an extract from, a report, an opinion or a statement of an expert, the person or company had no reasonable grounds to believe and did not believe that (i) there had been a Misrepresentation; or (ii) the relevant part of the offering memorandum or amendment to the offering memorandum (A) did not fairly represent the report, opinion or statement of the expert; or (B) was not a fair copy of, or an extract from, the report, opinion or statement of the expert.

Furthermore no person or company other than the issuer is liable with respect to any part of the offering memorandum or amendment to the offering memorandum not purporting: (a) to be made on the authority of an expert; or (b) to be a copy of, or an extract from, a report, opinion or statement of an expert, unless the person or company (i) failed to conduct a reasonable investigation to provide reasonable grounds for a belief that there had been no misrepresentation; or (ii) believed that there had been a Misrepresentation.

If a Misrepresentation is contained in a record incorporated by reference in, or deemed incorporated into, the offering memorandum or amendment to the offering memorandum, the Misrepresentation is deemed to be contained in the offering memorandum or amendment to the offering memorandum.

Pursuant to section 146 of the *Nova Scotia Act*, no action shall be commenced to enforce the right of action conferred by section 138 thereof unless an action is commenced to enforce that right not later than 120 days after the date on which payment was made for the security or after the date on which the initial payment for the security was made where payments subsequent to the initial payment are made pursuant to a contractual commitment assumed prior to, or concurrently with, the initial payment.

The right of action for rescission or damages described herein is conferred by section 138 of the *Nova Scotia Act* and is in addition to and without derogation from any right the purchaser may have at law.

### Rights of Action (New Brunswick Investors)

Section 2.1 of New Brunswick Securities Commission Rule 45-802 provides that the rights of action referred to in Section 150 of the Securities Act (New Brunswick) (the "**New Brunswick Act**") apply to information relating to an offering memorandum (such as this offering memorandum) that is provided to a purchaser in securities in connection with a distribution made in reliance on the "accredited investor" prospectus exemption in Section 2.3 of NI 45-106. The *New Brunswick Act* provides such purchasers with a statutory right of action against the issuer of the securities and a selling security holder on whose behalf a distribution is made for rescission or damages in the event that the offering memorandum or any amendment to it contains a Misrepresentation.

If any information relating to the offering of securities of the issuer which has been provided to the purchaser contains a Misrepresentation, the purchaser will be deemed to have relied upon the Misrepresentation if it was a Misrepresentation at the time of purchase and will have a statutory right of action against the issuer for damages or, alternatively, for rescission, provided that no action shall be commenced to enforce a right of action more than,

(hh)     in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or

(ii)     in the case of any action, other than an action for rescission, the earlier of: (a) one year after the purchaser first had knowledge of the facts giving rise to the cause of action, and (b) six years after the date of the transaction that gave rise to the cause of action.

This right of action is also subject to the following limitations:

(jj)     no person will be liable if it proves that the purchaser purchased the securities with knowledge of the Misrepresentation;

(kk)     in the case of an action for damages, the defendant will not be liable for all or any portion of those damages that it proves do not represent the depreciation in value of the securities as a result of the Misrepresentation; and

(ll)     in no case will the amount recoverable under this paragraph exceed the price at which the securities were sold to the purchaser.

### Rights of Action (Prince Edward Island Investors)

The right of action for rescission or damages described herein is conferred by Section 112 of the *Securities Act* (Prince Edward Island) (the "**PEI Act**"). If this offering memorandum delivered to a purchaser resident in Prince Edward Island contains a Misrepresentation, a purchaser will be deemed to have relied upon that Misrepresentation and will have a right of action for damages against the issuer, every director of the issuer at the date of the offering memorandum, every

person who signed the offering memorandum and, if applicable, the selling security holder on whose behalf the distribution is made.

Alternatively, where the purchaser purchased the securities from the issuer, the purchaser may elect to exercise a right of rescission against the issuer or, if applicable, the selling security holder on whose behalf the distribution is made.

A person, other than the issuer and the selling security holder, is not liable for damages if the person proves that:

(mm)  the offering memorandum was sent to the purchaser without the person's knowledge or consent and that, on becoming aware of its being sent, the person promptly gave reasonable notice to the issuer that it was sent without the knowledge and consent of the person;

(nn)  the person, on becoming aware of the Misrepresentation in the offering memorandum, withdrew the person's consent to the offering memorandum and gave reasonable notice to the issuer of the withdrawal and the reason for it; or

(oo)  with respect to any part of the offering memorandum purporting to be made on the authority of an expert or purporting to be a copy of, or an extract from, a report, statement or opinion of an expert, the person had no reasonable grounds to believe and did not believe that:

(i)  there had been a Misrepresentation, or

(ii)  the relevant part of the offering memorandum

(A)  did not fairly represent the report, statement or opinion of the expert, or

(B)  was not a fair copy of, or an extract from, the report, statement or opinion of the expert.

Such rights of rescission and damages are subject to certain limitations including the following:

(pp)  in an action for damages, a defendant will not be liable for all or any portion of the damages that he, she or it proves do not represent the depreciation in value of the securities resulting from the Misrepresentation relied on;

(qq)  no person or company, other than the issuer, will be liable for any part of the offering memorandum or any amendment to it not purporting to be made on the authority of an expert and not purporting to be a copy of, or an extract from, a report, opinion or statement of an expert, unless the person or company failed to conduct a reasonable investigation sufficient to provide reasonable grounds for a belief that there had been no misrepresentation or believed that there had been a Misrepresentation;

(rr)  in no case shall the amount recoverable exceed the price at which the securities were offered; and

(ss)    no person or company is liable in an action for rescission or damages if that person or company proves that the purchaser purchased the securities with knowledge of the Misrepresentation.

No action shall be commenced to enforce these rights more than:

(tt)    in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or

(uu)    in the case of any action, other than an action for rescission, (a) 180 days after the purchaser first had knowledge of the facts giving rise to the cause of action, or (b) three years after the date of the transaction that gave rise to the cause of action, whichever expires first.

This summary is subject to the conditions of the *PEI Act* and the regulations and rules made under it, and prospective purchasers should refer to the complete text of those provisions.

In addition, a person is not liable with respect to a Misrepresentation in forward looking information if:

(vv)    the offering memorandum containing the forward looking information also contains, proximate to the forward looking information, (i) reasonable cautionary language identifying the forward looking information as such and identifying material factors that could cause actual results to differ materially from a conclusion, forecast or project in the forward looking information and (ii) a statement of the material factors or assumptions that were applied in drawing a conclusion or making a forecast or project set out in the forward looking information; and

(ww)    the person had a reasonable basis for drawing the conclusions or making the forecast or projections set out in the forward looking information.

The above paragraph does not relieve a person of liability respecting forward looking information in a financial statement required to be filed under Prince Edward Island securities laws.

### Rights of Action (Newfoundland and Labrador Investors)

The right of action for rescission or damages described herein is conferred by Section 130.1 of the *Securities Act* (Newfoundland & Labrador) (the "**NL Act**"). The NL Act provides that where an offering memorandum contains a Misrepresentation, a purchaser to whom the offering memorandum has been delivered and who purchases a security referred to therein shall be deemed to have relied upon such Misrepresentation if it was a Misrepresentation at the time of purchase and the purchaser has a right of action for damages against the issuer and, subject to certain additional defenses, against directors of the issuer and persons who have signed the offering memorandum, but may elect to exercise a right of rescission against the issuer.  Where a right of rescission is exercised, a purchaser shall have no right of action for damages against any other person.

A defendant:

(xx)　　is not liable if the purchaser had knowledge of the Misrepresentation;

(yy)　　in an action for damages, is not liable for all or any portion of the damages that it proves do not represent the depreciation in value of the security as a result of the Misrepresentation relied upon; and

(zz)　　in an action for damages, the amount recoverable under the right of action shall not exceed the price at which the security was offered.

In addition no person or company, other than the issuer, is liable if the person proves that:

(aaa)　　the offering memorandum was sent to the purchaser without the person's or company's knowledge or consent and that, on becoming aware of its delivery, the person or company gave reasonable notice to the issuer that it was sent without the person's or company's knowledge or consent;

(bbb)　　on becoming aware of any Misrepresentation in the offering memorandum, the person or company proves they withdrew the person's or company's consent to the offering memorandum, and gave reasonable notice to the issuer of the withdrawal and the reason for it;

(ccc)　　with respect to any part of the offering memorandum purporting to be made on the authority of an expert, or purporting to be a copy of, or an extract from, a report, statement or opinion of an expert, the person or company proves they had no reasonable grounds to believe and did not believe that:

　　　　(i)　　there had been a Misrepresentation, or

　　　　(ii)　　the relevant part of the offering memorandum

　　　　　　(A)　　did not fairly represent the report, opinion or statement of the expert, or

　　　　　　(B)　　was not a fair copy of, or an extract from, the report, opinion or statement of the expert, or

(ddd)　　with respect to any part of the offering memorandum not purporting to be made on the authority of an expert unless the person or company did not conduct an investigation sufficient to provide reasonable grounds for a belief that there had been no Misrepresentation, or believed there had been a Misrepresentation.

If a Misrepresentation is contained in a record incorporated by reference in, or deemed incorporated into, the offering memorandum, the Misrepresentation is deemed to be contained in the offering memorandum.

The right of action for rescission or damages described herein is conferred by section 130.1 of the *Securities Act* (Newfoundland and Labrador) and is in addition to and without derogation from any other right the purchaser may have at law.

Pursuant to section 138 of the *Securities Act* (Newfoundland and Labrador), no action shall be commenced to enforce the rights conferred by section 130.1 thereof unless commenced:

(eee)  in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or

(fff)  in the case of an action, other than an action for rescission, the earlier of:

(i)  180 days after the plaintiff first had knowledge of the facts giving rise to the cause of action; or

(ii)  3 years after the date of the transaction that gave rise to the cause of action.

**Language**

The parties hereto acknowledge and confirm that they have requested that this Agreement, the Note as well as all notices and other documents contemplated hereby be drawn up in the English language.  Les parties aux présentes reconnaissent et conferment qu'elles ont convenu que la présente convention ainsi que tous les avis et documents qui s'y rattachent soient rédigés dans la langue anglaise.

**Enforcement of Legal Rights**

The Company is a company organized under the laws of the state of Delaware, United States and its registered office is located in the state of Delaware, United States.  All of the Company's directors and officers, as well as any experts named herein, may be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon the Company or such persons.  All or a substantial portion of the assets of the Company and such other persons may be located outside of Canada and as a result, it may not be possible to satisfy a judgment against the Company or such persons in Canada, or to enforce a judgment obtained in Canadian courts predicated upon the civil liability provisions of applicable securities laws in Canada against the Company or such persons outside of Canada.  In addition, the laws of the jurisdiction in which the books, records and other documents are located in respect of the Company may prevent the production of such documents in Canada.

# EXHIBIT A

## FORM OF NOTE

See attached.

AUS:678594.12

THIS NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE.  THEY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED ONLY ,IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS (A) TO THE COMPANY; (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN ACCORDANCE WITH ALL LOCAL LAWS AND REGULATIONS; (C) IN ACCORDANCE WITH THE EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR OTHER LOCAL LAWS AND REGULATIONS; (D) IN ACCORDANCE WITH THE EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR OTHER LOCAL LAWS AND REGULATIONS, OR (E) IN A TRANSACTION THAT DOES NOT OTHERWISE REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PROVIDED THAT IN THE CASE OF CLAUSES (D) OR (E), THE SELLER FURNISHES TO THE COMPANY AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY TO SUCH EFFECT.

UNLESS PERMITTED BY SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THIS SECURITY IN CANADA BEFORE THE DATE THAT IS FOUR (4) MONTHS AND A DAY AFTER THE LATER OF (I) AUGUST 1, 2014 AND (II) THE DATE THE COMPANY BECOMES AS REPORTING ISSUER IN ANY PROVINCE OR TERRITORY OF CANADA.

## COINTERRA, INC.

### SECURED CONVERTIBLE NOTE

Austin, Texas

$[_____]                                                   August 1, 2014


FOR VALUE RECEIVED, CoinTerra, Inc., a Delaware corporation (the "**Company**"), promises to pay to [_____] (the "**Holder**"), or its registered assigns, the principal amount of [_____] and 00/100ths dollars ($[_____]), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Secured Convertible Note (this "**Note**") on the unpaid principal balance at a rate equal to ten percent (10.0%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then accrued but unpaid interest and any other amounts payable hereunder, shall be due and payable on the earliest to occur of (i) July 31, 2015 or (ii) the occurrence of an Event of Default (as defined below) (such earliest date is hereinafter referred to as "**Maturity**").   Holder acknowledges that this Note is one of the Secured

Convertible Notes of like tenor (collectively, the "***Notes***") being issued by the Company to raise interim financing of up to $15,000,000.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

**Section 1.**     **Certain Definitions**.  As used in this Note, the following capitalized terms have the following meanings:

1.1     "***Capital Stock***" means the Company's Common Stock and Preferred Stock.

1.2     "***Change of Control***" means (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity (or if the Company or such other surviving or resulting entity is a wholly-owned subsidiary immediately following such acquisition, its parent); (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company and its subsidiaries taken as a whole by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned subsidiary of the Company; or (iii) any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary..

1.3     "***Collateral Agent***" means Fortis Advisors LLC as collateral agent for the ratable benefit of the Investors, or any successor collateral agent designated in accordance with the Collateral Agent Agreement;

1.4     "***Collateral Agent Agreement***" means the collateral agreement dated the date hereof entered into among the Collateral Agent, the Investors, the Company, Terramine Hosting Inc., Cohinoor, Inc. and Zuriya LLC;

1.5     "***Common Stock***" means shares of the Company's Common Stock, par value $0.0001  per share.

1.6     "***Company***" shall have the meaning set forth on the cover page hereof.

1.7     The "***Conversion Factor***" shall be .80 (i.e. a 20% discount).

1.8     "***Corporate Event***" shall mean any of (i) a Change of Control or (ii) a Public Offering.

1.9     "***Event of Default***" shall have the meaning set forth in Section 6 hereof.

1.10    "*Highest Lawful Rate*" means, at the particular time in question, the maximum nonusurious rate of interest which, under applicable law, the Holder is then permitted to charge the Company amounts outstanding hereunder.  If the maximum non-usurious rate of interest which, under applicable law, the Holder is permitted to charge the Company shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, as of the effective time of such change without notice.

1.11    "*Holder*" shall have the meaning set forth on the cover page hereof.

1.12    "*Investor*" means any Person who is a party to the Purchase Agreement other than the Company, and each such Persons' successors and assigns;

1.13    "*Majority Investors*" means persons holding a majority of the then outstanding aggregate principal amount of the Notes issued pursuant to the Purchase Agreement.

1.14    "*Maturity*" shall have the meaning set forth on the cover page hereof.

1.15    "*Note Conversion Price*" means, the product of (a) the price per share of Common Stock sold in, received pursuant to, or determined by a Corporate Event times (b) the Conversion Factor.

1.16    "*Notes*" shall have the meaning set forth on the cover page hereof.

1.17    "*Parent Entity*" shall have the meaning set forth in <u>Section 5.2</u> hereof.

1.18    "*Permitted Issuances*" means equity securities of the Company issued or issuable (a) upon conversion of any shares of Preferred Stock; (b) upon the conversion or exercise of convertible or exercisable securities or other rights to purchase the Company's capital stock outstanding as of the date hereof; (c) pursuant to the Company's Equity Incentive Plan; (d) pursuant to the Warrant.

1.19    "*Preferred Stock*" means shares of the Company's Preferred Stock, par value $0.0001 per share.

1.20    "*Public Offering*" means any public offering by the Company of shares of Common Stock, including, without limitation, (i) pursuant to an effective registration statement under the Securities Act of 1933, as then in effect, or any comparable statement under any similar federal statute then in force, (ii) an offering of the Company's capital stock completed concurrently with any listing on the Toronto Stock Exchange, TSX Venture Exchange, or other Canadian national stock exchange, (iii) admission to the Official List by the UK Listing Authority, (iv) admission of its Common Stock to trading on AIM, a market operated by the London Stock Exchange Group plc, (v) a private placement completed concurrently with any going public transaction of the Company, including without limitation a reverse takeover, in the jurisdictions and on the exchanges provided for in items (i) through (iv) above, or (vi) listing on a similar public offering under the laws of a foreign jurisdiction, in each case with respect to items (i) through (vi) with aggregate gross proceeds to the Company of at least $10,000,000.

1.21    "*Purchase Agreement*" means that certain secured convertible note purchase agreement by and among the Company and the other parties thereto.

1.22    "*Reorganization Transaction*" shall have the meaning set forth in Section 5.2 hereof.

1.23    "*Security Documents*" means the Collateral Documents (as defined in the Collateral Agent Agreement).

1.24    "*Transaction Documents*" means this Note, each of the other Notes issued under the Purchase Agreement, and the Purchase Agreement.

1.25    "*Voluntary Conversion Price*" shall be an amount equal to (i) $75,000,000 divided by (ii) 15,408,167.

1.26    "*Warrant*" means that certain Warrant to purchase Common Stock of the Company, by and between the Company and Industrial Alliance Securities, Inc., dated as of the date hereof.

**Section 2.**    **Interest**.  Accrued interest on this Note shall be payable in quarterly installments, with the first such payment of accrued interest occurring on October 31, 2014.

**Section 3.**    **Prepayment; Principal Payment**.  The Note, any accrued but unpaid interest and any other amounts payable under this Note may be prepaid only with the written consent of the Majority Investors.  If a Public Offering has not occurred on or before the date that is six (6) months from the date hereof, and the Note has not been converted pursuant to Section 4 below, then the Company shall make a payment to Holder in an amount equal to [_____][1] within three (3) business days of the date that is six (6) months from the date hereof.  For the avoidance of doubt, such payment will not reduce the outstanding principal amount of the Note.

**Section 4.**    **Conversion**.

4.1    Automatic Conversion.  Immediately prior to, but in any event conditioned upon the consummation of a Corporate Event, the entire outstanding principal amounts payable under this Note, any accrued but unpaid interest and any other amounts payable under this Note shall be automatically converted into shares of Common Stock.  In the event of such conversion, this Note shall be converted into that number of shares of Common Stock determined by dividing (x) the amount of this Note to be converted by (y) the Note Conversion Price.  The Company shall give the Holder at least ten (10) days' advance written notice of a Corporate Event.

4.2    Voluntary Conversion.  At any time prior to Maturity, the entire outstanding principal amounts payable under this Note, any accrued but unpaid interest and any other amounts payable under this Note may be converted into shares of Common Stock at the option of the Holder (a "*Voluntary Conversion*").  In the event of such conversion, this Note shall be

---

[1] Amount to be equal to 10% of the Note's principal amount.

converted into that number of shares of Common Stock determined by dividing (x) the amount of this Note to be converted by (y) the Voluntary Conversion Price.

4.3    Conversion Procedure.

(a)    Automatic Conversion.  Upon automatic conversion of this Note, the outstanding principal, any accrued but unpaid interest and any other amounts payable under this Note shall be converted automatically without any further action by the Holder and whether or not the Note is surrendered to the Company or its transfer agent.

(b)    Voluntary Conversion.  If this Note is voluntarily converted, the Holder shall give written notice to the Company notifying the Company of its election to convert this Note and specifying the amount of the unpaid principal amount of this Note, any accrued but unpaid interest and any other amounts payable under this Note to be converted.

(c)    The Company shall not be obligated to issue the securities issuable upon such automatic conversion, unless the Holder shall surrender this Note at the Company's principal executive office, or, if this Note has been lost, stolen, destroyed or mutilated, then, in the case of loss, theft or destruction, the Holder shall deliver an indemnity agreement reasonably satisfactory in form and substance to the Company (without the requirement of a bond) or, in the case of mutilation, the Holder shall surrender and cancel this Note, *provided, however*, that any failure of a Holder to comply with these provisions shall not have any effect on the conversion of this Note in accordance with Section 4.1 or Section 4.2.  The Company shall, as soon as practicable thereafter issue and deliver to such Holder at such principal executive office a certificate or certificates for the number of shares to which the Holder shall be entitled upon such conversion (bearing such legends as are required by applicable state and federal securities laws in the opinion of counsel to the Company).  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of the closing of the transaction causing automatic conversion.  The person or persons entitled to receive securities issuable upon such conversion shall be treated for all purposes as the record holder or holders of such securities on such date.

(d)    Fractional Shares; Interest; Nonassessable; Effect of Conversion.  Any fractional shares issuable upon conversion of this Note shall be rounded down to the nearest whole share, and the Company shall pay to the Holder the amount of such fractional share multiplied by the Note Conversion Price in the event of a conversion pursuant to Section 4.1 or the Voluntary Conversion Price in the event of a conversion pursuant to Section 4.2.  Upon conversion of this Note in full and the payment of the amounts specified in this Section 4.3(d), the Company shall be forever released from all its obligations and liabilities under this Note.

(e)    Further Assurances.  In connection with the conversion of this Note upon a Corporate Event, and as a condition to the Company's delivery of any securities upon conversion or exchange thereof, by acceptance of this Note, the Holder shall be entitled (and/or required, as the case may be) to execute all agreements (including any market stand-off agreements, if applicable) and other documents executed by the similarly situated investors in connection with the Corporate Event transaction in which this Note is converted.

4.4     Company to Reserve Shares.  The Company covenants with the Holder that it will at all times reserve and keep available out of its authorized Common Stock and solely for the purpose of conversion as provided in this Section 4, and conditionally allot to the Holder, such number of Common Stock as shall then be issuable upon the conversion of this Note.  The Company covenants with the Holder that all Common Stock which shall be so issuable shall be duly and validly issued as fully-paid and non-assessable.

## Section 5.     Covenants.

5.1     Market Stand-Off.  The Holder hereby agrees that it will not, without the prior written consent of the Company and the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's initial public offering and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) calendar days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any securities of the Company, including (without limitation) shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether such securities are then owned by the Holder or are thereafter acquired) or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any securities of the Company, including (without limitation) shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of securities, in cash or otherwise.  The foregoing provisions of this Section 5.1 shall apply only to the Company's initial public offering of equity securities, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Holder if all officers and directors and holders of more than five percent (5%) of the outstanding capital stock of the Company enter into similar agreements.  The Holder agrees to execute an agreement(s) reflecting clauses (i) and (ii) above as may be requested by the managing underwriters at the time of the initial public offering, and further agrees that the Company may impose stop transfer instructions with its transfer agent in order to enforce the agreements in (i) and (ii) above.  The underwriters in connection with the Company's initial public offering are intended third party beneficiaries of this Section 5.1 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

5.2     Recapitalization, Reorganization, Merger.     Following the date hereof, the Company shall not directly or indirectly, be acquired by means of any transaction or series of related transactions (including, without limitation, merger, consolidation, amalgamation or other form of reorganization) (a "***Reorganization Transaction***") in which outstanding shares of the Company are exchanged for or convertible into securities or other consideration is issued, or caused to be issued, to the stockholders of the Company by another acquiring entity (the "***Parent Entity***"), unless in advance of such Reorganization Transaction, the Company delivers to each Holder a written assumption agreement in respect of such Holder's Note executed by the Parent Entity in form and substance satisfactory to such Holder.  Immediately prior to the occurrence of Corporate Event with respect to the Parent Entity, this Note shall be automatically converted in accordance with Section 4 hereof for securities of the Parent Entity that were issued in the Reorganization Transaction.

5.3     Restrictions.  Unless it has obtained the prior written consent of the Collateral Agent, the Company shall not (a) authorize or issue any new equity securities other than the Warrant or the Permitted Issuances (b) subdivide or redivide the outstanding Capital Stock into a greater number of Capital Stock; (c) reduce, combine or consolidate the outstanding Capital Stock into a smaller number of Common Stock; (d) issue any Capital Stock to the holders of all or substantially all of the outstanding Capital Stock by way of a stock dividend; (e) reclassify, subdivide, redivide, reduce, combine or consolidate or make any other change in, the outstanding Capital Stock; (f) issue or distribute to all or substantially all the holders of Capital Stock (i) shares of the Company of any class other than Capital Stock, (ii) rights, options or warrants, (iii) evidences of indebtedness, or (iv) any other assets; (g) amalgamate, consolidate, merge with, or the enter into any agreement to amalgamate, consolidate or merge the Company with, any company, partnership, joint venture or firm (including, without limitation, through a sale of Capital Stock) or continue or re-organize the Company through acquisition or otherwise; (h) permit the sale, lease, exchange or other disposition of all or substantially all of the assets of the Company or any sale, lease, exchange or other disposition of any assets out of the ordinary course of the Company's business; (i) permit the declaration, payment or setting aside for payment of any dividend or distribution in stock or in specie on Capital Stock, in each case of any class or series; or (j) incur, create, assume, become liable in any manner with respect to any indebtedness or debt, other than Permitted Liens (as defined in the Purchase Agreement), unless such debt is subordinate to the Notes.  Notwithstanding the restrictions set forth in this Section 5.3, the Company may redeem, repurchase or otherwise acquire for value (collectively, a "**Repurchase**") any shares of the Company without the consent of the Collateral Agent, or of the Holder; provided further, however, that the Company shall obtain the prior written consent of the Collateral Agent for all Repurchases once the aggregate consideration paid by the Company for Repurchases occurring after the date hereof exceeds $500,000.

**Section 6.     Default; Remedies.**

6.1     Default.  The Company shall be in default under this Note upon the occurrence of any condition or event set forth below (each, an "**Event of Default**"):

        (a)     the Company's failure to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note on the date due, and such default shall continue unremedied for a period of five (5) days following receipt of written notice of such failure to pay by the Collateral Agent;

        (b)     the Company's failure to perform any other obligation or covenant of the Company in favor of the Holder under this Note and such failure to perform remains unremedied for a period of five (5) days;

        (c)     if an event of default occurs in payment or performance of any obligation in favour of any person from whom the Company  has borrowed money which would entitle the holder to accelerate repayment of a material amount of borrowed money, and such default is not waived in writing and remains unremedied for a period of thirty (30) days;

        (d)     if the Company (i) applies for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) is unable,

or admits in writing its inability, to pay its debts as they mature, (iii) makes a general assignment for the benefit of its or any of its creditors, (iv) is dissolved, liquidated or wound up , (v) becomes insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consents to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, (vii) ceases to carry on business, or (viii) takes any action for the purpose of effecting any of the foregoing;

       (e)    proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 90 days of commencement;

       (f)    the Notes or any other Transaction Document shall cease to be, or be asserted by the Company not to be, a legal, valid and binding obligation of the Company enforceable in accordance with their terms or shall cease to give the Investors the rights, powers and privileges purported to be created and granted thereby; or

       (g)    if declared by the Collateral Agent following the occurrence of any of the following: (i) any representation or warranty made or deemed made in any Transaction Document shall prove to have been incorrect, false or misleading in any material respect on or as of the date made or deemed made or (ii) the Company shall fail to perform, comply with or observe any term, covenant or agreement applicable to it contained in any Transaction Document and the continuance thereof beyond any applicable cure periods provided for therein, unless the Company or such other party shall promptly commence and diligently pursue action to (a) cause such representation or warranty to become true in all material respects and/or (b) remedy any failure to perform, comply, or observe such term, covenant or agreement and does so within thirty (30) days after notice thereof has been given to the Company by the Collateral Agent (unless such cure is not capable of being effected within such thirty (30) day period in which case the Company shall have an additional thirty (30) day period in which to perform such cure) and such cure removes any material adverse effect on the Majority Investors of such representation or warranty having been incorrect or of such failure to perform, comply with or observe such term covenant or agreement.

      6.2    <u>Remedies</u>.  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in <u>Section 6.1(b)</u> and <u>Section 6.1(d)</u>) and at any time thereafter during the continuance of such Event of Default, the Majority Investors may, by written notice to the Company, declare the entire outstanding principal amount of the Notes, any accrued but unpaid interest and any other amounts payable under the Notes to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Transaction Documents to the contrary notwithstanding.  Upon the occurrence or existence of any Event of Default described in <u>Section 6.1(b)</u> or <u>Section 6.1(d)</u>, immediately and without notice, all outstanding obligations

payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Transaction Documents to the contrary notwithstanding.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Collateral Agent may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

**Section 7.**     **Collateral Documents**.  This Note is secured by, and guaranteed pursuant to, the Security Documents.

**Section 8.**     **Charges, Taxes and Expenses**.  Issuance of certificates for equity securities issued upon the conversion of this Note shall be made without charge to the Holder hereof for any issue or transfer tax or other incidental expense in respect of the issuance of such certificate, all of which taxes and expenses shall be paid by the Company, and such certificates shall be issued in the name of the Holder.

**Section 9.**     **Saturdays, Sundays, Holidays, etc**.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday, a Sunday or a legal holiday, then such action may be taken or such right may be exercised on the next succeeding day that is not a Saturday, Sunday or legal holiday.

**Section 10.**     **Miscellaneous**.

10.1     Loss, Theft, Destruction or Mutilation of Note.     Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and, in the case of loss, theft or destruction, and delivery of an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it connection with the Note (without the requirement of a bond) or, in the case of mutilation, on surrender and cancellation of this Note, the Company shall execute and deliver, in lieu of this Note, a new Note executed in the same manner as this Note, in the same principal amount as the unpaid principal amount of this Note and dated the date to which interest shall have been paid on this Note or, if no interest shall have yet been so paid, dated the date of this Note.

10.2     Payment.     All payments under this Note shall be made in lawful tender of the United States.

10.3     Waivers and Amendments.     This Note and the obligations of the Company and the rights of the Holder under this Note may be amended, waived, discharged or terminated (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely) with the written consent of the Company (which shall not be required in connection with a waiver of rights in favor of the Company) and the Majority Investors; provided, however, that no such amendment or waiver shall reduce the principal amount of this Note or alter any other economic provisions of this Note in a manner adverse to the Holder or amend any of the provisions of this Note related to conversion of this Note in a manner adverse to the Holder without the written consent of the Holder.  This Note may not be changed, waived, discharged or terminated orally but only by a signed statement in writing.  Any

amendment, waiver, discharge or termination effected in accordance with this <u>Section 10.3</u> shall be binding upon each Holder and the Company.

10.4    <u>Notices</u>.    Any notice, request or other communication required or permitted hereunder shall be given in accordance with the Purchase Agreement.

10.5    <u>Severability</u>.  If one or more provisions of this Note are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

10.6    <u>Successors and Assigns</u>.  Subject to compliance with applicable federal and state securities laws, this Note and all rights under this Note are transferable in whole or in part by the Holder to any person or entity upon written notice to the Company.  This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company.  Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee.  Interest and principal shall be paid solely to the registered holder of this Note.  Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. The Company may not transfer this Note or any of its rights or obligations hereunder, without the prior written consent of the Majority Investors.  Except as otherwise expressly provided in this Note or the Purchase Agreement, the provisions of this Note and the Purchase Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the Company and the Holder.

10.7    <u>Usury</u>.    Each provision in this Note is expressly limited so that in no event whatsoever shall the amount paid, or otherwise agreed to be paid, by the Company for the use, forbearance or detention of the money to be loaned under this Note, exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate, and all amounts owed under this Note shall be held to be subject to reduction to the effect that such amounts so paid or agreed to be paid which are for the use, forbearance or detention of money under this Note shall in no event exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate. To the extent that the Highest Lawful Rate applicable to the Holder is at any time determined by Texas law, the applicable rate ceiling shall be the "weekly ceiling" described in, and computed in accordance with, the provisions of Section 303.003 of the Texas Finance Code, as amended.  The provisions of Chapter 346 of the Texas Finance Code are specifically declared by the parties hereto not to be applicable to this Note. Notwithstanding any provision in this Note to the contrary, if the maturity of the amounts due hereunder are accelerated for any reason, or in the event of prepayment of all or any portion of the amounts due hereunder, earned interest on the principal may never exceed the Highest Lawful Rate, and any unearned interest otherwise payable hereunder that is in excess of the Highest Lawful Rate shall be canceled automatically as of the date of such acceleration or prepayment or other such event and, if theretofore paid, shall be credited on the principal outstanding hereunder or, if the principal has been paid in full, held as collateral for any contingent or unmatured obligation of the Company, or, if there are no contingent or unmatured obligations of the Company then outstanding, refunded to the Company.  In determining whether

or not the interest paid or payable, under any specific contingency, exceeds the Highest Lawful Rate, the Company and the Holder shall, to the maximum extent permitted by applicable law, amortize, prorate, allocate and spread, in equal parts during the period of the actual term of this Note, all interest at any time contracted for, charged, received or reserved in connection with this Note.

     10.8   *Pari Passu* Notes.  The Holder acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued by the Company pursuant to the Purchase Agreement or pursuant to the terms of such Notes issued by the Company.  In the event the Holder receives payments of principal or interest in excess of its pro rata share of the Company's payments of principal or interest to the Holders of all of the Notes issued by the Company, then the Holder shall hold in trust all such excess payments for the benefit of the holders of the other Notes issued by the Company and shall pay such amounts held in trust to such other holders upon demand by such holders.

     10.9   Delays or Omissions.  No delay or omission to exercise any right, power, or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power, or remedy of the Holder nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of the Collateral Agent or the Majority Investors of any breach or default under this Note or any waiver on the part of the Collateral Agent or the Majority Investors of any provisions or conditions of this Note must be made in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Note or by law or otherwise afforded to the Investors, shall be cumulative and not alternative.

     10.10  Titles and Subtitles.  The titles of the paragraphs and subparagraphs of this Note are for convenience of reference only and are not to be considered in construing this Note.

     10.11  Construction.  The language used in this Note will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

     10.12  Governing Law.  This Note shall be governed by and construed under the laws of the State of Texas, without regard to conflicts of law principles.

     10.13  Attorneys' Fees.  In the event of any dispute involving the terms hereof, the prevailing parties shall be entitled to collect legal fees and expenses from the other party to the dispute.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Company has caused this Secured Convertible Note to be executed by its duly authorized officer.

**COINTERRA, INC.**

By:_____
Name:_____
Title:_____

Accepted and agreed to by Holder:

**<u>INVESTORS</u>**

[_____]

By: [_____]
        its General Partner


By:_____

Name:_____

Title:_____

## <u>EXHIBIT B</u>

### FORM OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

See attached.

_____

## COINTERRA, INC.

## SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

_____

**COINTERRA, INC.** (the "*Corporation*"), a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "*DGCL*"), does hereby certify:

**FIRST:**    That the Corporation was originally incorporated pursuant to the DGCL on May 15, 2013 under the name **CoinTerra, Inc.**

**SECOND:**    The Second Amended and Restated Certificate of Incorporation of the Corporation in the form attached hereto as **Exhibit A** (the "*Restated Certificate*") has been duly adopted in accordance with the provisions of Sections 228, 245 and 242 of the DGCL by the directors and stockholders of the Corporation.

**THIRD:**    The Restated Certificate restates, integrates and amends the provisions of the Certificate of Incorporation of this Corporation, as previously amended.

**FOURTH:**    The Restated Certificate so adopted reads in full as set forth in **Exhibit A** attached hereto and is incorporated herein by this reference.

**IN WITNESS WHEREOF**, COINTERRA, INC., has caused this Amended and Restated Certificate to be signed by the President and Chief Executive Officer as of June 25, 2014.

**COINTERRA, INC**

By: _____
       **Ravi Iyengar**
       President and Chief Executive Officer

<u>EXHIBIT A</u>

_____

**SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
OF
COINTERRA, INC.**

_____

## ARTICLE I

The name of this Corporation is CoinTerra, Inc.

## ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is Harvard Business Services, Inc., 16192 Coastal Highway, City of Lewes, County of Sussex, Delaware, 19958 and the name of the registered agent at that address is Harvard Business Services, Inc.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

A.     *Capital Stock*.

1.     <u>Distribution of Stock</u>.  The Corporation is authorized to issue two classes of capital stock to be designated, respectively, "***Common Stock***" and "***Preferred Stock***."  The total number of shares of capital stock authorized to be issued is 80,000,000 shares.  50,000,000 shares shall be Common Stock, par value $0.0001 per share ("***Common Stock***"), and 30,000,000 shares shall be Preferred Stock, par value $0.0001 per share ("***Preferred Stock***"), 10,000,000 of which shall be designated Class A, Series AA Preferred Stock (the "***Class A, Series AA Preferred Stock***"), 10,000,000 of which shall be designated Class A, Series AB Preferred Stock (the "***Class A, Series AB Preferred Stock***"), and 10,000,000 of which shall be designated as "***Class B, Series AA Preferred Stock***" (the "***Class B, Series AA Preferred Stock***").

B.     ***Rights, Preferences and Restrictions of the Capital Stock***. The designations and preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications, and terms and conditions of redemption of the shares of capital stock are as follows:

1.     <u>Common Stock</u>.     Subject to all of the rights of the Preferred Stock as expressly provided herein, by law or by the Board of Directors pursuant to this Restated Certificate, the Common Stock of the Corporation shall possess all such rights and privileges as

AUS:679907.3

are afforded to capital stock by applicable law in the absence of any express grant of rights or privileges provided for herein, including, but not limited to, the following rights and privileges:

       (a)     Dividends may be declared and paid or set apart for payment upon the Common Stock out of any assets or funds of the Corporation legally available for the payment of dividends;

       (b)     The holders of Common Stock shall have the right to vote for the election of directors and on all other matters requiring shareholder action, each share being entitled to one vote; and

       (c)     Upon the voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, the net assets of the Corporation available for distribution shall be distributed pro rata to the holders of the Common Stock in accordance with their respective rights and interests.

       2.     <u>Preferred Stock</u>.

       (a)     The Preferred Stock may be issued from time to time by the Board of Directors as shares of one or more series or class, as provided by this Restated Certificate  or any amendments thereto.  The holders of shares of Preferred Stock will not be entitled to vote on any matter separately as a class, except to the extent specified with respect to each series with respect to any amendment or alteration of the provisions of this Restated Certificate that would adversely affect the powers, preferences, or special rights of the applicable series of Preferred Stock.

       (b)     Except as otherwise provided in this Restated Certificate or pursuant to the terms of any authorized series of Preferred Stock or by action of the Board of Directors pursuant to the DGCL, the vote required for stockholder action on all matters shall be the minimum vote required by the DGCL.

       (c)     <u>Liquidation Rights</u>.

       (i)     ***Liquidation Preference***.

       (A)     The "***Class B, Series AA Liquidation Preference***" shall mean the original price paid per share for the Class B, Series AA Preferred Stock (as adjusted to reflect any stock dividend, stock split, combination, recapitalization or other similar event with respect to each such share occurring after the date of the filing of this Restated Certificate).  In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of Class B, Series AA Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Corporation to the holders of Common Stock or any other security ranking junior in priority to the Class B, Series AA Preferred Stock, by reason of their ownership of such stock, an amount per share for each share of Preferred Stock held by them equal to the Class B, Series AA Liquidation Preference specified for such share of Class B, Series AA Preferred Stock, or such lesser amount as may be approved by the holders of the majority of the outstanding shares of Class B, Series AA Preferred Stock.

A-2

(B)     The "*Class A, Series AA Liquidation Preference*" for Class A Series AA shall mean the original price paid per share for the Class A, Series AA Preferred Stock (as adjusted to reflect any stock dividend, stock split, combination, recapitalization or other similar event with respect to each such share occurring after the date of the filing of this Restated Certificate). In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, and after the payment to the holders of Class B, Series AA Preferred Stock of the amounts set forth in Section 2(c)(i)(A) above, the holders of the Class A, Series AA Preferred Stock, on a pari passu basis with the holders of the Class A, Series AB Preferred Stock, shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Corporation to the holders of Common Stock or any other security ranking junior in priority to the Class A, Series AA Preferred Stock, by reason of their ownership of such stock, an amount per share for each share of Class A, Series AA Preferred Stock held by them equal to the Class A, Series AA Liquidation Preference specified for such share of Class A, Series AA Preferred Stock, or such lesser amount as may be approved by the holders of the majority of the outstanding shares of Class A, Series AA Preferred Stock.

(C)     The "*Class A, Series AB Liquidation Preference*" for Class A Series AB shall mean the original price paid per share for the Class A, Series AB Preferred Stock in BTC (as adjusted to reflect any stock dividend, stock split, combination, recapitalization or other similar event with respect to each such share occurring after the date of the filing of this Restated Certificate). In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, and after the payment to the holders of Class B, Series AA Preferred Stock of the amounts set forth in Section 2(c)(i)(A) above, the holders of the Class A, Series AB Preferred Stock, on a pari passu basis with the holders of Class A, Series AA Preferred Stock, shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Corporation to the holders of Common Stock or any other security ranking junior in priority to the Class A, Series AB Preferred Stock, by reason of their ownership of such stock, an amount per share for each share of Class A, Series AB Preferred Stock held by them equal to the Class A, Series AB Liquidation Preference specified for such share of Class A, Series AB Preferred Stock, or such lesser amount as may be approved by the holders of the majority of the outstanding shares of Class A, Series AB Preferred Stock.

(D)     Conversion rate for BTC shall be determined by querying the spot exchange rate for BTC provided by Bitpay.com BTC exchange, and if the Bitpay.com exchange data are not available, by querying the BTC exchange rate with the BTC Exchanger with the highest 30-day trade volume for the preceding 30 days.

(E)     In the event that no liquid market for BTC exists at the time of the liquidation, shares of Class A, Series AB Preferred Stock will be converted to Common Stock with one to one conversion ratio of Class A, Series AB Preferred Stock to Common Stock.

(F)     If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this Section 2(c), then the entire assets of the Corporation legally available for distribution shall be distributed with equal priority and pro rata among the holders of the

A-3

Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this Section 2(c).

(G)     ***Remaining Assets***.  After the payment or setting aside for payment to the holders of Preferred Stock of the full amounts specified in Section 2(a) above, the entire remaining assets of the Corporation legally available for distribution shall be distributed pro rata to holders of the Common Stock of the Corporation in proportion to the number of shares of Common Stock held by them.

(H)     ***Shares not Treated as Both Preferred Stock and Common Stock in any Distribution***.  Shares of Preferred Stock shall not be entitled to be converted into shares of Common Stock in order to participate in any distribution, or series of distributions, as shares of Common Stock, without first foregoing participation in the Distribution, or series of Distributions, as shares of Preferred Stock. "***Distribution***" means the payments described in Section 2(c) above.

(I)     ***Reorganization***.  For purposes of this Section 2, a liquidation, dissolution or winding up of the Corporation shall be deemed to be occasioned by, or to include, (i) the acquisition of the Corporation by another entity by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of related transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Corporation held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Corporation or such other surviving or resulting entity (or if the Corporation or such other surviving or resulting entity is a wholly-owned subsidiary immediately following such acquisition, its parent); (ii) a sale, lease or other disposition of all or substantially all of the assets of the Corporation and its subsidiaries taken as a whole by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned subsidiary of the Corporation; or (iii) any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary.  The treatment of any transaction or series of related transactions as a liquidation, dissolution or winding up pursuant to clause (i) or (ii) of the preceding sentence may be waived with respect to any series of Preferred Stock by the consent or vote of a majority of the outstanding shares of such series by the consent or vote of a majority of the outstanding Preferred Stock (voting on an as-converted basis).

(J)     ***Valuation of Non-Cash Consideration***.  If any assets of the Corporation distributed to stockholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board of Directors.

(d)     <u>Conversion Rights</u>.  The holders of the Preferred Stock shall have conversion rights as follows:

A-4

(i)     ***Right to Convert***.  Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into that number of fully-paid, nonassessable shares of Common Stock determined by dividing the original price paid per share for the Class A, Series AA Preferred Stock, Class A, Series AB Preferred Stock and Class B, Series AA Preferred Stock (such price, the "***Original Issue Price***") by the Conversion Price for such series.  (The number of shares of Common Stock into which each share of Preferred Stock of a series may be converted is hereinafter referred to as the "***Conversion Rate***" for each such series.) The initial "***Conversion Price***" per share for the Class A, Series AA Preferred Stock, Class A, Series AB Preferred Stock, and Class B, Series AA Preferred Stock shall be the original price paid per share for the Class A, Series AA Preferred Stock, Class A, Series AB Preferred Stock and Class B, Series AA Preferred Stock, respectively. Upon any decrease or increase in the Conversion Price for any series of Preferred Stock, as described in this Section 2(c), the Conversion Rate for such series shall be appropriately increased or decreased.

(ii)    ***Automatic Conversion***.  Each share of Preferred Stock shall automatically be converted into fully-paid, non-assessable shares of Common Stock at the then effective Conversion Rate for such share (i) immediately prior to the closing of a firm commitment underwritten initial public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended (the "Securities Act"), covering the offer and sale of the Corporation's Common Stock, or (ii) upon the receipt by the Corporation of a written request for such conversion from the holders of a majority of the Preferred Stock then outstanding (voting as a single class and on an as-converted basis), or, if later, the effective date for conversion specified in such requests (each of the events referred to in (i) and (ii) are referred to herein as an "Automatic Conversion Event").

(iii)   ***Mechanics of Conversion***.  No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Common Stock as determined by the Board of Directors.  For such purpose, all shares of Preferred Stock held by each holder of Preferred Stock shall be aggregated, and any resulting fractional share of Common Stock shall be paid in cash.  Before any holder of Preferred Stock shall be entitled to convert the same into full shares of Common Stock, and to receive certificates therefor, he shall either (I) surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Preferred Stock or (II) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to convert the same; provided, however, that on the date of an Automatic Conversion Event, the outstanding shares of Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent; provided further, however, that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such Automatic Conversion Event unless either the certificates evidencing such

AUS:679907.3

shares of Preferred Stock are delivered to the Corporation or its transfer agent as provided above, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates.  On the date of the occurrence of an Automatic Conversion Event, each holder of record of shares of Preferred Stock shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, notwithstanding that the certificates representing such shares of Preferred Stock shall not have been surrendered at the office of the Corporation, that notice from the Corporation shall not have been received by any holder of record of shares of Preferred Stock, or that the certificates evidencing such shares of Common Stock shall not then be actually delivered to such holder.

(e)  ***Adjustments for Subdivisions or Combinations of Common Stock***.  In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, the Conversion Price of each series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, the Conversion Prices in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(f)  ***Adjustments for Subdivisions or Combinations of Preferred Stock***.  In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Preferred Stock, the Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Preferred Stock, the Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(g)  ***Adjustments for Reclassification, Exchange and Substitution***.  Subject to Section 2(c) above ("***Liquidation Rights***"), if the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Preferred Stock shall have the right thereafter to convert such shares of Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such series of Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

A-6

(h)     *Certificate as to Adjustments*.   Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 3, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

3.     Notices of Record Date.  In the event that this Corporation shall propose at any time:

(a)     to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(b)     to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or

(c)     to voluntarily liquidate or dissolve or to enter into any transaction deemed to be a liquidation, dissolution or winding up of the corporation pursuant to Section 4(d); then, in connection with each such event, this Corporation shall send to the holders of the Preferred Stock at least 10 days' prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (ii) and (iii) above. Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed. The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the consent or vote of the holders of a majority of the Preferred Stock, voting as a single class and on an as-converted basis.

4.     Reservation of Stock Issuable Upon Conversion.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

5.     Certificates of Stock.  Each stockholder shall be entitled to a certificate of the capital stock of the Corporation in such form as may from time to time be prescribed by the

Board of Directors.  Such certificate shall be signed by a President or a Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary.  Such signatures may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the time of its issue.  Every certificate for shares of stock which are subject to any restriction on transfer and every certificate issued when the Corporation is authorized to issue more than one class or series of stock shall contain such legend with respect thereto as is required by law.  The Corporation shall be permitted to issue fractional shares.

6.     Transfers.  Subject to any restrictions on transfer, shares of stock may be transferred on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate therefor properly endorsed or accompanied by a written assignment or power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such proof of the authenticity of signature as the Corporation or its transfer agent may reasonably require.

7.     Record Holders.  Except as may otherwise be required by law, by the Certificate of Incorporation or by these By laws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect thereto, regardless of any transfer, pledge or other disposition of such stock, until the shares have been transferred on the books of the Corporation in accordance with the requirements of these By laws. It shall be the duty of each stockholder to notify the Corporation of such stockholder's post office address.

(a)     *Record Date*.  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not precede the date on which it is established, and which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, more than ten (10) days after the date on which the record date for stockholder consent without a meeting is established, nor more than sixty (60) days prior to any other action. In such case only stockholders of record on such record date shall be so entitled notwithstanding any transfer of stock on the books of the Corporation after the record date.

(b)     If no record date is fixed, (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held, (ii) the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in this state, to its principal place

A-8

of business, or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded, and (iii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

8. <u>Lost Certificates</u>.  The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

C.	***Rights, Preferences, Privileges and Restrictions of Class B, Series AA Preferred Stock***.

1.	Dividend Provisions.  Dividends shall be payable pro rata on the Class B, Series AA Preferred Stock based on the number of shares of Common Stock into which they are convertible, but only if and when declared by the Company's Board of Directors. No dividends shall be paid on any Common Stock unless comparable dividends are paid on all of the Preferred Stock based on the number of Common Stock into which they are convertible.

2.	Automatic Conversion: The Class B, Series AA Preferred Stock shall be automatically converted into Common Stock, at the then applicable conversion rate, in the event of an underwritten public offering of shares of the Company's stock at a per share public offering price (prior to underwriting commissions and expenses).

3.	Other Rights: All other right applicable to Preferred Stock, not in conflict with this Section C shall be available to Class B, Series AA Preferred Stock.

D.	***General Voting Rights***.  Each holder of each share of each series of Preferred Stock (i) shall be entitled to the number of votes equal to the number of shares of Common Stock into which such share of Preferred Stock could be converted at the record date for determination of the stockholders entitled to vote, or, if no such record date is established, at the date such vote is taken or any written consent of stockholders is solicited, (ii) shall have voting rights and powers equal to the voting rights and powers of the Common Stock, except as required by law or as expressly provided herein, voting together with the Common Stock as a single class with respect to any question upon which holders of Common Stock have the right to vote, and (iii) shall be entitled to notice of any stockholders' meeting in accordance with the Corporation's Bylaws.  Fractional votes shall not, however, be permitted and any fractional voting resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted) shall be rounded down to the nearest whole number.  Each holder of each share of Common Stock shall be entitled to one vote per share of Common Stock held.

E.	***Adjustment in Authorized Common Stock***.  The authorized number of shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding or reserved for issuance) by the affirmative vote of the holders of a

majority of the shares of capital stock of the Corporation entitled to vote, voting as a single class, irrespective of the provisions of Section 242(b)(2) of the DGCL

## ARTICLE V

In furtherance of and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors of the Corporation is expressly authorized to make, amend, or repeal Bylaws of the Corporation.

## ARTICLE VI

The management of the business and the conduct of the affairs of the Corporation shall be vested in its Board of Directors.

## ARTICLE VII

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide.  The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

## ARTICLE VIII

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation; (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders; (iii) any action asserting a claim arising pursuant to any provision of the DGCL; or (iv) any action asserting a claim governed by the internal affairs doctrine.  Any person or entity purchasing or otherwise acquiring any interst in shares of capital stock of the Corporation shall be deemed to have notice or and to have consented to the provisions of this <u>Article VIII</u>.

## ARTICLE IX

A.              ***Limitation of Director's Liability***.  A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived any improper personal benefit.  If the DGCL is amended after approval by the stockholders of this Article to authorize Corporation action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended.

B.              ***Indemnification of Directors and Officers***.  To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of, and

advancement of expenses to, directors, officers, employees and agents of the Corporation (and any other persons to which the DGCL permits the Corporation to provide indemnification) through bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of indemnification and advancement otherwise permitted by Section 145 of the DGCL, subject only to limits created by applicable law (statutory or non-statutory), with respect to actions for breach of duty to the Corporation, its stockholders, and others.

C. ***Amendment, Repeal or Modification***.  Any amendment, repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a director, officer, agent, or other person existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

\* \* \*

AUS:679907.3

<u>**EXHIBIT C**</u>

**FORM OF CANADIAN INVESTOR QUESTIONNAIRE**

**ACCREDITED INVESTOR STATUS CERTIFICATE**

*The categories listed herein contain specifically defined terms.  If you are unsure as to the meanings of those terms, or are unsure as to the applicability of any category below, please contact your broker and/or legal advisor before completing this certificate.*

**TO:**          CoinTerra, Inc. (the "**Corporation**")
**AND TO:**    Industrial Alliance Securities Inc. (the "**Agent**")

In connection with the purchase by the undersigned Investor of the Secured Convertible Note (the "**Note**"), the Investor, on its own behalf and on behalf of each of the beneficial purchasers for whom the Investor is acting, hereby represents, warrants, covenants and certifies to the Corporation and the Agent (and acknowledges that the Corporation, the Agent and their respective counsel are relying thereon) that:

(i)      the Investor, or each of the beneficial purchasers for whom the Investor is acting, is resident in or otherwise subject to the securities laws of one of the provinces of Canada;

(ii)     the Investor, or each of the beneficial purchasers for whom the Investor is acting, is purchasing the Note as principal for its own account and not for the benefit of any other person;

(iii)    the Investor, or each of the beneficial purchasers for whom the Investor is acting, is an "accredited investor" within the meaning of NI 45-106 on the basis that the undersigned fits within the category of "accredited investor" reproduced below beside which the undersigned has indicated the undersigned belongs to such category; and

(iv)    upon execution of this Exhibit C by the Investor, this Exhibit C shall be incorporated into and form a part of the Secured Convertible Note Purchase Agreement.

**(PLEASE CHECK THE BOX OF THE APPLICABLE CATEGORY OF ACCREDITED INVESTOR)**

☐   (a)  a Canadian financial institution or a Schedule III bank;

☐   the Business Development Bank of Canada incorporated under the *Business Development Bank of Canada Act* (Canada);

☐   (a)      a subsidiary of any person referred to in paragraphs (a) or (b), if the person or company owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary;

☐   (b)     a person registered under the securities legislation of a jurisdiction of Canada, as an adviser or dealer, other than person registered solely as a limited market dealer registered under one or both of the *Securities Act* (Ontario) or the *Securities Act* (Newfoundland and Labrador);

☐   (c)     an individual registered or formerly registered under the securities legislation of a jurisdiction of Canada, as a representative of a person or company referred to in paragraph (d);

☐   (d)     the Government of Canada or a jurisdiction of Canada, or any crown corporation, agency or wholly owned entity of the government of Canada or a jurisdiction of Canada;

☐   (e)     a municipality, public board or commission in Canada and a metropolitan community, school board, the Comité de gestion de la taxe scolaire de l'île de Montréal or an intermunicipal management board in Québec;

☐   (f)     any national, federal, state, provincial, territorial or municipal government of or in any foreign jurisdiction, or any agency of that government;

☐   (g)     a pension fund that is regulated by either the Office of the Superintendent of Financial Institutions (Canada) or a pension commission or similar regulatory authority of a jurisdiction of Canada;

☐   (h)     an individual who, either alone or with a spouse, beneficially owns, directly or indirectly, financial assets having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000;

☐   (i)     an individual whose net income before taxes exceeded $200,000 in each of the two most recent calendar years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the two most recent calendar years and who, in either case, reasonably expects to exceed that net income level in the current calendar year;

☐   (j)     an individual who, either alone or with a spouse, has net assets of at least $5,000,000;

☐   (k)     a person, other than an individual or investment fund that has net assets of at least $5,000,000 as shown on its most recently prepared financial statements (and such person has not been created or used solely to pursue or hold securities pursuant to this paragraph (k));

☐   (l)     an investment fund that distributes or has distributed its securities only to (i) person that is or was an accredited investor at the time of the distribution, (ii) a person that acquires or acquired securities in the circumstances referred to in sections 2.10 [*Minimum amount investment*] and 2.19 [*Additional investment in investment funds*] of NI 45-106, or (iii) a person described in paragraph (i) or (ii) that acquires or acquired securities under section 2.18 [*Investment fund reinvestment*] of NI 45-106;

☐ (m)    an investment fund that distributes or has distributed securities under a prospectus in a jurisdiction of Canada for which the regulator or, in Québec, the securities regulatory authority, has issued a receipt;

☐ (n)    a trust company or trust corporation registered or authorized to carry on business under the *Trust and Loan Companies Act* (Canada) or under comparable legislation in a jurisdiction of Canada or a foreign jurisdiction, acting on behalf of a fully managed account managed by the trust company or trust corporation, as the case may be;

☐ (o)    a person acting on behalf of a fully managed account managed by that person, if that person (i) is registered or authorized to carry on business as an adviser or the equivalent under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction, and (ii) in Ontario, is purchasing a security that is not a security of an investment fund;

☐ (p)    a registered charity under the *Income Tax Act* (Canada) that, in regard to the trade, has obtained advice from an eligibility adviser or an adviser registered under the securities legislation of the jurisdiction of the registered charity to give advice on the securities being traded;

☐ (q)    an entity organized in a foreign jurisdiction that is analogous to any of the entities referred to in paragraphs (a) to (d) or paragraph (i) in form and function;

☐ (r)    a person in respect of which all of the owners of interests, direct, indirect or beneficial, except the voting securities required by law to be owned by directors, are persons that are accredited investors;

☐ (s)    an investment fund that is advised by a person registered as an adviser or a person that is exempt from registration as an adviser; or

☐ (t)    a person that is recognized or designated by the securities regulatory authority or, except in Ontario and Québec, the regulator as (i) an accredited investor, or (ii) an exempt purchaser in Alberta or British Columbia.

For the purposes hereof, the following definitions are included for convenience:

1)    "**Canadian financial institution**" means (i) an association governed by the *Cooperative Credit Associations Act* (Canada) or a central cooperative credit society for which an order has been made under section 473(1) of that Act, or (ii) a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services cooperative, or league that, in each case, is authorized by an enactment of Canada or a jurisdiction of Canada to carry on business in Canada or a jurisdiction of Canada;

2)    "**control person**" has the same meaning as in securities legislation except in Manitoba, Newfoundland and Labrador, Northwest Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island and Québec where control person means any person that holds or is one of a combination of persons that holds (i) a sufficient number of any of the securities of an issuer so as to affect materially the control of the issuer, or (ii) more than 20% of

the outstanding voting securities of an issuer except where there is evidence showing that the holding of those securities does not affect materially the control of the issuer;

3) "**eligibility adviser**" means

    a)     a person that is registered as an investment dealer or in an equivalent category of registration under the securities legislation of the jurisdiction of a purchaser and authorized to give advice with respect to the type of security being distributed, and

    b)     in Saskatchewan or Manitoba, also means a lawyer who is a practicing member in good standing with a law society of a jurisdiction of Canada or a public accountant who is a member in good standing of an institute or association of chartered accountants, certified general accounts or certified management accountants in a jurisdiction of Canada provided that the lawyer or public accountant must not

        have a professional, business or personal relationship with the issuer, or any of its directors, executive officers, founders, or control persons, and

        have acted for or been retained personally or otherwise as an employee, executive officer, director, associate or partner of a person that has acted for or been retained by the issuer or any of its directors, executive officers, founders or control persons within the previous 12 months;

4) "**entity**" means a company, syndicate, partnership, trust or unincorporated organization;

5) "**executive officer**" means, for an issuer, an individual who is

    c)     a chair, vice-chair or president,

    d)     a vice-president in charge of a principal business unit, division or function including sales, finance or production,

    e)     an officer of the issuer or any of its subsidiaries and who performs a policy-making function in respect of the issuer, or

    f)     performance a policy-making function in respect of the issuer;

6) "**financial assets**" means (i) cash, (ii) securities, or (iii) a contract of insurance, a deposit or an evidence of a deposit that is not a security for the purposes of securities legislation;

7) "**founder**" means in respect of an issuer, a person who, (i) acting alone, in conjunction, or in concert with one or more persons, directly or indirectly, takes the initiative in founding, organizing or substantially reorganizing the business of the issuer, and (ii) at the time of the trade is actively involved in the business of the issuer;

8)     "**fully managed account**" means an account of a client for which a person makes the investment decisions if that person has full discretion to trade in securities for the account without requiring the client's express consent to a transaction;

9)     "**investment fund**" means a mutual fund or a non-redeemable investment fund, and, for greater certainty in British Columbia, includes an employee venture capital corporation that does not have a restricted constitution, and is registered under Part 2 of the *Employee Investment Act* (British Columbia), R.S.B.C. 1996 c. 112, and whose business objective is making multiple investments and a venture capital corporation registered under Part 1 of the *Small Business Venture Capital Act* (British Columbia), R.S.B.C. 1996 c. 429 whose business objective is making multiple investments;

10)     "**mutual fund**" means an issuer whose primary purpose is to invest money provided by its security holders and whose securities entitle the holder to receive on demand, or within a specified period after demand, an amount computed by reference to the value of a proportionate interest in the whole or in part of the net assets, including a separate fund or trust account, of the issuer;

11)     "**NI 45-106**" means National Instrument 45-106 – *Prospectus and Registration Exemptions* made under applicable Canadian securities laws;

12)     "**non-redeemable investment fund**" means an issuer,

     g)     whose primary purpose is to invest money provided by its securityholders,

     h)     that does not invest,

          for the purpose of exercising or seeking to exercise control of an issuer, other than an issuer that is a mutual fund or a non-redeemable investment fund, or

          for the purpose of being actively involved in the management of any issuer in which it invests, other than an issuer that is a mutual fund or a non-redeemable investment fund, and

     i)     that is not a mutual fund;

13)     "**person**" includes

     j)     an individual,

     k)     a corporation,

     l)     a partnership, trust, fund and an association, syndicate, organization or other organized group of persons, whether incorporated or not, and

     m)     an individual or other person in that person's capacity as a trustee, executor, administrator or personal or other legal representative;

14) "**related liabilities**" means (i) liabilities incurred or assumed for the purpose of financing the acquisition or ownership of financial assets, or (ii) liabilities that are secured by financial assets;

15) "**Schedule III bank**" means an authorized foreign bank named in Schedule III of the *Bank Act* (Canada);

16) "**spouse**" means an individual who, (i) is married to another individual and is not living separate and apart within the meaning of the *Divorce Act* (Canada), from the other individual, (ii) is living with another individual in a marriage-like relationship, including a marriage-like relationship between individuals of the same gender, or (iii) in Alberta, is an individual referred to in paragraph (i) or (ii), or is an adult interdependent partner within the meaning of the *Adult Interdependent Relationships Act* (Alberta);

17) "**subsidiary**" means an issuer that is controlled directly or indirectly by another issuer and includes a subsidiary of that subsidiary.

In NI 45-106 a person or company is considered to be an "**affiliated entity**" of another person or company if one is a subsidiary entity of the other, or if both are subsidiary entities of the same person or company, or if each of them is controlled by the same person or company.

In NI 45-106 a person (first person) is considered to "**control**" another person (second person) if (i) the first person, directly or indirectly, beneficially owns or exercises control or direction over securities of the second person carrying votes which, if exercised, would entitle the first person to elect a majority of the directors of the second person, unless that first person holds the voting securities only to secure an obligation, (ii) the second person is a partnership, other than a limited partnership, and the first person holds more than 50% of the interests of the partnership, or (iii) the second person is a limited partnership and the general manager of the limited partnership is the first person.

Dated: _____     Signed: _____


_____            _____
Witness (If Investor is an individual)        Print the name of Investor


_____            _____
Print Name of Witness                         If subscriber is a corporation, print name and
                                              title of Authorized Signing Officer

## EXHIBIT D

### U.S. ACCREDITED INVESTOR CERTIFICATION

**TO:**    CoinTerra, Inc. (the "***Company***")
**AND TO:**  Industrial Alliance Securities Inc. (the "**Agent**")


The undersigned hereby represents as follows:

**Representation as to Accredited Investor Status**.  The undersigned has read the definition of "*Accredited Investor*" from Rule 501(a) of Regulation D under the Securities Act of 1933, which definition is attached hereto as **Annex I**, and certifies that either (check one):

    ___  The undersigned is an "Accredited Investor;" or

    ___  The undersigned is not an "Accredited Investor."

The representation set forth herein is true and accurate as of the date hereof.  If in any respect such representation shall not be true and accurate prior to or on the date of any purchase of securities from the Company by the undersigned, the undersigned shall give immediate written notice of such fact to the Company and the Agent.

The undersigned understands that returning this Accredited Investor Certification does not commit the undersigned to purchase, nor does it commit the Company to sell, any securities to the undersigned.


Date:_____    _____

                  Printed Name

                  _____

                  Authorized Signature

                  _____

                  Print Title (if applicable)

Address:  _____

                  _____

                  _____

Facsimile:  _____

E-mail Address: _____

Tax ID or SSN: _____

ANNEX I

**ACCREDITED INVESTOR DEFINITION**

<u>**Rule 501.**</u>

(a)     <u>**Accredited Investor.**</u>  "*Accredited investor*" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1)     Any bank as defined in section 3(a)(2) of the Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)     Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)     Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

   (i)  Except as provided in paragraph (a)(5)(ii) of this section, for purposes of calculating net worth under this paragraph (a)(5):

      (A) The person's primary residence shall not be included as an asset;

      (B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

      (C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

   (ii) Paragraph (a)(5)(i) of this section will not apply to any calculation of a person's net worth made in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

(A) Such right was held by the person on July 20, 2010;

(B) The person qualified as an accredited investor on the basis of net worth at the time the person acquired such right; and

(C) The person held securities of the same issuer, other than such right, on July 20, 2010.

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8)     Any entity in which all of the equity owners are accredited investors.

<u>**EXHIBIT E**</u>

**OFFSHORE INVESTOR CERTIFICATION**

**TO:**        **CoinTerra, Inc.** (the "*Company*")

**AND TO:**    **Industrial Alliance Securities Inc.** (the "*Agent*")

The undersigned (the "**Investor**") hereby represents as follows:

<u>**Representation as to Foreign Investor Status**</u>.  The undersigned has read <u>**Annex I**</u> hereto, and certifies that:

(a)        Investor is <u>not</u> a U.S. Person as defined in Rule 902(k) of Regulation S under the 1933 Act.  The offer and sale of the Secured Convertible Promissory Note (the "**Note**") issued by the Company. to such Investor was made in an offshore transaction (as defined in Rule 902(h) of Regulation S).  To the actual knowledge of such Investor, no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States with respect to the Note. Such Investor is not acquiring the Note for the account or benefit of any U.S. Person;

(b)        Such Investor will not, during the period between the date of the issuance of the Note and the one year anniversary of such issuance of the Note (the "*Restricted Period*"), offer or sell any of the foregoing securities (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S; and

(c)        Such Investor will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Note (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the 1933 Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.  Such Investor acknowledges and agrees that the Company shall not register the transfer of the Note in violation of these restrictions.

The representation set forth herein is true and accurate as of the date hereof.  If in any respect such representation shall not be true and accurate prior to or on the date of any purchase of securities from the Company by the undersigned, the undersigned shall give immediate written notice of such fact to the Company and the Agent.

The undersigned understands that returning this Foreign Investor Certification does not commit the undersigned to purchase, nor does it commit the Company to sell, any securities to the undersigned.

Date:_____

_____
Printed Name

_____
Authorized Signature

_____
Print Title (if applicable)

Address:  _____
          _____
          _____

Facsimile:  _____

E-mail Address:  _____

Tax ID or SSN:  _____

<u>**ANNEX I**</u>

**DEFINITIONS UNDER REGULATION S UNDER THE U.S. SECURITIES ACT OF 1933**

<u>**Rule 902(c) of Regulation S**</u>

c.   Directed selling efforts.

    1.   "Directed selling efforts" means any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered in reliance on this Regulation S (Rule 901 through Rule 905, and Preliminary Notes). Such activity includes placing an advertisement in a publication "with a general circulation in the United States" that refers to the offering of securities being made in reliance upon this Regulation S.

    2.   Publication "with a general circulation in the United States":

        i.   Is defined as any publication that is printed primarily for distribution in the United States, or has had, during the preceding twelve months, an average circulation in the United States of 15,000 or more copies per issue; and

        ii.   Will encompass only the U.S. edition of any publication printing a separate U.S. edition if the publication, without considering its U.S. edition, would not constitute a publication with a general circulation in the United States.

    3.   The following are not "directed selling efforts":

        i.   Placing an advertisement required to be published under U.S. or foreign law, or under rules or regulations of a U.S. or foreign regulatory or self-regulatory authority, provided the advertisement contains no more information than legally required and includes a statement to the effect that the securities have not been registered under the Act and may not be offered or sold in the United States (or to a U.S. person, if the advertisement relates to an offering under Category 2 or 3 (paragraph (b)(2) or (b)(3)) in Rule 903) absent registration or an applicable exemption from the registration requirements;

        ii.   Contact with persons excluded from the definition of "U.S. person" pursuant to paragraph (k)(2)(vi) of this section or persons holding accounts excluded from the definition of "U.S. person" pursuant to paragraph (k)(2)(i) of this section, solely in their capacities as holders of such accounts;

iii.    A tombstone advertisement in any publication with a general circulation in the United States, provided:

    A.   The publication has less than 20% of its circulation, calculated by aggregating the circulation of its U.S. and comparable non-U.S. editions, in the United States;

    B.   Such advertisement contains a legend to the effect that the securities have not been registered under the Act and may not be offered or sold in the United States (or to a U.S. person, if the advertisement relates to an offering under Category 2 or 3 (paragraph (b)(2) or (b)(3)) in Rule 903) absent registration or an applicable exemption from the registration requirements; and

    C.   Such advertisement contains no more information than:

       1.   The issuer's name;

       2.   The amount and title of the securities being sold;

       3.   A brief indication of the issuer's general type of business;

       4.   The price of the securities;

       5.   The yield of the securities, if debt securities with a fixed (non- contingent) interest provision;

       6.   The name and address of the person placing the advertisement, and whether such person is participating in the distribution;

       7.   The names of the managing underwriters;

       8.   The dates, if any, upon which the sales commenced and concluded;

       9.   Whether the securities are offered or were offered by rights issued to security holders and, if so, the class of securities that are entitled or were entitled to subscribe, the subscription ratio, the record date, the dates (if any) upon which the rights were issued and expired, and the subscription price; and

          10. Any legend required by law or any foreign or U.S. regulatory or self- regulatory authority;

iv.    Bona fide visits to real estate, plants or other facilities located in the United States and tours thereof conducted for a prospective investor by an issuer, a distributor, any of their respective affiliates or a person acting on behalf of any of the foregoing;

v.    Distribution in the United States of a foreign broker-dealer's quotations by a third-party system that distributes such quotations primarily in foreign countries if:

    A. Securities transactions cannot be executed between foreign broker-dealers and persons in the United States through the system; and

    B. The issuer, distributors, their respective affiliates, persons acting on behalf of any of the foregoing, foreign broker-dealers and other participants in the system do not initiate contacts with U.S. persons or persons within the United States, beyond those contacts exempted under Rule 15a-6; and

vi.    Publication by an issuer of a notice in accordance with Rule 135 or Rule 135c.

vii.    Providing any journalist with access to press conferences held outside of the United States, to meetings with the issuer or selling security holder representatives conducted outside the United States, or to written press-related materials released outside the United States, at or in which a present or proposed offering of securities is discussed, if the requirements of Rule 135e are satisfied.

## Rule 902(h) of Regulation S

h.    Offshore transaction.

1.    An offer or sale of securities is made in an "offshore transaction" if:

i.    The offer is not made to a person in the United States; and

ii.    Either:

    A. At the time the buy order is originated, the buyer is outside the United States, or the seller and any person acting on its behalf reasonably believe that the buyer is outside the United States; or

B.  For purposes of:

    1.  Section Rule 903, the transaction is executed in, on or through a physical trading floor of an established foreign securities exchange that is located outside the United States; or

    2.  Section Rule 904, the transaction is executed in, on or through the facilities of a designated offshore securities market described in paragraph (b) of this section, and neither the seller nor any person acting on its behalf knows that the transaction has been pre-arranged with a buyer in the United States.

2.  Notwithstanding paragraph (h)(1) of this section, offers and sales of securities specifically targeted at identifiable groups of U.S. citizens abroad, such as members of the U.S. armed forces serving overseas, shall not be deemed to be made in "offshore transactions."

3.  Notwithstanding paragraph (h)(1) of this section, offers and sales of securities to persons excluded from the definition of "U.S. person" pursuant to paragraph (k)(2)(vi) of this section or persons holding accounts excluded from the definition of "U.S. person" pursuant to paragraph (k)(2)(i) of this section, solely in their capacities as holders of such accounts, shall be deemed to be made in "offshore transactions."

## **Rule 902(k) of Regulation S**

k.  U.S. person.

    1.  "U.S. person" means:

        i.  Any natural person resident in the United States;

        ii.  Any partnership or corporation organized or incorporated under the laws of the United States;

        iii.  Any estate of which any executor or administrator is a U.S. person;

        iv.  Any trust of which any trustee is a U.S. person;

        v.  Any agency or branch of a foreign entity located in the United States;

vi.   Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

vii.   Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

viii.   Any partnership or corporation if:

     A.   Organized or incorporated under the laws of any foreign jurisdiction; and

     B.   Formed by a U.S. person principally for the purpose of investing in securities not registered under the Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a)) who are not natural persons, estates or trusts.

2.   The following are not "U.S. persons":

i.   Any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States;

ii.   Any estate of which any professional fiduciary acting as executor or administrator is a U.S. person if:

     A.   An executor or administrator of the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estate; and

     B.   The estate is governed by foreign law;

iii.   Any trust of which any professional fiduciary acting as trustee is a U.S. person, if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person;

iv.   An employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country;

v. Any agency or branch of a U.S. person located outside the United States if:

    A. The agency or branch operates for valid business reasons; and

    B. The agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; and

vi. The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans.

## **Schedule 5.8(b)(iii)**

1. Purchase Money Security Interest (as defined in the UCC) originally granted in favor of Future Electronics Corp pursuant to the Security Agreement, dated March 3, 2014, between the Company and Future Electronics Corp, provided that the amount of Debt secured by such Liens does not exceed $4,000,000.

# Exhibit "B"- 3

Cointerra, Inc. Security and Pledge Agreement

## COINTERRA, INC.

## SECURITY AND PLEDGE AGREEMENT

THIS SECURITY AND PLEDGE AGREEMENT dated as of August 1, 2014 (this "*Agreement*") is executed by CoinTerra, Inc., a Delaware corporation (together with its successors and permitted assigns, the "*Debtor*"), in favor of Fortis Advisors LLC, a Delaware limited liability company, as collateral agent for the ratable benefit of the Secured Parties (together with its successors and permitted assigns, the "*Collateral Agent*").

### RECITALS:

**WHEREAS**, the Debtor, the Secured Parties and the Collateral Agent have executed a note purchase agreement dated as of even date hereof (as amended, supplemented or otherwise modified from time to time, the "*Purchase Agreement*") pursuant to which the Debtor shall issue secured convertible notes (collectively, the "*Notes*" and together with this Agreement, the IP Security Agreement (as defined in the Purchase Agreement), the Guarantee (as defined in the Purchase Agreement), the Deposit Control Agreement (as defined in the Purchase Agreement), the Securities Account Control Agreement (as defined in the Purchase Agreement), the Collateral Agent Agreement (as defined in the Purchase Agreement) and the Purchase Agreement, the "*Transaction Documents*") in the aggregate principal amount of up to $15,000,000.00;

**WHEREAS**, pursuant to the Collateral Agent Agreement, the Collateral Agent is to act as collateral agent and hold for the ratable benefit of the Secured Parties any and all security for the payment and performance of the Obligations; and

**WHEREAS**, in order to induce the Secured Parties to extend the credit evidenced by the Notes, the Debtor has agreed to enter into this Agreement and to grant to Collateral Agent the security interest in the Collateral described below.

### AGREEMENT:

**NOW, THEREFORE**, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Debtor hereby agrees with Collateral Agent as follows:

1.     **Definitions and Interpretation**.  All capitalized terms used in this Agreement and not defined herein shall have the respective meanings provided therefor in the Notes. When used in this Agreement, the following terms have the following respective meanings:

(a)     "*Collateral*" shall have the meaning given to that term in Section 2 hereof.

(b)     "*Event of Default*" shall mean (i) an Event of Default (as defined in the Notes) or (ii) any failure by any Obligor (as defined in the Collateral Agent Agreement) to perform any obligation or covenant of such Obligor under any Collateral Document (as defined in the Collateral Agent Agreement) and such failure remains unremedied for a period of five (5)

1

days or such shorter period as is expressly provided for such obligation or covenant pursuant to such Collateral Document.

(c)     "*Lien*" shall have the meaning given to that term in the Purchase Agreement.

(d)     "*Obligations*" shall mean the Notes and all loans, advances, debts, liabilities and other obligations, howsoever arising, owed by the Debtor to Collateral Agent and/or the Secured Parties of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the Transaction Documents, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Debtor hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(e)     "*Permitted Liens*" shall have the meaning given to that term in the Purchase Agreement.

(f)     "*Person*" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(g)     "*Secured Parties*" shall mean the holders of the Notes issued pursuant to the Purchase Agreement, initially identified as such on Annex A to this Agreement and any Person who may from time to time acquire Notes issued pursuant to the Purchase Agreement, in each case, including their successors and assigns.  Annex A to this Agreement shall be modified to reflect additional Secured Parties and additional amounts advanced by the Secured Parties from time, which modifications shall not be deemed an amendment.

(h)     "*UCC*" means the Uniform Commercial Code as in effect in the State of Texas from time to time; *provided*, *however*, that if by reason of mandatory provisions of applicable law, the perfection or the effect of perfection or non-perfection or priority of the security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Texas, "UCC" shall also mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection, or priority of such security interest.  Unless otherwise defined herein, all terms defined in the UCC and used herein shall have the respective meanings given to those terms in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

2.     **Grant of Security Interest**.  As security for the performance and payment in full in cash of the Obligations, the Debtor hereby pledges to Collateral Agent and grants to Collateral Agent a security interest in all right, title and interest of the Debtor in and to the Collateral

wherever located and whether now owned or hereafter acquired. "*Collateral*" shall mean and include all right, title, interest, claims and demands of the Debtor in and to each and every asset, tangible and intangible, in which the Debtor has any right, title, interest, claim or demand, including, but not limited to, equipment, accounts, inventory, general intangibles (including all payment intangibles), investment property, letter-of-credit rights, commercial tort claims, fixtures, real and personal property, patents, trademarks, copyrights, trade secrets, confidential information and any other proprietary or intellectual property rights, deposit accounts, cash, contract rights, in each, together with all substitutions, renewals or replacements of and additions, improvements, replacement parts and accumulations to any and all of such assets and all books and records related to any of the foregoing, and to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing. Notwithstanding the foregoing, the term "Collateral" shall not include any property, rights or licenses to the extent the granting of a security interest therein (i) would be contrary to applicable law or (ii) is prohibited by (but only to the extent such prohibition is enforceable under applicable law), conflicts with, or would constitute a default under any agreement or document governing such property, rights or licenses (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9.406, 9.407, 9.408 or 9.409 of the UCC or any other applicable law or principles of equity); *provided, however*, that such security interest shall attach immediately to any portion of such property, rights or licenses that does not result in any of the consequences specified in clause (i) or (ii) of this paragraph, including any proceeds of such contract or agreement.

3. **General Representations and Warranties**.

The Debtor represents and warrants to the Collateral Agent that:

(a)     The Debtor has full power and authority to grant to the Collateral Agent, the Lien in the Collateral granted pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval that has been obtained;

(b)     The Debtor is the owner or authorized user of the Collateral (or, in the case of after-acquired Collateral, at the time Debtor acquires rights in the Collateral, will be the owner or authorized user thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time the Debtor acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than Permitted Liens;

(c)     Upon the filing of UCC-1 financing statements in the appropriate filing offices, the Collateral Agent shall have (or, in the case of after-acquired Collateral, at the time the Debtor acquires rights therein, will have) a perfected security interest in the Collateral to the extent that a security interest in the Collateral can be perfected by such filing;

(d)     The security interest in the Collateral is and shall be prior to any other Lien on any of the Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the Uniform Commercial Code or other applicable law in such jurisdictions, other than Permitted Liens;

(e)     The originals of all documents evidencing all accounts receivable and payment intangibles of the Debtor and the only original books of account and records of the Debtor relating thereto are, and will continue to be, kept at the chief executive office of the Debtor or at such other locations as the Debtor may establish in accordance with this Agreement and the Purchase Agreement;

(f)     The equity interests listed on Schedule 3(f) (the "***Pledged Equity Interests***") constitute all the issued and outstanding shares of all classes of equity interests of each issuer owned by Debtor and such shares represent all of the issued and outstanding shares of each such issuer.  All the shares of the Pledged Equity Interests have been duly and validly issued and are fully paid and, to the extent applicable, non-assessable; and

(g)     No Subsidiary (as defined in the Purchase Agreement) of the Debtor has any right, title or interest in any registered patent, trademark, copyright or other intellectual property, or in any application or exclusive license for any registered patent, trademark, copyright or other intellectual property.

4.     **Covenants Relating to Collateral**.

The Debtor hereby covenants and agrees:

(a)     To perform all acts that may be necessary to maintain, preserve, protect and perfect the Collateral, the Lien granted to the Collateral Agent therein and the perfection and priority of such Lien subject to Permitted Liens, including any and all actions necessary to defend title to the Collateral against all Persons and to defend the security interest of the Collateral Agent in the Collateral and the priority thereof against any Lien other than a Permitted Lien;

(b)     Not to use or permit any Collateral to be used (i) in violation in any material respect of any applicable law, rule or regulation, or (ii) in violation of any policy of insurance covering the Collateral;

(c)     To pay promptly when due all taxes, other governmental charges and all other charges now or hereafter imposed upon or affecting any Collateral, except as may be subject to good faith contest or as to which a bona fide dispute may arise;

(d)     Without 30 days' prior written notice to the Collateral Agent, (i) not to change the Debtor's name or place of business (or, if the Debtor has more than one place of business, its chief executive office), or the office in which the Debtor's records relating to accounts receivable and payment intangibles are kept and (ii) not to change the Debtor's state of incorporation;

(e)     To procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by the Collateral Agent to perfect, maintain and protect its Lien hereunder and the priority thereof and to deliver promptly upon the request of the Collateral Agent all originals of Collateral consisting of instruments;

4

(f)     Not to surrender or lose possession of (other than to the Collateral Agent), sell, encumber, lease, rent, or otherwise dispose of or transfer any Collateral or right or interest therein, and to keep the Collateral free of all Liens except Permitted Liens; *provided* that the Debtor may sell, lease, transfer, license or otherwise dispose of any of the Collateral in the ordinary course of business consisting of (i) the sale of inventory, (ii) sales of worn-out or obsolete equipment, (iii) non-exclusive licenses and similar arrangements for the use of the property of the Debtor and (iv) escrows of software or other intellectual property entered into by the Debtor in the ordinary course of Debtor's business;

(g)     To comply in all material respects with all requirements of law relating to the production, possession, operation, maintenance and control of the Collateral;

(h)     To permit the Collateral Agent and its representatives the right, at any time during normal business hours, upon reasonable prior notice, to visit and inspect the properties of the Debtor and its corporate, financial and operating records, and make abstracts therefrom, and to discuss the Debtor's affairs, finances and accounts with its directors, officers and independent public accountants;

(i)     To maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) so long as no Event of Default has occurred and is continuing, be disbursed to the Debtor for direct application by the Company solely to the repair or replacement of the Debtor's property so damaged or destroyed and (ii) in all other circumstances, be held by the Collateral Agent as cash collateral for the Obligations. The Collateral Agent may disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Collateral Agent may reasonably prescribe, for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed, or the Collateral Agent may apply all or any part of such proceeds to the Obligations.   All policies of insurance shall provide for at least 30 days' prior written cancellation notice to the Collateral Agent (or 10 days' notice of cancellation due to nonpayment of premiums).  In the event of failure by the Debtor to provide and maintain insurance as herein provided, the Collateral Agent may provide such insurance and charge the amount thereof to the Debtor.  The Debtor shall furnish the Collateral Agent with certificates of insurance and policies evidencing compliance with the foregoing insurance provision;

(j)     Any of the Collateral evidenced by any Instrument (as defined in the UCC) (other than checks and drafts in the ordinary course of business), Certificated Security (as defined in the UCC) or Chattel Paper (as defined in the UCC) shall, concurrently with execution of this Agreement, be delivered by the Debtor to the Collateral Agent, duly indorsed in a manner reasonably satisfactory to the Collateral Agent, together with an undated stock power covering such certificate duly executed in blank by Debtor, if required, to be held as Collateral pursuant to this Agreement. If any of the Collateral shall be or become evidenced by any Instrument (as defined in the UCC) (other than checks and drafts in the ordinary course of business), Certificated Security (as defined in the UCC) or Chattel Paper (as defined in the UCC), such

5

Instrument, Certificated Security or Chattel Paper shall be promptly delivered by the Debtor to the Collateral Agent, duly indorsed in a manner reasonably satisfactory to the Collateral Agent, together with an undated stock power covering such certificate duly executed in blank by Debtor, if required, to be held as Collateral pursuant to this Agreement; and

      (k)    If Debtor receives any stock certificate (including, without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Equity Interests of any issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Equity Interests, or otherwise in respect thereof, Debtor shall accept the same as the agent of the Collateral Agent, hold the same in trust for the Collateral Agent and deliver the same forthwith to the Collateral Agent in the exact form received, duly indorsed by Debtor to the Collateral Agent, if required, together with an undated stock power covering such certificate duly executed in blank by Debtor, to be held by the Collateral Agent, subject to the terms hereof, as additional collateral security for the Obligations.  Any sums paid upon or in respect of the Investment Property (as defined in the UCC) upon the liquidation or dissolution of any issuer (other than in connection with any of the foregoing not prohibited  under the terms of the Purchase Agreement) shall be paid over to the Collateral Agent to be held by it hereunder as additional collateral security for the Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property in connection with any such liquidation or dissolution (other than in connection with any of the foregoing not prohibited under the terms of the Purchase Agreement) shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Collateral Agent, be delivered to the Collateral Agent to be held by it hereunder as additional collateral security for the Obligations.  If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by Debtor, Debtor shall, until such money or property is paid or delivered to the Collateral Agent, hold such money or property in trust for the Collateral Agent, segregated from other funds of Debtor, as additional collateral security for the Obligations.

      5.    **Authorized Action by Collateral Agent**.  The Debtor hereby irrevocably appoints Collateral Agent as its attorney-in-fact (which appointment is coupled with an interest) and agrees that Collateral Agent may perform (but Collateral Agent shall not be obligated to and shall incur no liability to the Debtor or any third party for failure so to do) any act which the Debtor is obligated by this Agreement to perform, and to exercise such rights and powers as the Debtor might exercise with respect to the Collateral, including the right to:

      (a)    collect by legal proceedings or otherwise and endorse, receive and receipt for all dividends, interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral;

      (b)    enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for the Collateral;

(c)     make any compromise or settlement, and take any action it deems advisable, with respect to the Collateral;

(d)     insure, process and preserve the Collateral;

(e)     pay any indebtedness of the Debtor relating to the Collateral; and

(f)     file UCC financing statements and execute other documents, instruments and agreements required hereunder;

*provided, however*, that Collateral Agent shall not exercise any such powers granted pursuant to subsections (a) through (e) prior to the occurrence of an Event of Default and shall only exercise such powers during the continuance of an Event of Default, provided that prior to an Event of Default the Collateral Agent may insure the Collateral as provided in Section 4(i). The Debtor agrees to reimburse Collateral Agent upon demand for any reasonable costs and expenses, including attorneys' fees, Collateral Agent may incur while acting as the Debtor's attorney-in-fact hereunder, all of which costs and expenses are included in the Obligations. It is further agreed and understood between the parties hereto that such care as Collateral Agent gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Collateral when in Collateral Agent's possession; *provided, however*, that Collateral Agent shall not be required to make any presentment, demand or protest, or give any notice and need not take any action to preserve any rights against any prior party or any other person in connection with the Obligations or with respect to the Collateral.

6.     **Litigation and Other Proceedings**.

(a)     The Debtor shall have the right and obligation to commence and diligently prosecute such suits, proceedings or other actions for infringement or other damage, or reexamination or reissue proceedings, or opposition or cancellation proceedings as are reasonable to protect any of the patents, trademarks, copyrights, mask works or trade secrets.

(b)     Upon the occurrence and during the continuation of an Event of Default, Collateral Agent shall have the right but not the obligation to bring suit or institute proceedings in the name of the Debtor or Collateral Agent to enforce any rights in the Collateral, including any license thereunder, in which event the Debtor shall at the request of Collateral Agent do any and all lawful acts and execute any and all documents reasonably required by Collateral Agent in aid of such enforcement. If Collateral Agent elects not to bring suit to enforce any right under the Collateral, including any license thereunder, the Debtor agrees to use all reasonable measures, whether by suit, proceeding or other action, to cause to cease any infringement of any right under the Collateral by any Person and for that purpose agrees to diligently maintain any action, suit or proceeding against any Person so infringing necessary to prevent such infringement.

7.     **Default and Remedies**.

(a)     <u>Default</u>. The Debtor shall be deemed in default under this Agreement upon the occurrence and during the continuance of an Event of Default.

(b)    Remedies.  Upon the occurrence and during the continuance of any such Event of Default, Collateral Agent shall have the rights of a secured creditor under the UCC, all rights granted by this Agreement and by law, including the right to:  (i) require the Debtor to assemble the Collateral and make it available to Collateral Agent at a place to be designated by Collateral Agent; and (ii) prior to the disposition of the Collateral, store, process, repair or recondition it or otherwise prepare it for disposition in any manner and to the extent Collateral Agent deems appropriate.  The Collateral Agent may sell or assign the Collateral and associated goodwill at public or private sale for such amounts, and at such time or times as Collateral Agent deems advisable.  Debtor shall be credited with the net proceeds of such sale only when they are actually received by Collateral Agent, and Debtor shall continue to be liable for any deficiency remaining after the Collateral is sold or collected. The Debtor hereby agrees that fifteen (15) days' notice of any intended sale or disposition of any Collateral is reasonable.  To the maximum extent permitted by applicable law, Collateral Agent or any Secured Party may be the purchaser of any or all of the Collateral and associated goodwill at any public sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any public sale, to use and apply all or any part of the Obligations as a credit on account of the purchase price of any collateral payable by Collateral Agent or such Secured Party at such sale.  In furtherance of Collateral Agent's rights hereunder, the Debtor hereby grants to Collateral Agent an irrevocable, non-exclusive license, exercisable without royalty or other payment by Collateral Agent, and only in connection with the exercise of remedies hereunder upon an Event of Default, to use, license or sublicense any patent, trademark, trade name, copyright or other intellectual property in which the Debtor now or hereafter has any right, title or interest together with the right of access to all media in which any of the foregoing may be recorded or stored.

(c)    Application of Collateral Proceeds.  The proceeds and/or avails of the Collateral, or any part thereof, and the proceeds and the avails of any remedy hereunder (as well as any other amounts of any kind held by Collateral Agent at the time of, or received by Collateral Agent after, the occurrence of an Event of Default) shall be paid to and applied in accordance with the Collateral Agent Agreement.

(d)    Pledged Equity Interests.

(i)    Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given at least one Business Day's prior written notice to the Debtor of the Collateral Agent's intent to exercise its corresponding rights pursuant to Section 7(d)(ii) (which notice shall be deemed to have been given immediately upon the occurrence of an Event of Default under Sections 6.1(d) and 6.1(e) of the Notes), Debtor shall be permitted to receive all cash dividends paid in respect of the Pledged Equity Interests, and to exercise all voting and corporate rights with respect to the Investment Property; provided, however, that no vote shall be cast or corporate or other organizational right exercised or other action taken which (x) would result in any violation of any provision of the Purchase Agreement, this Agreement or any other Transaction Document or (y) could reasonably be expected to materially and adversely affect the security interest granted herein in the Pledged Equity Interests or the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement or the Purchase Agreement or any other Transaction Document or the ability of the Collateral Agent or the Secured Parties to exercise the same.

8

(ii)     To the extent permitted by applicable law, if an Event of Default shall occur and be continuing and the Collateral Agent shall have given at least one Business Day's prior written notice of its intent to exercise such rights to the Debtor (which notice shall be deemed to have been given immediately upon the occurrence of an Event of Default under Sections 6.1(d) and 6.1(e) of the Notes), (A) the Collateral Agent shall have the right to receive any and all cash dividends, payments or other proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 2.3 of the Collateral Agent Agreement, and (B) the Collateral Agent or its nominee may thereafter solely exercise (1) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant issuer or otherwise and (2) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any issuer, or upon the exercise by the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to Debtor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon waiver or cure of all Events of Default that have occurred, any voting, corporate or limited liability rights and other rights set forth in this Section 7(d)(ii) shall immediately revert to Debtor and the Collateral Agent shall as soon as practically reasonable take such steps reasonably requested by the Debtor to cause any Investment Property registered pursuant to clause (2) of this Section 7(d)(ii) to be registered in the name of the Debtor prior to the Event of Default which has been cured or waived.

(iii)     Debtor hereby authorizes and instructs each issuer of any Investment Property pledged by Debtor hereunder to (A) comply with any instruction received by it from the Collateral Agent in writing that (1) states that an Event of Default has occurred and is continuing and (2) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from Debtor, and Debtor agrees that each issuer shall be fully protected in so complying, and (B) pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent in accordance with the terms of this Agreement, in each case, until receipt by issuer of written notice from Collateral Agent stating that all Events of Default have been waived or cured (which such notice Collateral Agent shall deliver immediately upon the cure or waiver of all Events of Default).

8.     **Collateral Agent**.  In the event that the Collateral Agent shall resign or be removed as Collateral Agent in accordance with the Collateral Agent Agreement and a successor Collateral Agent is appointed in accordance with the Collateral Agent Agreement, this Agreement shall be deemed to be between the Debtor and such successor Collateral Agent.  In the event that the Collateral Agent shall resign or be removed as Collateral Agent in accordance with the Collateral Agent Agreement and no successor is appointed, then this Agreement shall be deemed to be between the Debtor and the Secured Parties in place of the Collateral Agent. Debtor acknowledges that the rights and responsibilities of the Collateral Agent under this

9

Agreement with respect to any action taken by the Collateral Agent, the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement, and the removal or resignation of, or appointment of a successor to, the Collateral Agent, shall be governed by the Collateral Agent Agreement, but Debtor shall be entitled to act in reliance upon a conclusive presumption that any action or non-action taken by the Collateral Agent has been authorized, and that the Collateral Agent is acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and Debtor shall not be under any obligation to make any inquiry respecting such authority.

       9.    **Miscellaneous**.

       (a)    <u>Notices</u>.  All notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or send via facsimile (with confirmation of receipt) to the parties at the address for such party set forth below (or at such other address for a party as shall be specified by like notice):

       (i)    If to the Collateral Agent:

       Fortis Advisors LLC
       Attn: Rick Fink
       4225 Executive Square, Suite 1040
       La Jolla, CA 92037
       Email: rfink@fortisrep.com
       Fax: (858) 409-1843

       (ii)    If to the Debtor:

       CoinTerra, Inc.
       11130 Jollyville Rd.
       Suite 100
       Austin, TX  78759
       Attn:  Chief Executive Officer

       with a copy (which shall not constitute notice) to:

       Andrews Kurth LLP
       111 Congress Ave, Suite 1700
       Austin, Texas 78701
       Facsimile: (512) 320-9292
       Attention: Carmelo M. Gordian

       Notice given by facsimile shall be confirmed by appropriate answer back and shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed promptly after transmission in

writing by certified mail or personal delivery. Any party may change any address to which notice is to be given to it by giving notice as provided above of such change of address.

An electronic communication ("*Electronic Notice*") shall be deemed written notice for purposes of this <u>Section 9(a)</u> if sent with return receipt requested to the electronic mail address specified by the receiving party in a signed writing in a nonelectronic form. Electronic Notice shall be deemed received at the time the party sending Electronic Notice receives verification of receipt by the receiving party. Any party receiving Electronic Notice may request and shall be entitled to receive the notice on paper, in a nonelectronic form ("*Nonelectronic Notice*") which shall be sent to the requesting party within ten (10) days of receipt of the written request for Nonelectronic Notice.

(b)     <u>Termination of Security Interest</u>. Upon the payment in full in cash of all Obligations or the conversion of all the outstanding Notes into shares of the Debtor's capital stock pursuant to the terms thereof, the security interest granted herein shall terminate and all rights to the Collateral shall revert to the Debtor. Upon such termination, the Collateral Agent shall authorize the Debtor to file any UCC termination statements necessary to effect such termination and Collateral Agent will execute and deliver to the Debtor any additional documents or instruments as the Debtor shall reasonably request to evidence such termination. In the event that, for any reason, any portion of such payments to the Collateral Agent or the Secured Parties is set aside or restored, whether voluntarily or involuntarily, after the making thereof, then the obligation intended to be satisfied thereby shall be revived and continued in full force and effect as if said payment or payments had not been made.

(c)     <u>Waivers and Amendments</u>. This Agreement may not be amended, waived, discharged or terminated (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely) unless such amendment, waiver, discharge or termination is in writing and signed by (i) the Debtor (which shall not be required in connection with a waiver of rights by the Collateral Agent or the Secured Parties) and (ii) the Collateral Agent.

(d)     <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of Texas, without regard to conflicts of law principles.

(e)     <u>Attorneys' Fees</u>. In the event of any dispute involving the terms hereof, the prevailing parties shall be entitled to collect legal fees and expenses from the other party to the dispute.

(f)     <u>Entire Agreement</u>. This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Debtor, the Collateral Agent and the Secured Parties and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(g)     <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement

11

and the balance of this Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

(h)     <u>Successors and Assigns</u>.  Except as otherwise expressly provided in this Agreement, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto; *provided, however*, that the Debtor may not sell, assign or delegate rights and obligations hereunder without the prior written consent of Collateral Agent.

(i)     <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power, or remedy accruing to the Collateral Agent or a Secured Party, upon any breach or default of the Debtor under this Agreement shall impair any such right, power, or remedy of the Collateral Agent or a Secured Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of the Collateral Agent or any Secured Party of any breach or default under this Agreement or any waiver on the part of the Collateral Agent or any Secured Party of any provisions or conditions of this Agreement must be made in writing, and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to the Collateral Agent or the Secured Parties, shall be cumulative and not alternative.

(j)     <u>Titles and Subtitles</u>.  The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(k)     <u>Telecopy Execution and Delivery</u>.  A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

(l)     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

(m)     <u>Construction</u>.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the language used in this Agreement has been chosen by the parties to express their mutual intent.  Accordingly, no rules of strict construction will be applied against any party with respect to this Agreement.

(n)     <u>Payments Free of Taxes, Etc</u>.  All payments made by the Debtor under the Transaction Documents shall be made by the Debtor free and clear of and without deduction for any and all present and future taxes, levies, charges, deductions and withholdings.  In addition,

the Debtor shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Agreement.  Upon request by Collateral Agent, the Debtor shall furnish evidence satisfactory to Collateral Agent that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

(o)     Other Interpretive Provisions.  References in this Agreement and each of the other Transaction Documents to any document, instrument or agreement (a) includes all exhibits, schedules and other attachments thereto, (b) includes all documents, instruments or agreements issued or executed in replacement thereof, and (c) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "include" and "including" and words of similar import when used in this Agreement shall not be construed to be limiting or exclusive.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of date first above written.

<u>**DEBTOR**</u>:

**COINTERRA, INC.**

By: _____

Name: _RAVI IYENGAR_____

Title: _CHIEF EXECUTIVE OFFICER_

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of date first above written.

**COLLATERAL AGENT**
for the ratable benefit of the Secured Parties

**FORTIS ADVISORS LLC**

By: _____

Name: Ryan Simkin

Title: Managing Director

Signature Page to Security and Pledge Agreement

**ANNEX A**

**SCHEDULE OF SECURED PARTIES**

**(as of August 1, 2014)**

# ANNEX A

## SCHEDULE OF SECURED PARTIES

### (as of August 1, 2014)

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| 101049658 SK Ltd. 518 Queen St Saskatoon SK S7K 0M5 | 25,000.00 | NBCN Inc.  ITF **101049658 SK Ltd., Acct 4EH378A** 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Dr. James McHattie Medical Prof. Corp 1821 Rose St Regina SK S4P 1Z7 | 25,000.00 | NBCN Inc.  ITF **Dr. James McHattie Medical Prof Corp, Acct 4EH122A** 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Rodney Koch PO BOX 151 Edenwold SK S0G 1K0 | 40,000.00 | NBCN Inc.  ITF **Rodney Koch,  Acct 4EH110E** 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #905 |
| T.Thiessen M.D.Surgical Prof Corp 247 Lakeshore Pl Saskatoon SK S7J 3T7 | 54,000.00 | NBCN Inc.  ITF **T. Thiessen M.D. Surgical Prof Corp,  Acct 4EH623E** 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #906 |

A-1

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Dorothy Platzer<br>401 Dalhousie Cres<br>Saskatoon SK S7H 3S3 | 40,000.00 | NBCN Inc.  ITF **Dorothy Platzer, Acct 4EH104B**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #906 |
| Brian Gibbs<br>PO Box 29004<br>111-1715 Preston Ave N<br>Saskatoon SK S7N 4V2 | 50,000.00 | NBCN Inc.  ITF **Brian Gibbs,  Acct 4EH035E**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Kevin Thompson<br>414 Victor Place<br>Saskatoon SK S7T 0E2 | 10,000.00 | NBCN Inc.  ITF **Kevin Thompson,  Acct 4EE498A**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Philip Armstrong PH<br>77  Avenue Rd<br>Toronto On M5R 3R8 | 100,000.00 | NBCN Inc.  ITF Philip Armstrong  **Acct 4EDO89F**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |
| Mel Glickman Architect, 378A Beresford ave ,<br>Toronto On M6S 3B5 | 100,000.00 | NBCN Inc.  ITF Mel Glickman Architect  **Acct 4ELJ28F**<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2 | NBCN Inc.<br>1010 De la Gauchetiere West<br>Mezzanine 100<br>Montreal, QC H3B 5J2<br>Attn: Securities Department #904 |

AUS:680317.8

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Mark Wayne, 155 Waterloo Dr SW, Calgary AB T3C 3G4 | 250,000.00 | NBCN Inc.  ITF Mark Wayne  **Acct 4EE211F** 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 De la Gauchetiere West Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Felcom Capital Corp 26 Wellington Street East Suite 910 Toronto ON M5E 1S2 | 25,000.00 | NBCN Inc.  ITF Felcom Capital Corp, Acct 4ea937f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Anita Berkis 26 Wellington Street East Suite 910 Toronto ON M5E 1S2 | 25,000.00 | NBCN Inc.  ITF Anita Berkis, Acct 4ea938f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Donald S McFarlane 26 Wellington Street East Suite 900 Toronto ON M5E 1S2 | 100,000.00 | NBCN Inc.  ITF Donald S McFarlane, Acct 4ee586f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| James Ward Timothy Witzel 932 Victoria Street North Kitchener ON N2B 1W4 | 50,000.00 | NBCN Inc.  ITF James Ward Timothy Witzel, Acct 4ea875f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |

A-3

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Maxillo-Care Inc 2891 Ridge Road West RR # 2 RPO Shanty Bay ON L0L 2L0 | 25,000.00 | NBCN Inc.  ITF Maxillo-Care Inc, Acct 4ea656f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| David Gargaro 9 Hyland Ave Etobicoke ON M8X 1P8 | 25,000.00 | NBCN Inc.  ITF David Gargaro, Acct 4ea764e 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Ward Seymour, 81 Stainway Blvd, Etobicoke On M9W 6H6 | 50,000.00 | NBCN Inc.  ITF Ward Seymour, Acct 4ea054f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Thomas J Rice, 342 Country Club Blvd. Winnipeg MB R3K 1X6 | 50,000.00 | NBCN Inc.  ITF Thomas J Rice, Acct 4eb620f1010 Rue De la Gauchetiere OuestMezzanine 100Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere OuestMezzanine 100Montreal, QC H3B 5J2Attn: Securities Department #904 |
| J David Bunston,46 Bernard Ave, Toronto On M5R 1R2 | 25,000.00 | NBCN Inc.  ITF J David Bunston, Acct 4ea200e 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |

A-4

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Joseph Conway, 49 Nanton Ave, Toronto On M4W 2Y8 | 100,000.00 | NBCN Inc. ITF Joseph Conway, Acct 4ea247f 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department #904 |
| Purling Holdings, 9 Wakefield Cres Scarborough ON M1W 2C1 | 60,000 | NBCN Inc. ITF Purling HoldingsAcct.#4EB713F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| JA Developments. 14689 Bathurst St. Aurora On L4G 7A4 | 35,000 | NBCN Inc. ITF JA Developments Acct.#4eb720F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Lorne Waldman, 281 Eglinton Ave E. Toronto ON M4P 1L3 | 35,000 | NBCN Inc. ITF Lorne Waldman Acct.#4eb766F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Jane Day, 36 Rosedale Rd, Toronto On M4W 2P6 | 60,000 | NBCN Inc. ITF Jane Day Acct.#4eda04e 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |

A-5

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Steedco, 796217 Grey Rd Blue Mountains On L9Y 0R1 | 25,000 | NBCN Inc.  ITF  Steedco Acct.#4EB743B      1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Peter Avery, 146 bathurst St. Aurora On L4G 7A4 | 35,000 | NBCN Inc.  ITF Peter Avery  Acct.#4edn50F 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Robert Hannah, 26 Wellington St E Suite 900 Toronto On M5E 1S2 | 26,000 | NBCN Inc. ITF Robert Hannah Acct: 4EE078F 1010 de la Gauchetiere West Mezzanine 100 Montreal QC, H3B 5J2 | NBCN Inc. 1010 Rue De la Gauchetiere Ouest Mezzanine 100 Montreal, QC H3B 5J2 Attn: Securities Department |
| Marquest -501 | 210,000.00 | RBC Investors Services Trust in Trust for a/c#011800030 | RBC Investor Sevices Trust,155 Wellington St. 2nd Floor, Toronto ON M5J 2S1 Att: Cage Rebecca 416-955-3191 |
| Marquest -571 | 115,000.00 | RBC Investors Services Trust in Trust for a/c#162142001 | RBC Investor Sevices Trust,155 Wellington St. 2nd Floor, Toronto ON M5J 2S1  Att: Cage Rebecca 416-955-3191 |
| Michael Shannon,2860 Hill Park Rd Montreal QC H3H 1T1 | 200,000.00 | Laurentian Bank Securities Inc. 1981, ave McGill College, Suite 1900 Montreal (Quebec) H3A 3K3 | Laurentain Bank Securities Inc. Attn: Louise Belanger 514-350-2826 belangerL@vmbl.ca, 1981 Ave McGill College Bureau 1900 Montreal Qc H3A |

A-6

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| | | | 3K3 |
| Jason Mann | 145,000.00 | Mackie Research Capital Corp. ITF Jason Mann, 199 Bay Street, Suite 4500 Commerce Court West Box 368 Toronto On M5L 1G2 | Mackie Research Capital Corp. ITF Jason Mann, 199 Bay Street, Suite 4500 Commerce Court West Box 368 Toronto On M5L 1G2 |
| Brad White, 3 May St, Toronto On M4W 2X9 | 250,000.00 | GMP Securities LP ITF 400-NHR0-F, 145 King St. W Suite 300 Toronto On M5H 1J8 | GMP Securities LP, ITF A/C #400-NHR0-F   2nd Fl-Cage, 145 King Street West, Suite 300 Toronto On M5H 1J8 |
| 2026860 Ontario Inc. 606-77 Avenue Rd, Toronto On M5R 3R8 | 100,000.00 | GMP Securities LP ITF 610-PC90-B, 145 King St. W Suite 300, Toronto On M5H 1J8 | GMP Securities LP,ITF A/C #610-PC90-B 2nd Fl-Cage, 145 King Street West, Suite 300 Toronto On M5H 1J8 |
| Helen Dittmer, 78 Sunset Way SE Calgary AB T2X 3C1 | 50,000.00 | GMP Securities L.P. ITF A/C 610-AWS0-F , 145 King St. W Suite 300, Toronto On M5H 1J8 | |
| Darren Dittmer or Ellen Shong Leong 308 Hidden Ranch Circle NW Calgary AB T3A 5R2 | 25,000.00 | GMP Securities L.P. ITF A/C 610-ZTN0-B , 145 King St. W Suite 300, Toronto On M5H 1J8 | |
| Gisela Wsaibel, 1385 Crestwell Rd West Vancouver BC V7V 3N6 | 100,000.00 | GMP Securities L.P. ITF A/C 610-B0R0-F  145 King St. W Suite 300, Toronto On M5H 1J8 | |
| Paloduro Investments | 500,000.00 | Paloduro Investments Inc. 1560 - 505 Burrard St. Vancouver BC V7X 1M5 | |

A-7

AUS:680317.8

| Name and Address of Purchaser | Principal | Registration | Delivery Instructions |
|---|---|---|---|
| Clarence LP | 500,000.00 | Clarence LP c/o Wicklow Capital, Inc.53 W. Jackson Blvd. Suite 1204, Chicago IL 60604 | |
| Serenity Investments LLC | 250,000.00 | Serenity Investments LLC 830 North Boulevard Oak Park, IL 60301 | |
| David G P Allan | 50,000.00 | David G P Allan 90 Winchester St T oronto, ON Canada M4X 1B2 | |
| Michael Rauchman | 75,000.00 | Hedgehog Advisors, LLC 1584 Dawn Ct, Long Grover, IL 60047 | |
| Derek Anderson | 35,000.00 | Derek Anderson 6179 Iris Way Arvada, CO 80004 | |
| Bart R McDonough | 100,000.00 | Certifiable Solutions, LLC 201 David L Boren Blvd, Suite 250 Norman, OK 73072 | |
| | | | |
| | 4,150,000.00 | | |

A-8

AUS:680317.8

### SCHEDULE 3(f)

**PLEDGED EQUITY INTERESTS**

| Securities Issuer | Pledgor | Outstanding Shares/Interests | % of Shares/Membership Interests Pledged | Certificate No. (if applicable) |
|---|---|---|---|---|
| Terramine Hosting, Inc. | Cointerra, Inc. | 10,000,000 | 100% | 01 |
| Cohinoor, Inc. | Cointerra, Inc. | 10,000,000 | 100% | 01 |
| Zuriya LLC | Cointerra, Inc. | 100% Membership Interest | 100% | N/A |

## SCHEDULE 3(f)

### PLEDGED EQUITY INTERESTS

| Securities Issuer | Pledgor | Outstanding Shares/Interests | % of Shares/Membership Interests Pledged | Certificate No. (if applicable) |
|---|---|---|---|---|
| Terramine Hosting, Inc. | Cointerra, Inc. | 10,000,000 | 100% | 01 |
| Cohinoor, Inc. | Cointerra, Inc. | 10,000,000 | 100% | 01 |
| Zuriya LLC | Cointerra, Inc. | 100% Membership Interest | 100% | N/A |

# Exhibit "B"-4

Intellectual Property Security Agreement

## INTELLECTUAL PROPERTY SECURITY AGREEMENT

This Intellectual Property Security Agreement ("*Agreement*") dated August 1, 2014 is between CoinTerra, Inc. (together with its successors and permitted assigns, "*Debtor*") and Fortis Advisors LLC, a Delaware limited liability company, for the ratable benefit of the Secured Parties (together with its successors and permitted assigns, "*Collateral Agent*").

### RECITALS:

A. The Secured Parties have agreed to purchase secured promissory notes (the "*Notes*"), pursuant to the terms and conditions of the note purchase agreement dated of even date herewith among Debtor, Collateral Agent, and the Secured Parties (as amended, supplemented or otherwise modified from time to time, the "*Purchase Agreement*").

B. Pursuant to the Collateral Agent Agreement dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "*Collateral Agent Agreement*"), the Collateral Agent is to act as collateral agent and hold for the ratable benefit of the Secured Parties any and all security for the payment and performance of the Obligations.

C. Debtor has granted Collateral Agent a security interest in all of its right, title and interest, presently existing or later acquired, in and to all the Collateral described in the Security and Pledge Agreement dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "*Security Agreement*") executed by Debtor and Collateral Agent contemporaneously with the Purchase Agreement.

D. It is a condition precedent, among others, to the purchase by the Secured Parties of their respective Notes under the Purchase Agreement that the Debtor shall have executed and delivered this Agreement to the Collateral Agent.

### AGREEMENT:

NOW THEREFORE, in consideration of the mutual promises, covenants, conditions, representations, and warranties hereinafter set forth and for other good and valuable consideration, and intending to be legally bound, the parties hereto mutually agree as follows:

1. **Definitions**. Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement. In addition, the following terms, as used in this Agreement, have the following meanings:

"*Intellectual Property Collateral*" means:

(i) Each of the patents and patent applications which are presently owned by Debtor (including all of Debtor's right, title, and interest, in and to the patents and patent applications listed on Exhibit A, attached hereto, as the same may be updated hereafter from time to time), in whole or in part, and all patent rights with respect thereto throughout the world, including all proceeds thereof (including license royalties and proceeds of infringement suits), foreign filing rights, and rights to extend such patents and patent rights;

(ii)      All of Debtor's right, title, and interest in all patentable inventions, and to file applications for patent under federal patent law or regulation of any foreign country, and to request reexamination and/or reissue of the patents, the right (without obligation) to sue or bring interference proceedings in the name of Debtor for past, present, and future infringements of the patents, and all rights (but not obligations) corresponding thereto in the United States and any foreign country;

(iii)      Each of the trademarks and rights and interest which are capable of being protected as trademarks (including all of Debtor's right to the trademark registrations listed on Exhibit B, attached hereto, as the same may be updated hereafter from time to time) and all other trademarks, service marks, designs, logos, indicia, tradenames, corporate names, company names, business names, fictitious business names, trade styles, and other source or business identifiers, and applications pertaining thereto, which are presently owned by Debtor, in whole or in part, and all trademark rights with respect thereto throughout the world, including all goodwill associated therewith and all proceeds thereof (including license royalties and proceeds of infringement suits), and rights to renew and extend such trademarks and trademark rights;

(iv)      All of Debtor's right, title and interest to register trademark claims under any state or federal trademark law or regulation of any foreign country and to apply for, renew, and extend the trademark registrations and trademark rights, the right (without obligation) to sue or bring opposition or cancellation proceedings in the name of Debtor for past, present, and future infringements of the trademarks, registrations, or trademark rights and all rights (but not obligations) corresponding thereto in the United States and any foreign country;

(v)      All copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof and rights and interest which are capable of being protected as copyrights (including all of Debtor's right to the copyright registrations listed on Exhibit C, attached hereto, as the same may be updated hereafter from time to time), which are presently owned by Debtor, in whole or in part, including all proceeds thereof (including license royalties and proceeds of infringement suits);

(vi)      All of Debtor's right, title, and interest to register copyrights under any state or federal copyright law or regulation of any foreign country and to apply for copyright registrations, the right (without obligation) to sue in the name of Debtor for past, present, and future infringements of the copyrights and all rights (but not obligations) corresponding thereto in the United States and any foreign country;

(vii)      All general intangibles relating to the foregoing, including, without limitation, goodwill, license agreements, purchase orders, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights and rights to payment of any kind all claims for damages by way of any past, present and future infringement with respect to any of the items sent forth in paragraphs (i), (ii), (iii), (iv), (v), and (vi);

(viii)      All books and records related to any of the foregoing; and

(ix)      All proceeds of any and all of the foregoing (including, without limitations, license royalties and proceeds of infringement suits) and, to the extent not otherwise

included, all payments under insurance, or any indemnity, warranty, or guaranty payable by reason of loss or damage to or otherwise with respect to the Collateral.

Notwithstanding the foregoing, "Intellectual Property Collateral" shall not include any license, property or contract right the granting of a security interest in which would be prohibited by law or contract (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9.406, 9.407, 9.408 or 9.409 of the UCC or any other applicable law or principles of equity); *provided, however*, that such security interest shall attach immediately to any portion of such property, rights or licenses that does not result in any of the consequences specified in this sentence, including any proceeds of such contract or agreement. Furthermore, notwithstanding the foregoing, the security interest granted herein does not extend to and the term "Intellectual Property Collateral" does not include any license or contract rights to the extent that such rights are nonassignable by their terms (but only to the extent such prohibition is enforceable under applicable law, including, without limitation, Section Sections 9-406 and 9-408 of the UCC) without the consent of the licensor or other party (but only to the extent such consent has not been obtained).

2.      **Grant of Security Interest**.  Debtor hereby grants Collateral Agent a security interest in all of Debtor's right, title, and interest in and to the Intellectual Property Collateral wherever located and whether now owned or hereafter acquired to secure the performance and payment in full in cash of the Obligations.  Notwithstanding the foregoing, all of the rights and remedies of the Collateral Agent hereunder are expressly subordinate to the Permitted Liens as set forth in the Security Agreement.

This security interest is granted in conjunction with the security interest granted under the Security Agreement dated of even date herewith.  Collateral Agent's rights and remedies in the security interest are in addition to those in the Purchase Agreement, the Security Agreement and those available in law or equity.  Collateral Agent's rights, powers and interests are cumulative with every right, power or remedy provided hereunder.  Collateral Agent's exercise of its rights, powers or remedies in this Agreement or any other Transaction Document, and does not preclude the simultaneous or later exercise of any or all other rights, powers or remedies.

3.      **Patents; Trademarks; Service Marks**.  Debtor hereby represents, warrants, and covenants that:

(a)      A true and complete schedule setting forth all patent and patent applications owned or controlled by Debtor, together with a summary description in respect of the filing or issuance thereof and expiration dates is set forth on Exhibit A.

(b)      A true and complete schedule setting forth all federal and state trademark and service mark registrations owned or controlled by Debtor, together with a summary description in respect of the filing or issuance thereof and expiration dates is set forth on Exhibit B.

(c)      A true and complete schedule setting forth all copyright applications or registrations owned or controlled by Debtor, together with a summary description in respect of the filing or issuance thereof and expiration dates is set forth on Exhibit C.

(d)     Except for the filing of a financing statement with the Secretary of State of Delaware and filings with the United States Patent and Trademark Office and the United States Copyright Office necessary to perfect the security interests created hereunder, no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body in the United States is required either for the grant by Debtor of the security interest hereunder or for the execution, delivery, or performance of this Agreement by Debtor or for the perfection of or the exercise by Collateral Agent of its rights hereunder with respect to the Intellectual Property Collateral.  Debtor shall notify Collateral Agent in advance of application for and within fifteen (15) days of receipt of notice of registration in connection of any future registrations related to any of the Intellectual Property Collateral.

(e)     The Debtor has full power and authority to grant to the Collateral Agent the Lien in the Intellectual Property Collateral granted pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval that has been obtained.

(f)     Upon the filing of the financing statement with the Secretary of State of Delaware and filings of this Agreement with the United States Patent and Trademark Office and the United States Copyright Office in the appropriate filing offices, the Collateral Agent shall have (or, in the case of after-acquired Intellectual Property Collateral, at the time the Debtor acquires rights therein, will have) a perfected security interest in the Intellectual Property Collateral, which security interest is and shall be prior to any other Lien on any of the Intellectual Property Collateral, other than Permitted Liens.

4.     **After-Acquired Patent, Service Mark, Trademark, and Copyright Rights**.  If Debtor shall obtain ownership rights to any new service marks, trademarks, copyrights, any new patentable inventions or become entitled to the benefit of any patent application or patent for any reissue, division, or continuation, of any patent, the provisions of this Agreement shall automatically apply thereto.  Debtor shall, upon reasonable request by Collateral Agent, provide a report from time to time, but not more frequently than once per calendar quarter (unless an Event of Default has occurred and is continuing in which case there shall be no limitation on frequency), in writing to Collateral Agent with respect to any such new service marks, trademarks, or patents, or renewal or extension of any service mark or trademark registration. Debtor shall bear any expenses incurred in connection with future patent applications, future service mark or trademark registrations, and future copyright applications.

5.     **Litigation and Proceedings**.  Debtor shall commence and diligently prosecute in its own name, as the real party in interest, for its own benefit, and at its own expense, such suits, administrative proceedings, or other actions for infringement or other damages as are in its reasonable business judgment necessary and appropriate to protect the Intellectual Property Collateral.  Debtor shall provide to Collateral Agent any non-privileged information with respect thereto reasonably requested by Collateral Agent.  Collateral Agent shall provide at Debtor's expense all necessary cooperation in connection with any such suits, proceedings, or action, including, without limitation, joining as a necessary party.  Following Debtor's becoming aware thereof, Debtor shall notify Collateral Agent of the institution of, or any adverse determination in, any proceeding in the United States Patent and Trademark Office, or any United States, state, or foreign court regarding Debtor's claim of ownership in any of the patents, service marks, or

trademarks, its right to apply for the same, or its right to keep and maintain such patent, service mark, or trademark right.

6. **Power of Attorney**.  Debtor grants Collateral Agent power of attorney, coupled with an interest, having the full authority, and in the place of Debtor and in the name of Debtor, from time to time during the occurrence and continuance of an Event of Default in Collateral Agent's discretion, to take any action and to execute any instrument which Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, as may be subject to the provisions of this Agreement: to endorse Debtor's name on all applications, documents, papers, and instruments necessary for Collateral Agent to use or maintain the Intellectual Property Collateral; to ask, demand, collect, sue for, recover, impound, receive, and give acquittance and receipts for money due or to become due under or in respect of any of the Intellectual Property Collateral; to file any claims or take any action or institute any proceedings that Collateral Agent may deem necessary for the collection of any of the Intellectual Property Collateral or otherwise to enforce Debtor's or the Collateral Agent's rights with respect to any of the Intellectual Property Collateral and to assign, pledge, convey, or otherwise transfer title in or dispose of the Intellectual Property Collateral to any person.

7. **Events of Default**.  The Debtor shall be deemed in default under this Agreement upon the occurrence and during the continuance of an Event of Default.

8. **Specific Remedies**.  Upon the occurrence and continuation of any Event of Default, Collateral Agent shall have, in addition to, other rights given by law or in this Agreement, the Purchase Agreement, the Security Agreement, or in the Notes, all of the rights and remedies with respect to the Intellectual Property Collateral of a secured party under the Code, including the following:

(a) <u>Notification</u>.  Collateral Agent may notify licensees to make royalty payments on license agreements directly to Collateral Agent.

(b) <u>Sale</u>.  Collateral Agent may sell or assign the Intellectual Property Collateral and associated goodwill at public or private sale for such amounts, and at such time or times as Collateral Agent deems advisable.  Any requirement of reasonable notice of any disposition of the Intellectual Property Collateral shall be satisfied if such notice is sent to Debtor fifteen (15) days prior to such disposition. Debtor shall be credited with the net proceeds of such sale only when they are actually received by Collateral Agent, and Debtor shall continue to be liable for any deficiency remaining after the Intellectual Property Collateral is sold or collected. If the sale is to be a public sale, Collateral Agent shall also give notice of the time and place by publishing a notice one time at least ten (10) days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held.  To the maximum extent permitted by applicable law, Collateral Agent or any Secured Party may be the purchaser of any or all of the Intellectual Property Collateral and associated goodwill at any public sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Intellectual Property Collateral sold at any public sale, to use and apply all or any part of the Obligations as a credit on account of the purchase price of any collateral payable by Collateral Agent or such Secured Party at such sale.

(c)     For the purpose of enabling the Collateral Agent to exercise the rights and remedies in the case of an Event of Default and for no other purpose, Debtor hereby grants to Collateral Agent, an irrevocable (except as hereinafter set forth), non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, assign, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by Debtor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof. Notwithstanding anything herein to the contrary, such license shall not be effective unless and until an Event of Default shall have occurred and be continuing beyond the expiration of any applicable grace periods.

(d)     Notwithstanding anything contained herein to the contrary, so long as no Event of Default shall have occurred and be continuing beyond any grace period, Debtor will be permitted exclusively to exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property Collateral in the ordinary course of the business of Debtor, subject to compliance with any applicable covenants set forth herein and in any other Transaction Document. In furtherance of the foregoing, unless an Event of Default shall have occurred and be continuing, Collateral Agent shall from time to time, upon the request of Debtor, execute and deliver any instruments, certificates or other documents, in the form so requested, that Debtor shall have certified are appropriate to allow it to take any action permitted above.  Further, upon the payment in full of all of the Obligations, the conversion of the Notes into shares of the Debtor's capital stock pursuant to the terms thereof, or the release of the Intellectual Property Collateral, the license granted pursuant to clause (c) above shall terminate. The exercise of rights and remedies upon an Event of Default by the Collateral Agent or any Secured Party shall not terminate the rights of the holders of any license or, sublicense or other interest theretofore granted by Debtor in accordance with the first sentence of this clause (d).

(e)     The Collateral Agent, without liability to Debtor, may, upon the occurrence and during the continuance of an Event of Default, (A) take control of funds generated by the Intellectual Property Collateral, such as license and maintenance and support fees or royalty payments and use same to reduce any part of the Obligations and exercise any other rights which an owner of such Collateral may exercise; and (B) demand, collect, convert, redeem, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Intellectual Property Collateral, in its own name or in the name of Debtor, as the Collateral Agent may determine.  The Collateral Agent shall not be liable for failure to collect any account or fees, or for any act or omission on the part of the Collateral Agent, or its officers, agents or employees, except willful misconduct and gross negligence.

9.     **Choice of Law**.  This Agreement shall be governed by and construed under the laws of the State of Texas, without regard to conflicts of law principles.

10.     **General Provisions**.

(a)     Effectiveness.  This Agreement shall be binding and deemed effective when executed by Debtor and Collateral Agent.

AUS:680318.7                                                    6

(b)　　Successors and Assigns.　This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; *provided, however*, that Debtor may not assign the Agreement or any rights or duties hereunder without Collateral Agent's prior written consent and any prohibited assignment shall be absolutely void.　Collateral Agent may assign this Agreement and its rights and duties hereunder, subject to the Purchase Agreement and the Collateral Agent Agreement, and no consent or approval by Debtor is required in connection with any such assignment.

(c)　　Section Headings.　The section headings contained in this Agreement are for reference purposes only and shall not control or affect its construction or interpretation in any respect.

(d)　　Interpretation.　Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Collateral Agent or Debtor, whether under any rule of construction or otherwise.　On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

(e)　　Severability of Provisions.　The provisions of this Agreement are intended to be severable.　If any provision of this Agreement shall for any reason be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or any other provision of this Agreement in any jurisdiction.

(f)　　Waivers and Amendments.　This Agreement may not be amended, waived, discharged or terminated (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely) unless such amendment, waiver, discharge or termination is in writing and signed by (i) the Debtor (which shall not be required in connection with a waiver of rights by the Collateral Agent or the Secured Parties) and (ii) the Collateral Agent.

(g)　　Counterparts; Telefacsimile Execution.　This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.　Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement.　Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

(h)　　Fees and Expenses.　Debtor shall pay to Collateral Agent on demand all costs and expenses that Collateral Agent pays or incurs in connection with the administration, enforcement, and termination of this Agreement, including:　(a) reasonable attorneys' and paralegals' fees and disbursements of counsel to Collateral Agent; (b) reasonable costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any

amendment, supplement, waiver, consent, or subsequent closing in connection with this Agreement and the transactions contemplated hereby; (c) costs and expenses of lien and title searches; (d) taxes, fees, and other charges for filing this Agreement at the United States Patent and Trademark Office and United States Copyright Office, or for filing financing statements, and continuations, and other actions to perfect, protect, and continue the security interest created hereunder; (e) sums paid or incurred to pay any amount or take any action required of Debtor under this Agreement that Debtor fails to pay or take; (f) costs and expenses of preserving and protecting the Intellectual Property Collateral; and (g) actual and reasonable out-of-pocket expenses (including actual and reasonable attorneys' and paralegals' fees and disbursements) paid or incurred to enforce the security interest created hereunder, sell or otherwise realize upon the Intellectual Property Collateral, and otherwise enforce the provisions of this Agreement, or to defend any claims made or threatened against the Collateral Agent arising out of the transactions contemplated hereby (including preparations for the consultations concerning any such matters). Debtor acknowledges that the Collateral Agent shall not be required to expend or risk its own funds or otherwise incur any financial liability in the exercise or performance of any of its powers, rights, duties or privileges or administration of its duties.  The foregoing shall not be construed to limit any other provisions of this Agreement or the Transaction Documents regarding costs and expenses to be paid by Debtor.

(i)    Notices.  Except as otherwise provided herein, all notices, demands, and requests that either party is required or elects to give to the other shall be in writing and shall be governed by the provisions of Section 9(a) of the Security Agreement.

(j)    Termination by Agent.  Upon the payment in full in cash of all Obligations or the conversion of all the outstanding Notes into shares of the Debtor's capital stock pursuant to the terms thereof, the security interest granted herein shall terminate and all rights to the Intellectual Property Collateral shall revert to the Debtor. Upon such termination, the Collateral Agent shall authorize the release of its security interest in the Intellectual Property Collateral, and in such event at the reasonable request of Debtor, the Collateral Agent shall, at Debtor's expense, make such filings with the State of Delaware and the United States Patent and Trademark Office and the United States Copyright Office as may be deemed by Debtor to be necessary or appropriate to evidence such release and terminate any financing statement or notice relating to the liens and security interests created hereby.  In the event that, for any reason, any portion of such payments to the Collateral Agent or Secured Parties is set aside or restored, whether voluntarily or involuntarily, after the making thereof, then the obligation intended to be satisfied thereby shall be revived and continued in full force and effect as if said payment or payments had not been made.

(k)    Integration.   This Agreement, together with the other Transaction Documents, reflect the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, entered into before the date hereof.

(l)    Resolution of Conflicts.  In the event that any express provision or term of this Agreement conflicts with the express provisions and terms of the Purchase Agreement, the provision or term in the Purchase Agreement shall control.

(m) <u>Collateral Agent</u>.  In the event that the Collateral Agent shall resign or be removed as Collateral Agent in accordance with the Collateral Agent Agreement and a successor Collateral Agent is appointed in accordance with the Collateral Agent Agreement, this Agreement shall be deemed to be between the Debtor and such successor Collateral Agent.  In the event that the Collateral Agent shall resign or be removed as Collateral Agent in accordance with the Collateral Agent Agreement and no successor is appointed, then this Agreement shall be deemed to be between the Debtor and the Secured Parties in place of the Collateral Agent. Debtor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent, the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement, and the removal or resignation of, or appointment of a successor to, the Collateral Agent, shall be governed by the Collateral Agent Agreement, but Debtor shall be entitled to act in reliance upon a conclusive presumption that any action or non-action taken by the Collateral Agent has been authorized, and that the Collateral Agent is acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and Debtor shall not be under any obligation to make any inquiry respecting such authority.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first written above.

**DEBTOR:**

**COINTERRA, INC.**

By:_____

Name: _RAVI  IYENGAR_____

Title: _CHIEF  EXECUTIVE  OFFICER___

**COLLATERAL AGENT**
for the ratable benefit of the Secured Parties:

**FORTIS ADVISORS LLC**

By:_____

Name: Ryan Simkin

Title: Managing Director

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first written above.

**DEBTOR:**

**COINTERRA, INC.**

By:_____
Name:_____
Title:_____

**COLLATERAL AGENT**
for the ratable benefit of the Secured Parties:

**FORTIS ADVISORS LLC**

By:_____
Name: Ryan Simkin
Title: Managing Director

# EXHIBIT A

## PATENTS

Set forth below is a list of the Debtor's registered patents and pending patent applications.

| Title | Application # | Receipt Date |
|---|---|---|
| An Architecture for a Unified Acknowledgement When Distributively Connected in a Daisy Chain | 61949312 | 03/07/2014 |
| Distributed Computing Engine Architecture Connected in a Daisy Chain | 61949324 | 03/07/2014 |
| Workload Distribution in a Daisy Chain Configuration | 61949329 | 03/07/2014 |
| Capturing of Results in a Daisy Chain in a Distributed Chain of Computing | 61949335 | 03/07/2014 |
| Capturing of Multiple Valid Results in a Computed Engine Connected to Other Engines that are Connected to a Daisy Chain Engine | 61949341 | 03/07/2014 |
| Distributed Nonce's Work Distributed Across Work Engines in a Distributed Computer Architecture Through Equal Distribution Nonce's Range | 61949347 | 03/07/2014 |
| A Massively-Parallel Cryptocurrency Architecture | 61949350 | 03/07/2014 |
| ASIC Based Bitcoin Mining with Pipe Control Register | 61949372 | 03/07/2014 |
| ASIC Based Bitcoin Mining that Permits Arbitrary Flop Buffering | 61949384 | 03/07/2014 |

## EXHIBIT B

### TRADEMARKS

Set forth below is a list of the Debtor's registered trademarks and trademark applications:

| Name | Serial # | Filing Date |
|------|----------|-------------|
| COINTERRA | 86127685 | 11/24/2013 |
| GOLDSTRIKE | 86127550 | 11/23/2013 |
| TERRAMINER | 86127688 | 11/24/2013 |
| PETAMINER | 86270994 | 05/04/2014 |

# EXHIBIT C

## COPYRIGHTS

Set forth below is a list of the Debtor's copyrights:

| Title | Case # | Filing Date |
|---|---|---|
| CoinTerra Logo  | 1-1537874731 | 07/11/2014 |

# Exhibit "B"-5

Cointerra, Inc., Guarantee, Security & Pledge Agreement

**COINTERRA, INC.**

**GUARANTEE, PLEDGE AND SECURITY AGREEMENT**

This GUARANTEE, PLEDGE AND SECURITY AGREEMENT, dated as of August 1, 2014 (this "Agreement"), by each of the parties signatory hereto as grantors (the "Grantors"), in favor of Fortis Advisors LLC, a Delaware limited liability company, as collateral agent for the ratable benefit of the Secured Parties (together with its successors and permitted assigns, the "Collateral Agent").

WITNESSETH:

WHEREAS, pursuant to the note purchase agreement (as amended, supplemented or otherwise modified from time to time, the "Note Purchase Agreement") dated as of the date hereof by and among CoinTerra, Inc., a Delaware corporation ("Borrower"), the Secured Parties, and Collateral Agent, the Secured Parties have severally agreed to purchase certain Notes issued by the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor is a wholly-owned subsidiary of Borrower, will derive substantial direct and indirect benefit from the extensions of credit under the Note Purchase Agreement and is willing to execute and deliver this Agreement in order to induce the Secured Parties to purchase their respective Notes under the Note Purchase Agreement;

WHEREAS, pursuant to the Collateral Agent Agreement, the Collateral Agent is to act as collateral agent and hold for the ratable benefit of the Secured Parties any and all security for the payment and performance of the Obligations; and

WHEREAS, it is a condition precedent, among others, to the purchase by the Secured Parties of their respective Notes under the Note Purchase Agreement that the Grantors shall have executed and delivered this Agreement to the Collateral Agent.

NOW, THEREFORE, in consideration of the foregoing premises and to induce the Collateral Agent and the Secured Parties to enter into the Note Purchase Agreement and to induce the Secured Parties to purchase the Notes thereunder, each Grantor hereby agrees with the Collateral Agent as follows:

SECTION 1.  DEFINED TERMS

1.1.  Definitions.  Capitalized terms used and not otherwise defined herein have the meanings given to them in the Security Agreement (as defined below).

(a)  The following terms shall have the following meanings:

"Grantor Obligations":  with respect to any Grantor, all obligations and liabilities of such Grantor which may arise under this Agreement (including, without limitation, Section 2) or any other Transaction Document, whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise

(including, without limitation, all fees and disbursements of counsel to the Secured Parties that are required to be paid by such Grantor pursuant to the terms of this Agreement or any other Transaction Document).

"Security Agreement": the Security and Pledge Agreement, dated as of the date hereof, by and between Borrower and the Collateral Agent, as amended, supplemented or otherwise modified from time to time.

1.2.    Other Definitional Provisions.

(a)    the meanings of defined terms are equally applicable to the singular and plural forms of the defined terms;

(b)    Annex, Exhibit, Schedule and Section references are to this Agreement unless otherwise specified;

(c)    the term "including" is not limiting and means "including but not limited to";

(d)    in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including";

(e)    unless otherwise expressly provided in this Agreement, (i) references to agreements and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, replacements, refinancings, supplements and other modifications thereto, but only to the extent such amendments, restatements, amendments and restatements, replacements, refinancing, supplements and other modifications are not prohibited by the terms of this Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation;

(f)    this Agreement may use several different limitations, tests or measurements to regulate the same or similar matters, all of which are cumulative and each shall be performed in accordance with its terms;

(g)    this Agreement is the result of negotiations among and have been reviewed by counsel to Collateral Agent, Grantors, Secured Parties and the other parties hereto and are the products of all parties; accordingly, they shall not be construed against Collateral Agent, Grantors, or Secured Parties merely because of Collateral Agent's, Grantors' or Secured Parties' involvement in their preparation; and

(h)    where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

SECTION 2.  GUARANTEE

2.1.    Guarantee.

(a)    Each of the Grantors hereby, jointly and severally, unconditionally and irrevocably, guarantees, as a primary obligor and not merely as a surety, to the Collateral Agent

AUS:680365.9

and the Secured Parties, the prompt and complete payment and performance by the Borrower when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations. Each Grantor further agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by the Collateral Agent and the Secured Parties to any security held for the payment of the Obligations or to any balance of any deposit account or credit on the books of the Collateral Agent or the Secured Parties in favor of the Borrower or any other Person.

(b) Anything herein or in any other Transaction Document to the contrary notwithstanding, the maximum liability of each Grantor hereunder and under the other Transaction Documents shall in no event exceed the amount which can be guaranteed by such Grantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 2.2).

2.2. Right of Contribution. Each Grantor hereby agrees that to the extent that a Grantor shall have paid more than its proportionate share of any payment made hereunder, such Grantor shall be entitled to seek and receive contribution from and against any other Grantor hereunder which has not paid its proportionate share of such payment. Each Grantor's right of contribution shall be subject to the terms and conditions of Section 2.3. The provisions of this Section 2.2 shall in no respect limit the obligations and liabilities of any Grantor to the Collateral Agent or any of the Secured Parties, and each Grantor shall remain liable to the Collateral Agent and the Secured Parties for the full amount guaranteed by such Grantor hereunder.

2.3. No Subrogation. Notwithstanding any payment made by any Grantor hereunder or any set-off or application of funds of any Grantor by the Collateral Agent or the Secured Parties, no Grantor shall be entitled to be subrogated to any of the rights of the Collateral Agent  or the Secured Parties against the Borrower or any other Grantor or any collateral security or guarantee or right of offset held by the Collateral Agent or the Secured Parties for the payment of the Grantor Obligations, nor shall any Grantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Grantor in respect of payments made by such Grantor hereunder, until all amounts owing to the Collateral Agent and the Secured Parties by the Borrower on account of the Grantor Obligations (other than unasserted contingent obligations) are paid in full.  If any amount shall be paid to any Grantor on account of such subrogation rights at any time when all of the Grantor Obligations shall not have been paid in full, such amount shall be held by such Grantor in trust for the Collateral Agent and the Secured Parties, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly indorsed by such Grantor to the Collateral Agent, if required), to be applied against the Grantor Obligations, whether matured or unmatured, as the Collateral Agent may determine in accordance with Section 8.3.

2.4. Amendments, etc. with respect to the Obligations. The obligations of each Grantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations or otherwise.  Each Grantor shall remain obligated hereunder notwithstanding that, without any reservation of rights

against any Grantor and without notice to or further assent by any Grantor, any demand for payment of any of the Grantor Obligations made by the Collateral Agent or any Secured Party may be rescinded by the Collateral Agent or such Secured Party and any of the Grantor Obligations continued, and the Grantor Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Collateral Agent or any Secured Party, and the Note Purchase Agreement and the other Transaction Documents, and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, in accordance with their respective terms, and any collateral security, guarantee or right of offset at any time held by the Collateral Agent or any Secured Party for the payment of the Grantor Obligations may be sold, exchanged, waived, surrendered or released.  Neither the Collateral Agent nor any Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Grantor Obligations or for the guarantee contained in this <u>Section 2</u> or any property subject thereto.

       2.5.  <u>Guarantee Absolute and Unconditional</u>.  Each Grantor waives, to the fullest extent permitted by applicable law, any and all notice of the creation, renewal, extension or accrual of any of the Grantor Obligations and notice of or proof of reliance by the Collateral Agent and the Secured Parties upon the guarantee contained in this <u>Section 2</u> or acceptance of the guarantee contained in this <u>Section 2</u>; the Grantor Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this <u>Section 2</u>; and all dealings between any of the Borrower and any of the Grantors, on the one hand, and the Collateral Agent and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this <u>Section 2</u>.  Each Grantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Grantors with respect to the Grantor Obligations.  Each Grantor understands and agrees that the guarantee contained in this <u>Section 2</u> shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (1) the validity or enforceability of the Note Purchase Agreement or any other Transaction Document, any of the Grantor Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Collateral Agent or any Secured Party, (2) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against the Collateral Agent or any Secured Party, or (3) any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Grantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower for the Grantor Obligations, or of such Grantor under the guarantee contained in this <u>Section 2</u>, in bankruptcy or in any other instance, other than termination of this guarantee pursuant to the terms of this <u>Section 2</u>.  When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Grantor, the Collateral Agent or any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Grantor or any other Person or against any collateral security or guarantee for the Grantor Obligations or any right of offset with respect thereto, and any failure by the Collateral Agent or any Secured Party to make any such demand,

-4-

to pursue such other rights or remedies or to collect any payments from the Borrower, any other Grantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Grantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Grantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Collateral Agent or any Secured Party against any Grantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

2.6. <u>Reinstatement</u>. The guarantee contained in this <u>Section 2</u> shall continue to be effective, or be reinstated, as the case may be, to the extent, at any time payment, or any part thereof, of any of the Grantor Obligations is rescinded or must otherwise be restored or returned by the Collateral Agent or any Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Grantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Grantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

2.7. <u>Information</u>. Each Grantor assumes all responsibility for being and keeping itself informed of the Borrower's and each other Grantor's financial condition and assets and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Grantor assumes and incurs hereunder, and agrees that neither the Collateral Agent nor any Secured Party will have any duty to advise such Grantor of information known to it or any of them regarding such circumstances or risks.

SECTION 3. GRANT OF SECURITY INTEREST

3.1. <u>Grant of Security Interest</u>. Each Grantor hereby pledges to Collateral Agent and grants to the Collateral Agent a security interest in all of the Collateral now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Grantor Obligations. "***Collateral***" shall mean and include all right, title, interest, claims and demands of the Grantor in and to each and every asset, tangible and intangible, in which the Grantor has any right, title, interest, claim or demand, including, but not limited to, equipment, accounts, inventory, general intangibles (including all payment intangibles), investment property, letter-of credit rights, commercial tort claims, fixtures, real and personal property, patents, trademarks, copyrights, trade secrets, confidential information and any other proprietary or intellectual property rights, deposit accounts, cash, contract rights, in each, together with all substitutions, renewals or replacements of and additions, improvements, replacement parts and accumulations to any and all of such assets and all books and records related to any of the foregoing, and to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing. Notwithstanding the foregoing, the term "Collateral" shall not include any property, rights or licenses to the extent the granting of a security interest therein (i) would be contrary to applicable law or (ii) is prohibited by (but only to the extent such prohibition is enforceable under applicable law), conflicts with, or would

-5-

constitute a default under any agreement or document governing such property, rights or licenses (other than to the extent that any such term would be rendered ineffective pursuant to Section 9.406, 9.407, 9.408 or 9.409 of the UCC or any other applicable law or principles of equity); *provided, however*, that such security interest shall attach immediately to any portion of such property, rights or licenses that does not result in any of the consequences specified in clause (i) or (ii) of this paragraph, including any proceeds of such contract or agreement.

SECTION 4.  REPRESENTATIONS AND WARRANTIES

Each Grantor hereby represents and warrants to the Collateral Agent that:

4.1.  <u>Title; No Other Liens</u>.  Each Grantor has full power and authority to grant to the Collateral Agent, the Lien in the Collateral granted pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any person other than any consent or approval that has been obtained.

(b)  Each Grantor is the owner or authorized user of the Collateral (or, in the case of after-acquired Collateral, at the time such Grantor acquires rights in the Collateral, will be the owner or authorized user thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time such Grantor acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than the Permitted Liens.

4.2.  <u>Perfected Liens</u>.  Upon the filing of UCC-1 financing statements in the appropriate filing offices, the Collateral Agent shall have (or, in the case of after-acquired Collateral, at the time the Grantor acquires rights therein, will have) a perfected security interest in the Collateral to the extent that a security interest in the Collateral can be perfected by such filing.

(b)  The security interest in the Collateral is and shall be prior to any other Lien on any of the Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the UCC or other applicable law in such jurisdictions, other than Permitted Liens.

(c)  The originals of all documents evidencing all accounts receivable and payment intangibles of each Grantor and the only original books of account and records of each Grantor related thereto are, and will continue to be, kept at the chief executive office of the Borrower or at such other locations as the Borrower may establish in accordance with this Agreement and the Purchase Agreement.

AUS:680365.9

4.3.    Pledged Equity Interests.  The equity interests listed on Schedule 4.3 (the "Pledged Equity Interests") constitute all the issued and outstanding shares of all classes of equity interests of each issuer owned by each Grantor and such shares represent all of the issued and outstanding shares of each such issuer.  All the shares of the Pledged Equity Interests have been duly and validly issued and are fully paid and, to the extent applicable, non-assessable.

4.4.    Intellectual Property.  No Grantor has any right, title or interest in any registered patent, trademark, copyright or other intellectual property, or in any application or exclusive license for any registered patent, trademark, copyright or other intellectual property.

SECTION 5.  COVENANTS

5.1.    Covenants Relating to Collateral.  Each Grantor covenants and agrees:

(a)    To perform all acts that may be necessary to maintain, preserve, protect and perfect the Collateral, the Lien granted to the Collateral Agent therein and the perfection and priority of such Lien subject to Permitted Liens, including any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of the Collateral Agent in the Collateral and the priority thereof against any Lien, other than a Permitted Lien;

(b)    Not to use or permit any Collateral to be used (i) in violation in any material respect of any applicable law, rule or regulation, or (ii) in violation of any policy of insurance covering the Collateral;

(c)    To pay promptly when due all taxes, other governmental charges and all other charges now or hereafter imposed upon or affecting any Collateral, except as may be subject to good faith contest or as to which a bona fide dispute may arise;

(d)    Without 30 days' prior written notice to the Collateral Agent, (i) not to change the Grantor's name or place of business (or, if the Grantor has more than one place of business, its chief executive office), or the office in which the Grantor's records relating to accounts receivable and payment intangibles are kept and (ii) not to change the Grantor's state of incorporation;

(e)    To procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by the Collateral Agent to perfect, maintain and protect its Lien hereunder and the priority thereof and to deliver promptly upon the request of the Collateral Agent all originals of Collateral consisting of instruments;

(f)    Not to surrender or lose possession of (other than to the Collateral Agent), sell, encumber, lease, rent, or otherwise dispose of or transfer any Collateral or right or interest therein, and to keep the Collateral free of all Liens except Permitted Liens; provided that the Grantor may sell, lease, transfer, license or otherwise dispose of any of the Collateral in the ordinary course of business consisting of (i) the sale of inventory, (ii) sales of worn-out or obsolete equipment, (iii) non-exclusive licenses and similar arrangements for the use of the

-7-

property of the Grantor and (iv) escrows of software or other intellectual property entered into by the Grantor in the ordinary course of Grantor's business;

(g)     To comply in all material respects with all requirements of law relating to the production, possession, operation, maintenance and control of the Collateral;

(h)     To permit the Collateral Agent and its representatives the right, at any time during normal business hours, upon reasonable prior notice, to visit and inspect the properties of the Grantor and its corporate, financial and operating records, and make abstracts therefrom, and to discuss the Grantor's affairs, finances and accounts with its directors, officers and independent public accountants;

(i)     To maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) so long as no Event of Default has occurred and is continuing, be disbursed to the Grantor for direct application by the Grantor solely to the repair or replacement of the Grantor's property so damaged or destroyed and (ii) in all other circumstances, be held by the Collateral Agent as cash collateral for the Grantor Obligations. The Collateral Agent may disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Collateral Agent may reasonably prescribe, for direct application by the Grantor solely to the repair or replacement of the Grantor's property so damaged or destroyed, or the Collateral Agent may apply all or any part of such proceeds to the Grantor Obligations.  All policies of insurance shall provide for at least 30 days' prior written cancellation notice to the Collateral Agent (or 10 days' notice of cancellation due to nonpayment of premiums).  In the event of failure by the Grantor to provide and maintain insurance as herein provided, the Collateral Agent may provide such insurance and charge the amount thereof to the Grantor.  The Grantor shall furnish the Collateral Agent and the Secured Parties with certificates of insurance and policies evidencing compliance with the foregoing insurance provision;

(j)     Any of the Collateral evidenced by any Instrument (as defined in the UCC) (other than checks and drafts in the ordinary course of business), Certificated Security (as defined in the UCC) or Chattel Paper (as defined in the UCC) shall, concurrently with execution of this Agreement, be delivered by the Grantors to the Collateral Agent, duly indorsed in a manner reasonably satisfactory to the Collateral Agent, together with an undated stock power covering such certificate duly executed in blank by the applicable Grantor, if required, to be held as Collateral pursuant to this Agreement. If any of the Collateral shall be or become evidenced by any Instrument (as defined in the UCC) (other than checks and drafts in the ordinary course of business), Certificated Security (as defined in the UCC) or Chattel Paper (as defined in the UCC), such Instrument, Certificated Security or Chattel Paper shall be promptly delivered by the Grantors to the Collateral Agent, duly indorsed in a manner reasonably satisfactory to the Collateral Agent, together with an undated stock power covering such certificate duly executed in blank by the applicable Grantor, if required, to be held as Collateral pursuant to this Agreement;

-8-

(k)        If any Grantor receives any stock certificate (including, without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Equity Interests of any issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Equity Interests, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Collateral Agent, hold the same in trust for the Collateral Agent and deliver the same forthwith to the Collateral Agent in the exact form received, duly indorsed by such Grantor to the Collateral Agent, if required, together with an undated stock power covering such certificate duly executed in blank by such Grantor, to be held by the Collateral Agent, subject to the terms hereof, as additional collateral security for the Grantor Obligations.  Any sums paid upon or in respect of the Investment Property (as defined in the UCC) upon the liquidation or dissolution of any issuer (other than in connection with any of the foregoing not prohibited  under the terms of the Purchase Agreement) shall be paid over to the Collateral Agent to be held by it hereunder as additional collateral security for the Grantor Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property in connection with any such liquidation or dissolution (other than in connection with any of the foregoing not prohibited under the terms of the Purchase Agreement) shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Collateral Agent, be delivered to the Collateral Agent to be held by it hereunder as additional collateral security for the Grantor Obligations.  If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by any Grantor, such Grantor shall, until such money or property is paid or delivered to the Collateral Agent, hold such money or property in trust for the Collateral Agent, segregated from other funds of such Grantor, as additional collateral security for the Grantor Obligations; and

(l)        to not issue any equity interest or securities in its share capital or otherwise to any Person except that it may issue equity interests or securities to the Borrower or another Grantor provided that such equity interests or securities are, immediately upon issuance, pledged to the Collateral Agent hereunder or under the Security Agreement.

SECTION 6.  AUTHORIZED ACTION BY COLLATERAL AGENT

6.1.    Appointment.  Each Grantor hereby irrevocably appoints Collateral Agent as its attorney-in-fact (which appointment is coupled with an interest) and agrees that Collateral Agent may perform (but Collateral Agent shall not be obligated to and shall incur no liability to the Grantor or any third party for failure so to do) any act which the Grantor is obligated by this Agreement to perform, and to exercise such rights and powers as the Grantor might exercise with respect to the Collateral, including the right to:

(a)        collect by legal proceedings or otherwise and endorse, receive and receipt for all dividends, interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral;

(b)    enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for the Collateral;

(c)    make any compromise or settlement, and take any action it deems advisable, with respect to the Collateral;

(d)    insure, process and preserve the Collateral;

(e)    pay any indebtedness of the Grantor relating to the Collateral; and

(f)    file UCC financing statements and execute other documents, instruments and agreements required hereunder;

*provided, however*, that Collateral Agent shall not exercise any such powers granted pursuant to subsections (a) through (e) prior to the occurrence of an Event of Default and shall only exercise such powers during the continuance of an Event of Default, provided that prior to an Event of Default the Collateral Agent may insure the Collateral as provided in Section 5.1(i).  The Grantor agrees to reimburse Collateral Agent upon demand for any reasonable costs and expenses, including attorneys' fees, Collateral Agent may incur while acting as the Grantor's attorney-in-fact hereunder, all of which costs and expenses are included in the Grantor Obligations.  It is further agreed and understood between the parties hereto that such care as Collateral Agent gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Collateral when in Collateral Agent's possession; *provided, however*, that Collateral Agent shall not be required to make any presentment, demand or protest, or give any notice and need not take any action to preserve any rights against any prior party or any other person in connection with the Grantor Obligations or with respect to the Collateral.

## SECTION 7.  LITIGATION AND OTHER PROCEEDINGS

7.1.    The Grantors shall have the right and obligation to commence and diligently prosecute such suits, proceedings or other actions for infringement or other damage, or reexamination or reissue proceedings, or opposition or cancellation proceedings as are reasonable to protect any of the patents, trademarks, copyrights, mask works or trade secrets.

7.2.    Upon the occurrence and during the continuation of an Event of Default, Collateral Agent shall have the right but not the obligation to bring suit or institute proceedings in the name of the Grantor or Collateral Agent to enforce any rights in the Collateral, including any license thereunder, in which event the Grantor shall at the request of Collateral Agent do any and all lawful acts and execute any and all documents reasonably required by Collateral Agent in aid of such enforcement.  If Collateral Agent elects not to bring suit to enforce any right under the Collateral, including any license thereunder, the Grantor agrees to use all reasonable measures, whether by suit, proceeding or other action, to cause to cease any infringement of any right under the Collateral by any Person and for that purpose agrees to diligently maintain any action, suit or proceeding against any Person so infringing necessary to prevent such infringement.

AUS:680365.9

## SECTION 8.  DEFAULT AND REMEDIES

8.1.  <u>Default</u>.  The Grantors shall be deemed in default under this Agreement upon the occurrence and during the continuance of an Event of Default.

8.2.  <u>Remedies</u>.  Upon the occurrence and during the continuance of any such Event of Default, Collateral Agent shall have the rights of a secured creditor under the UCC, all rights granted by this Agreement and by law, including the right to:  (i) require the Grantor to assemble the Collateral and make it available to Collateral Agent at a place to be designated by Collateral Agent; and (ii) prior to the disposition of the Collateral, store, process, repair or recondition it or otherwise prepare it for disposition in any manner and to the extent Collateral Agent deems appropriate.  The Collateral Agent may sell or assign the Collateral and associated goodwill at public or private sale for such amounts, and at such time or times as Collateral Agent deems advisable.  The Grantor shall be credited with the net proceeds of such sale only when they are actually received by Collateral Agent, and Grantor shall continue to be liable for any deficiency remaining after the Collateral is sold or collected. The Grantor hereby agrees that fifteen (15) days' notice of any intended sale or disposition of any Collateral is reasonable.  To the maximum extent permitted by applicable law, Collateral Agent or any Secured Party may be the purchaser of any or all of the Collateral and associated goodwill at any public sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any public sale, to use and apply all or any part of the Obligations as a credit on account of the purchase price of any collateral payable by Collateral Agent or such Secured Party at such sale.  In furtherance of Collateral Agent's rights hereunder, the Grantor hereby grants to Collateral Agent an irrevocable, non-exclusive license, exercisable without royalty or other payment by Collateral Agent, and only in connection with the exercise of remedies hereunder upon an Event of Default, to use, license or sublicense any patent, trademark, trade name, copyright or other intellectual property in which the Grantor now or hereafter has any right, title or interest together with the right of access to all media in which any of the foregoing may be recorded or stored.

8.3.  <u>Application of Collateral Proceeds</u>.  The proceeds and/or avails of the Collateral, or any part thereof, and the proceeds and the avails of any remedy hereunder (as well as any other amounts of any kind held by Collateral Agent at the time of, or received by Collateral Agent after, the occurrence of an Event of Default) shall be paid to and applied in accordance of the Collateral Agent Agreement.

8.4.  <u>Pledged Equity Interests</u>.

(a)  Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given at least one Business Day's prior written notice to the relevant Grantor of the Collateral Agent's intent to exercise its corresponding rights pursuant to <u>Section 8.4(b)</u> (which notice shall be deemed to have been given immediately upon the occurrence of an Event of Default under Sections 6.1(d) and 6.1(e) of the Notes), each Grantor shall be permitted to receive all cash dividends paid in respect of the Pledged Equity Interests, and to exercise all voting and corporate rights with respect to the Investment Property; provided, however, that no vote shall be cast or corporate or other organizational right exercised or other action taken which (x) would  result in any violation of any provision of the Purchase Agreement, this Agreement or

any other Transaction Document or (y) could reasonably be expected to materially and adversely affect security interest granted herein in the Pledged Equity Interests or the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement or the Purchase Agreement or any other Transaction Document or the ability of the Collateral Agent or the Secured Parties to exercise the same.

(b)     To the extent permitted by applicable law, if an Event of Default shall occur and be continuing and the Collateral Agent shall have given at least one Business Day's prior written notice of its intent to exercise such rights to the relevant Grantor or Grantors (which notice shall be deemed to have been given immediately upon the occurrence of an Event of Default under Sections 6.1(d) and 6.1(e) of the Notes), (i) the Collateral Agent shall have the right to receive any and all cash dividends, payments or other proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 2.3 of the Collateral Agent Agreement, and (ii) the Collateral Agent or its nominee may thereafter solely exercise (A) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant issuer or otherwise and (B) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any issuer, or upon the exercise by the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to such Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon waiver or cure of all Events of Default that have occurred, any voting, corporate or limited liability rights and other rights set forth in this Section 8.4(b) shall immediately revert to the relevant Grantor and the Collateral Agent shall as soon as practically reasonable take such steps reasonably requested by the relevant Grantor to cause any Investment Property registered pursuant to clause (B) of this Section 8.4(b) to be registered in the name of such Grantor prior to the Event of Default which has been cured or waived.

(c)     Each Grantor hereby authorizes and instructs each issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (A) states that an Event of Default has occurred and is continuing and (B) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each issuer shall be fully protected in so complying, and (ii) pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent in accordance with the terms of this Agreement, in each case, until receipt by issuer of written notice from Collateral Agent stating that all Events of Default have been waived or cured (which such notice Collateral Agent shall deliver immediately upon the cure or waiver of all Events of Default).

AUS:680365.9

## SECTION 9.  COLLATERAL AGENT

9.1.    In the event that the Collateral Agent shall resign or be removed as Collateral Agent in accordance with the Collateral Agent Agreement and a successor Collateral Agent is appointed in accordance with the Collateral Agent Agreement, this Agreement shall be deemed to be between the Grantors and such successor Collateral Agent.  In the event that the Collateral Agent shall resign or be removed as Collateral Agent in accordance with the Collateral Agent Agreement and no successor is appointed, then this Agreement shall be deemed to be between the Grantors and the Secured Parties in place of the Collateral Agent. Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent, the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement, and the removal or resignation of, or appointment of a successor to, the Collateral Agent, shall be governed by the Collateral Agent Agreement, but Grantors shall be entitled to act in reliance upon a conclusive presumption that any action or non-action taken by the Collateral Agent has been authorized, and that the Collateral Agent is acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and Grantors shall not be under any obligation to make any inquiry respecting such authority.

## SECTION 10.  MISCELLANEOUS

10.1.    <u>Notices</u>.  All notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or send via facsimile (with confirmation of receipt) to the parties at the address for such party set forth below (or at such other address for a party as shall be specified by like notice):

(a)     If to the Collateral Agent:

Fortis Advisors LLC
Attn: Rick Fink
4225 Executive Square, Suite 1040
La Jolla, CA 92037
Email: rfink@fortisrep.com
Fax: (858) 408-1843

(b)     If to the Grantors:

c/o CoinTerra, Inc.
11130 Jollyville Rd.
Suite 100
Austin, TX  78759
Attn:  Chief Executive Officer

with a copy (which shall not constitute notice) to:

AUS:680365.9

Andrews Kurth LLP
111 Congress Ave, Suite 1700
Austin, Texas 78701
Facsimile: (512) 320-9292
Attention: Carmelo M. Gordian

Notice given by facsimile shall be confirmed by appropriate answer back and shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which notice is to be given to it by giving notice as provided above of such change of address.

An electronic communication ("Electronic Notice") shall be deemed written notice for purposes of this Section 10.1 if sent with return receipt requested to the electronic mail address specified by the receiving party in a signed writing in a nonelectronic form. Electronic Notice shall be deemed received at the time the party sending Electronic Notice receives verification of receipt by the receiving party. Any party receiving Electronic Notice may request and shall be entitled to receive the notice on paper, in a nonelectronic form ("Nonelectronic Notice") which shall be sent to the requesting party within ten (10) days of receipt of the written request for Nonelectronic Notice.

10.2.    Termination of Security Interest.  Upon the payment in full in cash of all Grantor Obligations or the conversion of all the outstanding Notes into shares of the Borrower's capital stock pursuant to the terms thereof, the security interest granted herein shall terminate and all rights to the Collateral shall revert to the Grantors. Upon such termination, the Collateral Agent shall authorize the Grantors to file any UCC termination statements necessary to effect such termination and the Collateral Agent will execute and deliver to the Grantors any additional documents or instruments as the Grantors shall reasonably request to evidence such termination. In the event that, for any reason, any portion of such payments to the Collateral Agent or the Secured Parties is set aside or restored, whether voluntarily or involuntarily, after the making thereof, then the obligation intended to be satisfied thereby shall be revived and continued in full force and effect as if said payment or payments had not been made.

10.3.    Waivers and Amendments.  This Agreement may not be amended, waived, discharged or terminated (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely) unless such amendment, waiver, discharge or termination is in writing and signed by (a) the Grantors (which shall not be required in connection with a waiver of rights by the Collateral Agent or the Secured Parties) and (b) the Collateral Agent.

10.4.    Governing Law.  This Agreement shall be governed by and construed under the laws of the State of Texas, without regard to conflicts of law principles.

10.5.    Attorneys' Fees.  In the event of any dispute involving the terms hereof, the prevailing parties shall be entitled to collect legal fees and expenses from the other party to the dispute.

AUS:680365.9

10.6.  <u>Entire Agreement</u>.  This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Grantors, the Collateral Agent and the Secured Parties and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

10.7.  <u>Severability</u>.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

10.8.  <u>Successors and Assigns</u>.  Except as otherwise expressly provided in this Agreement, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto; provided, however, that the Grantors may not sell, assign or delegate rights and obligations hereunder without the prior written consent of Collateral Agent.

10.9.  <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power, or remedy accruing to the Collateral Agent or a Secured Party, upon any breach or default of the Grantors under this Agreement shall impair any such right, power, or remedy of the Collateral Agent or the Secured Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of the Collateral Agent or any Secured Party of any breach or default under this Agreement or any waiver on the part of the Collateral Agent or any Secured Party of any provisions or conditions of this Agreement must be made in writing, and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to the Collateral Agent or the Secured Parties, shall be cumulative and not alternative.

10.10.  <u>Titles and Subtitles</u>.  The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

10.11.  <u>Telecopy Execution and Delivery</u>.  A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

10.12.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

AUS:680365.9

10.13. <u>Construction</u>.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the language used in this Agreement has been chosen by the parties to express their mutual intent.  Accordingly, no rules of strict construction will be applied against any party with respect to this Agreement.

10.14. <u>Payments Free of Taxes, Etc</u>.  All payments made by the Grantors under the Transaction Documents shall be made by the Grantors free and clear of and without deduction for any and all present and future taxes, levies, charges, deductions and withholdings.  In addition, the Grantors shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Agreement.  Upon request by Collateral Agent, the Grantors shall furnish evidence satisfactory to Collateral Agent that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

10.15. <u>Other Interpretive Provisions</u>.  References in this Agreement and each of the other Transaction Documents to any document, instrument or agreement (a) includes all exhibits, schedules and other attachments thereto, (b) includes all documents, instruments or agreements issued or executed in replacement thereof, and (c) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "include" and "including" and words of similar import when used in this Agreement shall not be construed to be limiting or exclusive.

*[Signature page follows]*

AUS:680365.9

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**"Grantors"**

TERRAMINE HOSTING INC., a Nevada corporation

By:_____

    Name: RAVI IYENGAR
    Title: PRESIDENT & SECRETARY


COHINOOR, INC., a Montana corporation

By:_____

    Name: RAVI IYENGAR
    Title: PRESIDENT & SECRETARY


ZURIYA LLC, a Delaware limited liability company

By:_____

    Name: RAVI IYENGAR
    Title: PRESIDENT & SECRETARY

Signature Page to Guarantee, Pledge and Security Agreement

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

"**Collateral Agent**" for the ratable benefit of the Secured Parties

FORTIS ADVISORS LLC

By: _____
Name: Ryan Simkin
Title: Managing Director

## SCHEDULE 4.3

### PLEDGED EQUITY INTERESTS

None.

# **Exhibit "B"**-6

Deposit Account Control Agreement

Execution Copy
(Account – With Activation)

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (the "Agreement") is entered into as of October 15, 2014, among CoinTerra, Inc ("Company"), Fortis Advisors LLC, as collateral agent for the ratable benefit of certain lenders ("Collateral Agent") and Bank of America, N.A. ("Bank") with respect to the following:

RECITALS:

A.      Bank has agreed to establish and maintain for Company certain deposit account(s) identified as number(s) 5860 3213 3045 (referred to individually and collectively, as the "Account").

B.      Company has assigned to Collateral Agent a security interest in the Account and in any checks, automated clearinghouse ("ACH") transfers, wire transfers, instruments and other payment items deposited in the Account (collectively, "Funds").

C.      Company and Collateral Agent have requested Bank to enter into this Agreement to evidence Collateral Agent's security interest in the Account and to provide for the disposition of the Funds deposited in the Account.

D.      Bank is willing to enter into this Agreement for the benefit of Company and Collateral Agent pursuant to the terms to and conditions set forth herein.

Accordingly, Company, Collateral Agent and Bank agree as follows:

1.    Collateral Agent's Control over the Account.

(a)    This Agreement evidences Collateral Agent's control over the Account. Notwithstanding any contrary duties owed by Bank to the Company under any other deposit account agreements, terms and conditions or other documentation entered into by and between Bank and the Company governing the Account and any cash management or similar services provided by Bank or an affiliate of Bank in connection with the Account, including without limitation, services in connection with any "Lockbox," as defined below (collectively, the "Account Related Agreements"), Bank will comply with instructions originated by Collateral Agent as set forth herein directing the disposition of Funds in the Account without further consent of the Company. Bank may follow such instructions even if doing so results in the dishonoring by Bank of items presented for payment from the Account or Bank otherwise not complying with any instruction from Company directing the disposition of any Funds in the Account.

(b)    Company represents and warrants to Collateral Agent and Bank that it has not assigned or granted a security interest in the Account or any Funds deposited in the Account, except to Collateral Agent and Bank.

AUS.685113.2

Feb 03 2015 09:49:32 800-294-5658                                    Bank of America          Page 007

     (c)     Company will not permit any Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind ("Charges"), other than Collateral Agent's security interest referred to herein, Bank's setoffs and the Charges permitted hereinafter.

     (d)     Company covenants to Collateral Agent that it will not close the Account prior to the termination of this Agreement. Bank shall have no liability in the event Company breaches this covenant to Collateral Agent.

2.    <u>Company Access to the Account</u>.    Except as otherwise provided in this Section 2 of the Agreement, prior to the Activation Effective Time (as defined below) Bank may honor withdrawal, payment, transfer, or other instructions originated by the Company concerning the disposition of Funds in the Account (collectively, "Company Instructions"). On and after the Activation Effective Time, Bank shall only honor instructions originated by Collateral Agent concerning the disposition of Funds in the Account ("Collateral Agent Instructions") without further consent from the Company and Company shall have no right or ability to access, withdraw or transfer Funds from the Account. Except as provided herein, no Collateral Agent Instruction may be rescinded or modified without Bank's consent. Both Collateral Agent and Company acknowledge that Bank may, without liability, (i) comply with any Company Instruction or otherwise complete a transaction involving the Account that Bank or an affiliate had started to process before the Activation Effective Time and (ii) commence to solely honor Collateral Agent's Instructions at any time or from time to time after Bank becomes aware that Collateral Agent has sent to Bank the Activation Notice (as defined below) even if prior to the Activation Effective Time (including without limitation halting, reversing or redirection of any transaction), which actions (under (i) and/or (ii)) shall not, in any way, affect the commencement of the Activation Effective Time. The Account may receive merchant card deposits and chargebacks. Company acknowledges and agrees that upon commencement of the Activation Effective Time, chargebacks may be blocked from debiting the Account.

     For purposes hereof, and notwithstanding anything to the contrary in this agreement, the "Activation Effective Time" shall commence upon the opening of business on the second Banking Day (as defined below) following the Banking Day on which the receipt of a notice purporting to be signed by Collateral Agent in substantially the form of Exhibit A and sent to the location of Bank to which Collateral Agent is required hereunder to send the Activation Notice, with a copy of this Agreement attached (the "Activation Notice"), is acknowledged by the Bank; provided, however, that if such receipt is acknowledged on any day after 12:00 noon, eastern time, the acknowledgement shall be deemed to have occurred on the next Banking Day. A "Banking Day" is any day other than a Saturday, Sunday or other day on which Bank is or is authorized or required by law to be closed.

     Within a reasonable time, and in any event within three (3) Banking Days, after commencement of the Activation Effective Time and continuing on each Banking Day thereafter, Bank shall wire transfer all immediately available Funds in the Account to the account specified by Collateral Agent in the Activation Notice. In the event Collateral Agent requests in writing a change to the wire transfer instructions provided to Bank in the Activation Notice by sending a written notice in substantially the form of Exhibit B and sent to the location of Bank to which Collateral Agent is required hereunder to send the Activation Notice to Bank to the location set forth hereunder, any such change requested by Collateral Agent shall

commence within a reasonable time, but no earlier than two Banking Days, after the opening of business on the second Banking Day following the Banking Day on which such notice is acknowledged by Bank; provided, however, that if such receipt is acknowledged on any day after 12:00 noon, eastern time, the acknowledgement shall be deemed to have occurred on the next Banking Day. Funds are not available if (i) they are not available pursuant to Bank's funds availability policy as set forth in the Account Related Agreements or (ii) in the reasonable determination of Bank, (A) they are subject to hold, dispute or a binding order, judgment, decree or injunction or a garnishment, restraining notice or other legal process directing or prohibiting or otherwise restricting, the disposition of the Funds in the Account or (B) the transfer of such Funds would result in Bank failing to comply with a statute, rule or regulation.

3.      Returned Items. Collateral Agent and Company understand and agree that the face amount ("Returned Item Amount") of each Returned Item (as defined herein) may be paid by Bank debiting the Account to which the Returned Item was originally credited, without prior notice to Collateral Agent or Company. As used in this Agreement, the term "Returned Item" means (i) any item deposited to an Account and returned unpaid or otherwise uncollected, whether for insufficient funds or for any other reason, and without regard to timeliness of the return or the occurrence or timeliness of any drawee's notice of non-payment; (ii) any item subject to, a claim against Bank of breach of transfer or presentment warranty under the Uniform Commercial Code (as adopted in the applicable state), Regulation CC (12 C.F.R. §229), clearing house operating rules or NACHA as in effect from time to time; (iii) any ACH entry credited to the Account and returned unpaid or subject to an adjustment entry under applicable clearing house rules, whether for insufficient funds or for any other reason, and without regard to timeliness of the return or adjustment; (iv) any credit to the Account from a merchant card transaction, against which a contractual demand for chargeback has been made; and (v) any credit to the Account made in error and any other adjustments including those due to encoding errors or other items posted to the account in error.

4.      Settlement Items. Collateral Agent and Company understand and agree that Bank may pay the face amount ("Settlement Item Amount") of each Settlement Item (as defined herein) by debiting the applicable Account, without prior notice to Collateral Agent or Company. As used in this Agreement, the term "Settlement Item" means (i) each check or other payment order drawn on or payable against any controlled disbursement account, a Controlled Balance Account (as defined below)or other deposit account at any time linked to any Account by a controlled balance arrangement (each a "Linked Account"), which Bank takes for deposit or value, cashes or exchanges for a cashier's check or official check in the ordinary course of business prior to the Activation Effective Time, and which is presented for settlement against the Account (after having been presented against the Linked Account) after the Activation Effective Time, (ii) each check or other payment order drawn on or payable against an Account, which, prior to the Activation Effective Time, Bank takes for deposit or value, assures payment pursuant to a banker's acceptance, cashes or exchanges for a cashier's check or official check in the ordinary course of business after Bank's cutoff time for posting, (iii) each ACH credit entry initiated by Bank, as originating depository financial institution, on behalf of Company, as originator, prior to Activation Effective Time, which ACH credit entry settles after Activation Effective Time, and (iv) any other payment order drawn on or payable against an Account, which Bank has paid or funded prior to the Activation Effective Time, and which is first presented for settlement

DACA with Activation 01-08-12v.3
AUS:6851 13.2

against the Account in the ordinary course of business after the Activation Effective Time. Company and Collateral Agent acknowledge and agree that if there are Linked Accounts not subject to this Agreement, that upon commencement of the Activation Effective Time any such Linked Accounts will be de-linked and will no longer transfer balances to or from the Account. "Controlled Balance Account" is a deposit account that is linked to one or more other deposit accounts in order to allow transfers to be made between such accounts on an automated basis, pursuant to the Company's instructions, in order to maintain a specified balance in one or more of the Linked Accounts, including, without limitation, zero balance arrangements where transfers are made to a subaccount from a master account or from a subaccount to a master account at the end of each Banking Day in order to maintain a zero balance in such subaccount at the end of such Banking Day.

5.      Account Related Agreements. This Agreement supplements, rather than replaces, the Account Related Agreements. The Account Related Agreements will continue to apply to the Account and cash management or similar services provided by Bank or any affiliate of Bank in connection with the Account to the extent not directly in conflict with the provisions of this Agreement (provided, however, that in the event of any such conflict, the provisions of this Agreement shall control).

6.      Lockboxes. To the extent that any Funds to be deposited to the Account have been received in one or more post office lockboxes maintained for Company by Bank (each a "Lockbox") and have been or will be processed by Bank for deposit to the Account in accordance with the terms of the applicable Account Related Agreement (the "Remittances"), Company acknowledges that Company has granted to Collateral Agent a security interest in all Remittances. Company agrees that after Bank receives the Activation Notice, Company will not instruct Bank regarding the receipt, processing or deposit of Remittances nor will it attempt to change or redirect the items deposited in the Lockbox. Company and Collateral Agent acknowledge and agree that Bank's operation of each Lockbox, and the receipt, retrieval, processing and deposit of Remittances, will at all times be governed by Bank's Account Related Agreements.

7.      Bank Subordination and Permitted Debits. Bank agrees that, after the Activation Effective Time, Bank shall not offset, charge, deduct, debit or otherwise withdraw funds from the Account, except as permitted by this Section 7, until Bank has been advised in writing by Collateral Agent that this Agreement has been terminated. Collateral Agent shall notify Bank promptly in writing upon payment in full of Company's obligations by means of a Termination Notice (defined below).

Continuing after commencement of the Activation Effective Time, Bank is permitted to debit the Account for:

        (a)    Bank's fees and charges relating to the Account or associated with this Agreement and any other charges, fees, expenses, payments and other amounts for treasury management services or card services provided by Bank to the Company, including, without limitation, funds transfer (origination or receipt), trade, merchant card, lockbox, stop payment, positive pay, automatic investment, imaging, and information services (collectively "Bank Fees");

DACA with Activation 01-08-12v.3
AUS:685113.3

Feb 03 2015 09:58:56 888-294-5650                                        Bank of America          Page 010

(b) any Returned Item Amounts;

(c) any Settlement Item Amounts; and

(d) chargebacks regarding merchant card deposits, merchant card fees and debits related to cash vault coin and currency requests ("Permitted Debits").

Bank's right to debit the Account under this Section 7 shall exist notwithstanding any obligation of the Company or Collateral Agent to reimburse or indemnify Bank.

8.    Company and Collateral Agent Responsibilities.

(a) If the balances in the Account are not sufficient to compensate Bank for any Bank Fees, Company agrees to pay Bank on demand the amount due Bank. If Company fails to so pay Bank and such Bank Fees are incurred on or after the Activation Effective Time, Collateral Agent agrees to pay Bank within five days after Bank's demand to Collateral Agent with respect to such Bank Fees. The failure of Company or Collateral Agent to so pay Bank shall constitute a breach of this Agreement.

(b) If the balances in the Account are not sufficient to compensate Bank for any Returned Item Amounts or Settlement Item Amounts, Company agrees to pay Bank on demand the amount due Bank. If Company fails to so pay Bank and such Returned Item Amounts or Settlement Item Amounts are incurred on or after the Activation Effective Time, Collateral Agent agrees to pay Bank the amount due within five days after Bank's demand to Collateral Agent to pay such amount up to any amount transferred to an account designated by Collateral Agent. The failure by Company or Collateral Agent to so pay Bank shall constitute a breach of this Agreement.

(c) Bank is authorized, without prior notice and without regard to the Activation Notice under this Agreement or any other control agreement with Collateral Agent, from time to time to debit any other account Company may have with Bank for the amount or amounts due Bank under this Agreement or any other Account Related Agreement.

(d) At the request of Bank, Company agrees to provide Bank with monthly unaudited and annual audited financial statements within a reasonable period of time after the end of each month or year-end, as applicable, to Bank's address set forth below.

9.    Bank Statements.   Upon written request by Collateral Agent, in addition to the original Bank statement for the Account provided to Company, Bank will provide Collateral Agent with a duplicate of such statement.

10.   Bank's Responsibility/Limitation of Liability.

(a) Bank will not be liable to Company or Collateral Agent for any expense, claim, loss, damage or cost ("Damages") arising out of or relating to its performance or failure to perform under this Agreement other than those Damages that result solely and directly from Bank's acts or omissions constituting gross negligence or intentional misconduct as determined in a court of competent jurisdiction in a final non-appealable order. Bank's obligations

DACA with Activation 01-08-12v.3
AUS:685113.2

hereunder shall be that of a depository bank, and nothing in this Agreement shall create custodial or bailee obligations.

(b)     Notwithstanding the foregoing, in the event that a court or other trier of fact determines that Bank breached its obligations owing under this Agreement, Company and Collateral Agent agree that the amount that may be awarded, for whatever reason or cause, shall in no event exceed the fee actually paid to Bank for Bank's agreement to provide the services required under this Agreement. In no event will Bank be liable for any special, indirect, exemplary, punitive or consequential damages, including but not limited to lost profits.

(c)     Bank will be excused from any failure to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, acts of terrorism, flood, earthquake or other natural disaster, breakdown of public or private or common carrier communications or transmission facilities, equipment failure, or negligence or default of Company or Collateral Agent or (ii) such failure or delay resulted from Bank's reasonable belief that the action would have violated any of Bank's guidelines or policies, or rule or regulation of any governmental authority.

(d)     Bank shall have no duty to inquire or determine whether Company's obligations to Collateral Agent are in default or whether Collateral Agent is entitled to provide the Activation Notice or any Collateral Agent Instructions to Bank. Bank may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party. Bank may accept, acknowledge or act upon any notice, instructions or other directions hereunder that contain minor mistakes or other irregularities, including notices that fail to attach an accurate copy of this Agreement.

(e)     Notwithstanding any of the other provisions in this Agreement, in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against Company, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against Company, Bank may act as Bank deems reasonably necessary to comply with all applicable provisions of governing statutes and shall not be in violation of this Agreement as a result.

(f)     Bank shall be permitted to comply with any writ, levy, order or other similar judicial or regulatory order or process concerning the Account or any Funds and shall not be in violation of this Agreement for so doing.

11.     Indemnities.

(a)     Company shall indemnify, defend and hold harmless Bank against all liabilities, expense, claim, loss, damage or cost of any nature (including but not limited to allocated costs of in-house legal services and other reasonable attorney's fees) and any other fees and expenses, whether to Bank or to third parties ("Losses") in any way arising out of or relating to this

Agreement, including all costs of settlement of claims. This section does not apply to any Losses solely attributable to gross negligence or intentional misconduct of Bank as determined by a court of competent jurisdiction in a final non-appealable order.

(b)     Collateral Agent shall indemnify, defend and hold harmless Bank against all Losses arising out of or relating to this Agreement after receipt of the Activation Notice from Collateral Agent other than Losses solely attributable to Bank's gross negligence or intentional misconduct as determined by a court of competent jurisdiction in a final non-appealable order.

(c)     Company shall pay to Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for inhouse legal services) incurred by Bank in connection with the enforcement of this Agreement or any related instrument or agreement, including but not limited to any costs, expenses and fees arising out of the resolution of any conflict, dispute, motion regarding entitlement to rights or rights of action, or other action relating to Bank's rights or obligations in a case arising under Title 11, United States Code. Company agrees to pay Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in the preparation and administration of this Agreement or any related instrument or agreement (including any amendments thereto).

(d)     Collateral Agent shall pay to Bank, upon receipt of Bank's invoice, all reasonable costs, expenses and attorneys' fees (including allocated costs for inhouse legal services) incurred by Bank in connection with the enforcement against Collateral Agent of its obligations hereunder.

12.     Termination and Assignment of this Agreement.

(a)     Collateral Agent may terminate this Agreement by providing notice substantially in the form of Exhibit C ("Termination Notice") together with a copy of this Agreement to Company and Bank, provided that Bank shall have a reasonable time to act on such termination. Collateral Agent may assign this Agreement by providing 30 days' prior written notice of such assignment together with a copy of this Agreement to Company and Bank.

(b)     Notwithstanding subsection 12(a), Bank may terminate this Agreement at any time by written notice to Company and Collateral Agent if either Company or Collateral Agent breaches any of the terms of this Agreement, or if Company breaches any other agreement with Bank.

(c)     Sections 8, 10 and 11 shall survive any termination of this Agreement.

13.     Representations and Warranties.

(a)     Each party represents and warrants to the other parties that (i) this Agreement constitutes its duly authorized, legal, valid, binding and enforceable obligation; (ii) the performance of its obligations under this Agreement and the consummation of the transactions contemplated hereunder will not (A) constitute or result in a breach of its certificate or articles of incorporation, by-laws or partnership agreement, as applicable, or the provisions of any material

DACA with Activation 01-C6-12v.3
AUS:685113.2

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

CoinTerra, Inc.
("Company")

By: _____
Name: RAVI IYENGAR
Title: CHIEF EXECUTIVE OFFICER

Address for notices:
CoinTerra, Inc.
11130 Jollyville Rd, Suite 200
Austin, Texas 78759
Attn.: Chief Executive Officer
Email: ravi@cointerra.com


Fortis Advisors LLC
("Collateral Agent")

By: _____
Name: _____
Title: _____

Address for notices:
Fortis Advisors LLC
Attn: Rick Fink
4225 Executive Square, Suite 1040
La Jolla, California 92037
Email: rfink@fortisrep.com
Facsimile: (858) 408-1843


Bank of America, N.A.
("Bank")

By: _____
Name: Jennifer Nieves
Title: Vice President

Address for notices:
Bank of America, N.A.
2001 Clayton Road, Building B
Concord, CA 94520-2425
Attn: Blocked Account Support
Mail Code: CA4-702-02-37
Telephone: 925.681.6165
Facsimile: 877.207.2524


DACA with Activation 01-08-12v.3
AUS:651132

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

CoinTerra, Inc.
("Company")


By: _____
Name: _____
Title: _____

Address for notices:
CoinTerra, Inc.
11130 Jollyville Rd, Suite 100
Austin, Texas  78759
Attn.:  Chief Executive Officer
Email: ravi@cointerra.com


Fortis Advisors LLC
("Collateral Agent")

By: _Richard G. Fink_
Name: _Richard A. Fink_
Title: _Managing Director_

Address for notices:
Fortis Advisors LLC
Attn: Rick Fink
4225 Executive Square, Suite 1040
La Jolla, California 92037
Email: rfink@fortisrep.com
Facsimile: (858) 408-1843


**Bank of America, N.A.**
("Bank")


By: _____
Name: _____
Title: _____

Address for notices:
Bank of America, N.A.
2001 Clayton Road, Building B
Concord, CA 94520-2425
Attn: Blocked Account Support
Mail Code:  CA4-702-02-37
Telephone:  925.681.6165
Facsimile:  877.207.2524


CACA with Activation 01-09-12v.3
AUS:685113.2

**EXHIBIT A**
**DEPOSIT ACCOUNT CONTROL AGREEMENT**

[Letterhead of Collateral Agent]

To:   Bank of America, N.A.
      [Address]

            Re:   CoinTerra, Inc.
                  Account No._____

Ladies and Gentlemen:

        Reference is made to the Deposit Account Control Agreement dated October 15, 2014 (the "Agreement") among CoinTerra, Inc., us and you regarding the above-described account (the "Account"), a copy of which is attached hereto.  In accordance with Section 2 of the Agreement, we hereby give you notice of our exercise of control of the Account and we hereby instruct you to transfer funds to the below account as follows:

Bank Name:
Bank Address:
ABA No.:
Account Name:
Account No.:
Beneficiary's Name:

                                Very truly yours,

                                Fortis Advisors LLC
                                as Collateral Agent

                                By:
                                Name:
                                Title:

                ACKNOWLEDGED AND AGREED:

                BANK OF AMERICA, N.A., as Bank

                                By:
                                Name:
                                Title:

DACA with Activation 01-08-12v.3
AUS:685113.2

**EXHIBIT B**
**DEPOSIT ACCOUNT CONTROL AGREEMENT**

[Letterhead of Collateral Agent]

To:    Bank of America, N.A.
     [Address]

         Re:    CoinTerra, Inc.
               Account No._____

Ladies and Gentlemen:

     Reference is made to the Deposit Account Control Agreement dated October 15, 2014 (the "Agreement") among CoinTerra, Inc., us and you regarding the above-described account (the "Account"). In accordance with Section 2 of the Agreement, we hereby give you notice of our request to change the wire transfer instructions provided to Bank in the Activation Notice, and we hereby instruct you to transfer funds to the below account as follows:

Bank Name:
Bank Address:
ABA No.:
Account Name:
Account No.:
Beneficiary's Name:

                        Very truly yours,

                        Fortis Advisors LLC
                        as Collateral Agent

                        By:
                        Name:
                        Title:

            ACKNOWLEDGED AND AGREED:

            BANK OF AMERICA, N.A., as Bank

                        By:
                        Name:
                        Title:

DACA with Activation 01-08-12v.3
AUS:685113.2

GET / HTTP/1.0

**EXHIBIT C**

**DEPOSIT ACCOUNT CONTROL AGREEMENT**

[Letterhead of Collateral Agent]

_____, 20__
Bank of America, N.A.

_____

Attn: _____

Re:   **Termination of Deposit Account Control Agreement**

**Account(s):** _____

Ladies and Gentlemen:

Reference is made to that certain Deposit Account Control Agreement dated as of _____ October 15, 2014 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Agreement") among you, CoinTerra, Inc. (the "Company"), and us as ('Collateral Agent"), a copy of which is attached hereto.

You are hereby notified that the Agreement is terminated with respect to the undersigned, and you have no further obligations to the undersigned thereunder and Collateral Agent is terminating its security interest in the Account. Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to the Account from the Company.

This notice terminates any obligations you may have to the undersigned with respect to the Account.

Very truly yours,

Fortis Advisors LLC
as Collateral Agent

By:
Name:
Title:

# Exhibit "B"-7

UCC-1 Filing in Delaware

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

CT Lien Solutions
4400 Easton Commons Way
Suite 125
Columbus, OH 43219

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 12:32 PM 08/04/2014*
*INITIAL FILING # 2014 3100245*

*SRV: 141030418*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| CoinTerra, Inc. | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 11130 Jollyville RD, STE 303 | Austin | TX | 78759 | | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Fortis Advisors LLC, Collateral Agent | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 4225 Executive Square, Suite 1040 | La Jolla | CA | 92037 | | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

"Collateral" shall mean and include all right, title, interest, claims and demands of CoinTerra, Inc., a Delaware corporation (together with its successors and permitted assigns, the "Debtor"), in and to each and every asset, tangible and intangible, in which the Debtor has any right, title, interest, claim or demand wherever located and whether now owned or hereafter acquired, including, but not limited to, equipment, accounts, inventory, general intangibles (including all payment intangibles), investment property, letter-of-credit rights, commercial tort claims, fixtures, real and personal property, patents, trademarks, copyrights, trade secrets, confidential information and any other proprietary or intellectual property rights, deposit accounts, cash, contract rights, in each, together with all substitutions, renewals or replacements of and additions, improvements, replacement parts and accumulations to any and all of such assets and all books and records related to any of the foregoing, and to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

| 5. Check only if applicable and check only one box: Collateral is | ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|---|

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
|---|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA:**
Security and Pledge Agreement August 2014

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**